# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUSTIN DUFOE, on Behalf of Himself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>DRAFTKINGS INC., JASON D. ROBINS, JASON K. PARK, and MATTHEW KALISH,<br><br>                              Defendants. | Case No. 1:23-cv-10524<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Justin Dufoe ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against DraftKings Inc. ("Company" or "DraftKings"); Jason D. Robins, DraftKings' Chief Executive Officer and Chairman of the Board of Directors; Jason K. Park, DraftKings' Chief Financial Officer; and Matthew Kalish, President of DraftKings North America, based upon, *inter alia*, the investigation conducted by and under the supervision of Plaintiff's counsel, which included a review of the Company's public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, wires and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and readily obtainable information. Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company, Jason D. Robins, Jason K. Park, and Matthew Kalish. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired DraftKings' non-fungible tokens ("NFTs") between August 11, 2021 and the present (the "Class Period").[1] The NFTs constitute unregistered securities, and Defendants are operating an unregistered securities exchange.

2.      Plaintiff seeks recission and damages caused by Defendants' violation of the federal securities laws under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933 (the "Securities Act"), Sections 5, 15(a)(1), and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Mass. Gen. Laws. Ch. 110A §§ 201 and 301(a).

3.      DraftKings is a Nevada corporation with its principal place of business at 222 Berkeley Street, 5th Floor, Boston, MA 02116. DraftKings is a digital sports entertainment and gaming company. The Company provides users with daily fantasy sports, sports betting ("Sportsbook"), online casino opportunities, NFT sales and trading on its private and exclusively controlled DraftKings Marketplace ("DK Marketplace"), and other online consumer product offerings.

4.      NFTs are a form of digital assets that can be bought, sold, and exchanged on proprietary trading platforms. In this case, Plaintiff and the Class bought DraftKing's NFTs in DraftKing's initial public offerings (called "drops") of the NFTs, with the expectation that the DraftKing's NFT platform would allow them to realize profits on their NFTs. The profits would come from the efforts of DraftKings to promote and operate the NFT platform. The profits would be realized when Plaintiffs and the Class would sell their NFTs on the secondary market platform that DraftKings solely owned and managed, with DraftKings receiving exchange-like fees and

---

[1] As defined *infra*, the Class consists of Plaintiff and all individuals, except Defendants and their affiliates, who purchased or otherwise acquired DraftKings NFTs during the Class Period and were damaged thereby.

commissions from the purchases and sales on its secondary market platform. Thus, Plaintiff and the Class were entirely dependent on the managerial efforts of DraftKings, both when they initially purchased the NFTs and when they later sold them on the DraftKings' controlled secondary market.

5.      Defendants had actual knowledge of facts indicating that the NFTs they promoted and sold were "securities" under federal and state securities laws and further that they had failed to register their NFTs as securities. Defendants reaped, or will reap, hundreds of millions of dollars in profits from their unregistered securities sales.

6.      During the Class Period, DraftKings and the Individual Defendants, as defined below, failed to register the DraftKings NFTs as securities with the SEC.

7.      In addition, Individual Defendants Jason D. Robins, Jason K. Park, and Matthew Kalish had control of DraftKings and used that control to avoid scrutiny and facilitate this scheme.

8.      Plaintiff brings this class action on behalf of an objectively identifiable Class consisting of all investors that purchased DraftKings between August 11, 2021 and the present. Due to the Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to evaluate the risks associated with their investment in DraftKings NFTs and were denied the information that would have been contained in the materials required for the registration of the DraftKings NFTs—have suffered significant damages.

## II.    PARTIES

9.      Plaintiff is a resident and citizen of the State of Illinois. As set forth in the attached Certification, incorporated by reference herein, Plaintiff acquired DraftKings NFTs during the Class Period and was damaged by the federal securities law violations alleged herein. Plaintiff

purchased $72,263.21 of DraftKings NFTs on DK Marketplace, using United States Dollars to make the purchase, as indicated on **Exhibit 1**. Plaintiff sold certain NFTs at a loss on the DraftKings' secondary market exchange, also as indicated on **Exhibit 1**. Plaintiff currently holds certain NFTs, which have declined in value. Plaintiff's current losses exceed $14,000. At all times, Plaintiff was entirely dependent on DraftKings' managerial efforts when purchasing and selling the NFTs.

10.    Defendant DraftKings is a Nevada corporation with its principal place of business at 222 Berkeley Street, 5th Floor, Boston, Massachusetts 02116. It trades on the NASDAQ Capital Markets under the ticker, "DKNG." DraftKings is a digital sports entertainment and gaming company. More importantly, it owns and operates DK Marketplace, an online platform where individuals can purchase and sell DraftKings NFTs.

11.    Defendant Jason D. Robins ("Robins") is the Chief Executive Officer, Chairman of the Board of Directors, and a co-founder of the Company. Robins exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of DraftKings NFTs to the public.

12.    Defendant Jason K. Park ("Park") is the Chief Financial Officer of the Company. Park exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of DraftKings NFTs to the public.

13.    Defendant Matthew Kalish ("Kalish" and collectively with Robins and Park, the "Individual Defendants") is the President of DraftKings North America. Kalish exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of DraftKings NFTs to the public.

### III.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 5, 12(a)(1), and 15 of the Securities Act (15 U.S.C. §§ 77e, 77*l*(a), 77o), Sections 5, 15(a)(1), and 29(b) of the Exchange Act (15 U.S.C. §§ 78e, 78o, 78cc), and Sections 201 and 301(a) of the Massachusetts General Laws (Mass. Gen. Laws. Ch. 110A §§ 201 and 301(a)).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), as Defendant DraftKings' headquarters are located in this Judicial District. Substantial acts by the Individual Defendants in furtherance of the claims have occurred in this Judicial District.

17.     In connection with the acts alleged in this Complaint, DraftKings, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

### IV.     FACTUAL ALLEGATIONS

<u>**Background**</u>

*Non-Fungible Tokens ("NFTs") Generally*

18.     NFTs are assets. The ownership, purchases and sales of NFTs are reflected in a "blockchain." A blockchain is a form of technology that allows participants in the NFTs to store information in a public and readily available manner. The blockchain is programmed to collect information together in groups, known as blocks, that hold sets of information. Once filled, these blocks are closed, timestamped, and linked to a previously filled block. Blockchains typically distribute this database, or ledger, among nodes of a computer network to maintain a secure and decentralized record of transactions. This real-time ledger is public and available for viewing by

any individual with internet access.

19.     NFTs are a digital certificate of ownership built on blockchain technology and available on the public ledger. Although the underlying asset may differ, NFTs provide both the owners and potential buyers assurances that they own the NFT by logging crucial details such as the asset, the quantity, and some information related to the creator. Typically, an NFT blockchain is decentralized in that it is located across a wide computer network of all participants in the NFT. This creation of an NFT is referred to as "minting the NFT." The process of selling "minted NFTs" is called a "drop."

20.     As explained below, although described as "NFTs," the securities offered and sold by DraftKings bore none of the hallmarks of a community-organized and managed decentralized ledger and instead reflected a completely centralized primary and secondary marketplace for securities.

***DraftKings Financial Performance And Efforts To Raise Money To Develop And Grow Its Platform***

21.     DraftKings is not a profitable business. DraftKings raised $1.5 billion through its sale of common stock in Q2 2020, $790.4 million through sale of common stock in Q4 2020, and $1.2 billion in convertible debt in Q1 2021.

22.     On information and belief, DraftKings lost $1.232 billion in 2020, $1.523 billion in 2021 and $1.135 billion in 2022. On information and belief, DraftKings burns its cash at approximately $500 million per year.

23.     DraftKings expected to generate $70 million from DK Marketplace in fiscal year 2022. On information and belief, DraftKings is using these funds to develop DraftKings' NFT platforms and the DK Marketplace, which is the only secondary market to sell DraftKings NFTs

and which is wholly owned and controlled by DraftKings.

24.     As described in more detail below, DraftKings has failed to develop and grow the NFT platform and DK Marketplace, but continues to sell drops of NFTs and pools the funds received from their sales to fund their development and growth. In turn, such reinvestment by DraftKings increased the value of the DraftKings NFTs and DK Marketplace.

### *DraftKings NFTs*

25.     On July 21, 2021, DraftKings announced its plan to launch DK Marketplace, a platform offering curated NFT drops for US dollar purchase and support for a secondary market transaction. The purpose of the DK Marketplace is to provide a platform to sell DraftKings NFTS.

26.     The NFTs were at all material times subject to an offering document entitled, "Important Legal Notice Regarding DraftKings Marketplace Terms of Use," updated on August 26, 2022 (herein referred to as the "Legal Notice"), which is attached as **Exhibit 3** and incorporated by reference herein.

27.     DraftKings defined the NFTs as "a non-fungible token with a unique token identification implemented on a blockchain using smart contracts, such as, by way of example but not limitation, a non-fungible token conforming to the ERC-721 standard on the Ethereum blockchain network." Legal Notice.

28.     DraftKings distinguished the NFT from the content (*e.g.*, player name or image) and intellectual property rights associated with the player name or image: "The NFT is separate and distinct from the Content or any Intellectual Property Rights with which it may be linked or associated." Legal Notice.

29.     The NFT purportedly conveys only the right, revocable by DraftKings at any time, to view the NFT: "Subject to the terms and conditions of these DK Marketplace [Legal Notice],

DraftKings, for itself and on behalf of its licensors, grants you a limited, non-exclusive, non-transferable (except pursuant to a Secondary Sale in accordance with these DK Marketplace [Legal Notice]), revocable, non-sublicensable license to the Intellectual Property Rights practiced by, incorporated, or embedded in your purchased DraftKings NFT solely for purposes of you using, accessing, and/or holding such purchased DraftKings NFT, including viewing the Content associated with such purchased DraftKings NFT (the foregoing license in this subsection 'NFT License and Intellectual Property', the 'NFT License')." Legal Notice. In short, ownership of a DraftKings NFT is limited only to the NFT itself (which may be subsequently revoked by DraftKings in its sole discretion) and the owner does not acquire any additional rights, including artwork or intellectual property.

30.     In its Legal Notice, DraftKings purports to convey some type of artistic or collectible asset, but the conveyance is revocable by DraftKings and non-transferable by the investor:

> DraftKings and its licensors reserve all rights in all Content and Intellectual Property Rights not expressly granted pursuant to the NFT License. Notwithstanding anything to the contrary, any sale, purchase, or other transfer of DraftKings NFTs (whether through a DraftKings NFT Primary Sale, DraftKings NFT Secondary Sale, Secondary Sale, or otherwise) shall not be a sale, purchase, or transfer of any rights, title or interest to Content or Intellectual Property Rights associated with any DraftKings NFTs, which such rights, title, and interest shall remain solely and entirely with DraftKings or its licensors, subject to the NFT License.

Legal Notice.

31.     DraftKings purports to disclaim that the NFTs are currencies or securities: "An NFT is not a medium of exchange or convertible virtual currency and does not grant the owner any rights associated with owning a security." Legal Notice. Later in the Legal Notice, DraftKings prohibits investors from "taking any action in connection with a DraftKings NFT that has the effect of resulting, or is intended to result, in the treatment of a DraftKings NFT as a security by any

governmental, administrative, or adjudicatory body (e.g., the U.S. Securities and Exchange Commission)."

32.     The Legal Notice places the following restrictions on transfer of DraftKings NFTs out of the DK Marketplace:

> DraftKings may permit you to transfer eligible Marketplace NFTs from your DraftKings Account to your Self-Custodial Wallet. **You acknowledge and agree that DraftKings has sole discretion to determine which Marketplace NFTs are eligible to be transferred to your Self-Custodial Wallet and to prohibit, for any reason, in DraftKings' sole discretion, any transfers of any Marketplace NFTs from the DK Marketplace to any Self-Custodial Wallet.** In the event DraftKings determines, in its sole discretion, that removal of a Marketplace NFT from the DK Marketplace is permissible, DraftKings may require you (as the transferor) to agree to additional terms and conditions with respect to such removed NFT, including terms relating to a smart contract that will pay to DraftKings and/or its designees any fees associated with further sales or transfers of such NFT that occur outside the DK Marketplace.
>
> **In the event a Marketplace NFT is removed from the DK Marketplace in violation of these Terms, any license associated with such NFT** (including, in the case of DraftKings NFTs, the associated NFT License) **will automatically terminate** (in addition to any other remedies DraftKings may have). You should refer to your DraftKings Account to determine whether the Marketplace NFT you own is eligible to be transferred to your Self-Custodial Wallet.

(Emphasis added). Given that transfer to a self-custodial wallet is typically the first step to transferring (and selling) on a different platform, DraftKings controlled the platform on which DraftKings NFTs could be sold. Thus, the Legal Notice prohibits selling or disposing of NFTs, other than through the DK Marketplace or explicit permission from DraftKings.

33.     The Legal Notice restricted the use of NFTs for any profit-making purposes:

You shall not, and shall not permit, encourage, or enable anyone to:

- license, sublicense, sell, resell, transfer assign, distribute, modify, create derivatives of, or otherwise exploit or make available to any third party, or use for any third party's benefit, or use for your commercial benefit, any DraftKings NFT (except to the extent Secondary Sales of DraftKings NFTs are permitted pursuant to these DK Marketplace [Legal Notice]) or any Content or Intellectual Property Rights associated with any DraftKings NFT . . .

34.     In a Legal Notice section titled "Reversionary Interest," DraftKings states:

Notwithstanding anything to the contrary: (a) each DraftKings NFT Primary Sale or DraftKings NFT Secondary Sale to you is conditioned upon your compliance with the terms and conditions of these DK Marketplace [Legal Notice]; (b) **in the event DraftKings determines that you have breached any of the terms or conditions** of these DK Marketplace [Legal Notice], **the DraftKings NFT(s) purchased by you will revert to DraftKings, such DraftKings NFT(s) will be removed from your DraftKings Account, and the NFT License associated with such DraftKings NFT(s) will automatically terminate**; and (c) **you acknowledge and agree that DraftKings retains and shall retain a right and interest in each DraftKings NFT** sold to enable DraftKings to do all of the foregoing (such right and interest, a "Reversionary Interest").

(Emphasis added).

35.    DraftKings intentionally established initial or primary market for its NFT securities, as well as a secondary market (or exchange) for its NFT securities and ensured that it would receive the initial investment dollars as well as traditional brokerage- and exchange-like fees for secondary market sales. Its doing so is clearly memorialized in its "Legal Notice" to investors:

The DraftKings Marketplace facilitates Primary Sales and Secondary Sales of Marketplace NFTs. Except for DraftKings NFTs sold in a DraftKings NFT Primary Sale, DraftKings does not own and is not selling for its own account any Marketplace NFTs available for sale on the DraftKings Marketplace, nor does it set the value of any Marketplace NFT (including, without limitation DraftKings NFTs) on any Secondary Sale. The Primary Sale of Marketplace NFTs, except for DraftKings NFTs, may be subject to terms directly between you and the seller of the Marketplace NFT, including through a link to terms and conditions in the "Review purchase" window of the purchase process of a Marketplace NFT. A Secondary Sale of a Marketplace NFT, including, for clarity, a DraftKings NFT, is solely between the buyer and seller of such Marketplace NFT, and DraftKings is not a party to any agreement between the buyer or seller related to the Secondary Sale of a Marketplace NFT. . . .

\* \* \*

DraftKings receives a service fee from the total purchase price of all Primary Sales of Marketplace NFTs on the DraftKings Marketplace. In addition, DraftKings receives all revenue from DraftKings NFT Primary Sales.

*See* Legal Notice.

36.    In its Legal Notice, DraftKings purports to disclaim that, "The value of each

Marketplace NFT, like other collectibles, is inherently subjective and may be based on a variety of factors unique to that NFT and to interested buyers, based on the different characteristics of the Marketplace NFT." *Id.* In reality, however, the value of each Marketplace NFT is dependent entirely on the successful managerial efforts of DraftKings, much like different classes of securities with different payouts, voting rights, maturities, etc., all depend on the managerial efforts of the corporation that issued them. Indeed, DraftKings NFTs are dependent upon the success of DraftKings because it controls the DK Marketplace. If DraftKings or DK Marketplace cease to exist, the Marketplace NFTs will be worthless.

37.    The Legal Notice further states:

"DraftKings NFT Fees" means (a) any fees payable to DraftKings, DraftKings' licensors, or their respective designees in connection with the sale of a DraftKings NFT, whether in a DraftKings NFT Primary Sale or a DraftKings NFT Secondary Sale and (b) any transaction fees, service fees, marketplace fees, payment processing fees, gas fees, network fees, or other fees charged by DraftKings or its service providers to facilitate a DraftKings NFT Primary Sale or a DraftKings NFT Secondary Sale.

"DraftKings NFT Primary Sale" means the initial purchase of a DraftKings NFT that is sold by DraftKings to an initial purchaser on the DraftKings Marketplace.

"DraftKings NFT Purchase Price" means the price at which the DraftKings NFT is sold at, whether in a DraftKings NFT Primary Sale or a DraftKings NFT Secondary Sale.

"DraftKings NFT Secondary Sale" means any sale of a DraftKings NFT on the DraftKings Marketplace subsequent to the DraftKings NFT Primary Sale of such DraftKings NFT.

* * *

"Primary Sale" means the initial sale of a Marketplace NFT to a purchaser on the DraftKings Marketplace.

"Secondary Sale" means a purchase and sale of Marketplace NFTs subsequent to the Primary Sale.

*See* Legal Notice.

38.     In an analyst call on August 6, 2021, Defendant Robins noted that the NFTs offered a "logical cross-sell opportunity with our existing customers," which would "enhance customer stickiness in LTV ["Lifetime Value"], as well as the potential for new customer acquisition to affiliate[e] with these iconic athletes fanbase." Robins noted that "[i]t [] has very attractive economics given the large potential revenue opportunity based on transaction fees, modest initial investment and excellent EBITDA margins."

39.     The phrase, "large potential revenue," opportunity appears to be a reference to the U.S. dollars that investors would pay to the promoter, DraftKings, when purchasing DraftKings NFTs in initial public offerings. The phrases "large potential revenue" and "transaction fees" appear to be a reference to the exchange fees that DraftKings would charge for sales on its secondary marketplace. The "modest initial investment" appears to be a reference to the expenses associated with developing DraftKings' NFT marketplace, which was largely underdeveloped and which would depend on investors in NFTs supplying DraftKings with U.S. dollars to facilitate further development.

40.     DraftKings released its first NFTs on August 11, 2021. The NFTs featured Tom Brady and, upon information and belief, sold from $12 to $1,500 per NFT.

41.     The NFT of Tom Brady, and all subsequent DraftKings NFTs, were released on the Polygon blockchain, a blockchain built on top of Ethereum that provides developers the ability to create NFTs. A CoinDesk article dated October 18, 2021 noted that the DraftKings-Polygon partnership "could make it one of the blockchain's largest governors."

42.     On February 18, 2022, Defendant Robins stated that the Company intended to launch "gamified NFT collections that we anticipate debuting on DK Marketplace during the 2022-2023 NFL season. The agreement branched [out] DraftKings licensing rights for active NFL

players, including the authentic use of name, image and likeness. Initial anticipated features of DraftKings' gamified NFL player NFTs include the ability for customers to use these collectibles within games against each other on the platform as well as separate buying and selling functionality." Upon information and belief, the Company expected approximately $70 million in revenue in 2022 from DK Marketplace.

43.     The gamification, however, was underdeveloped. In reality, the NFT drops were designed to secure or replace funds that DraftKings needed to develop its NFT platform and potentially for other operations unrelated to its NFTs.

44.     The aforementioned gamified version of DraftKings NFTs arrived on May 17, 2022 as "Reignmakers contests." These "gamified" DraftKings NFTs were NFTs of current NFL players in five different rarities: core/common, rare, elite, legendary, and Reignmakers. As the rarity increased, the number of minted NFTs decreased and the price increased. Every NFL player had a common NFT, but the higher tier rarities were limited to "superstars," *i.e.*, NFL players who were considered star players on their team. To participate in Reignmakers contests, investors could either purchase packs of different rarities on DK Marketplace, participate in auctions organized by DraftKings on DK Marketplace, or purchase cards on the secondary market on DK Marketplace.

45.     Regardless of the supposed classification and "rarity" of DraftKings NFTs, investors were entirely dependent on DraftKings' managerial efforts to realize any profits or avoid losses from their investment in the NFTs. Just as investors of traditional securities such as common stock, preferred stock, bonds and warrants that have different features and profit opportunities are still equally dependent on the managerial efforts of the company, here the investors of DraftKings' NFTs nominally associated with different players were entirely dependent on DraftKings' managerial efforts.

46.     DraftKings also sold these NFTs in "packs." Supplies of packs are limited and not everyone who queues to purchase a pack during a drop may successfully acquire the pack they want or any pack at all. In addition, the NFT packs are random and purchasers do not know which players they will receive when they buy a pack. All that is guaranteed is that certain packs will contain a certain number of players with varying levels of scarcity.

47.     Packs had five rarities: core/common, rare, elite, legendary, and Reignmakers. Each pack had exactly five NFTs, with a certain percentage of receiving higher rarity cards. For example, the 2022 Momentum CORE Pack, sold by DraftKings for $29.99, included five NFTs, with four core NFT, an 89.9% chance for a rare NFT, and a 10.1% chance for an elite NFT. The 2022 Momentum Rare Pack sold for $59.99 and guaranteed four core NFTs, a 62.1% chance for a rare NFT, a 34.3% chance for an elite NFT, a 3.3% chance for a legendary NFT, and a 0.3% chance for a Reignmakers NFT. Skipping forward, the 2022 Momentum Legendary Pack, which sold for $1,199.99, guarantees two rare NFTs, two elite NFTs, a 90% chance for a legendary NFT, and 10% chance for a Reignmakers NFT. Finally, the 2022 Momentum Reignmakers Pack sold for $6,000 and guarantees four legendary NFTs and one Reignmakers NFT.

48.     The first NFL "pack", the Genesis series, initially sold for $19.99 to $1,499.99 per pack, with 1,116 packs for sale for the legendary rarity and 13,778 for the core rarity. The Elevate series initially sold for $39.99 to $29,999.99 per pack, with 20 packs for sale for the Reignmakers rarity and 27,970 for the core rarity. The Momentum series initially sold for $49.99 to $9,999.99 per pack, with 162 packs for sale for the Reignmaker rarity and 91,208 for the core rarity. Separately, DraftKings also had 200,560 booster "packs" for sale for $19.99 per pack and 1,000,025 SuperStar "packs" for sale for $9.99. **Exhibit 2** describes the price and quantity for each series of NFT packs sold in drops during the 2022-2023 season. Upon information and belief,

DraftKings sold many more NFTs in DraftKings NFT Primary Sales through auctions, the details of which are entirely in Defendants' control. As such, Exhibit 2 is not an exhaustive list of all DraftKings NFT Sales that Defendants have conducted.

49.     The "packs" were nothing more than a bundle of unregistered securities.

50.     Individuals could either purchase these packs in initial drops on DK Marketplace (referred to in the Legal Notice as "DraftKings NFT Primary Sales") or purchase resold packs from other individuals (which falls under the Legal Notice's definition of "DraftKings NFT Secondary Sale").

51.     DraftKings receives all revenue from any DraftKings NFT Primary Sale. Similarly, DraftKings receives at least 5% in fees from a DraftKings NFT Secondary Sale, including "(a) any fees payable to DraftKings, DraftKings' licensors, or their respective designees in connection with the sale of a DraftKings NFT, whether in a DraftKings NFT Primary Sale or a DraftKings NFT Secondary Sale and (b) any transaction fees, service fees, marketplace fees, payment processing fees, gas fees, network fees, or other fees charged by DraftKings or its service providers to facilitate a DraftKings NFT Primary Sale or a DraftKings NFT Secondary Sale" ("DraftKings Fees").

52.     DraftKings NFT investors were purportedly able to participate in "Reignmakers" contests based on NFL matches played that week and on rarities of the cards they hold. These Reignmakers contests would have prize pots, ranging from a $10,000 core contest prize pot for the top 100 contestants to a $125,000 Reignmakers contest prize pot for the top 44 contestants. The prize pots also included NFTs as prizes or even vouchers to participate in other DraftKings services (*e.g.*, Sportsbook). For example, a rare contest between the New England Patriots (the "Pats") and the Buffalo Bills (the "Bills") would require contestants to have at least one rare NFT in their

"lineup." Thus, to compete for the Pats, a contestant would need five NFTs of unique players on the New England Patriots AND have at least one rare NFT of one of those players. However, as the rarity (and prize pot) went up, the entry requirements also went up. For example, a $125,000 Reignmakers contest required contestants to have two Reignmakers NFTs and three legendary NFTs in their lineup. Regardless of the contest, DraftKings receives a certain percentage of the prize pool for hosting the contest.

53.     In general, purchasing a single pack would not allow an individual to participate in a contest, given the 1,696 players (and thus minimum 1,696 player NFTs) in the NFL.[2] As such, individuals would need to purchase cards on the secondary market to round out a team, creating additional money inflow into DK Marketplace. DraftKings receives at least 5% in DraftKings Fees on DraftKings NFT Secondary Sales.

54.     Alternately, individuals could participate in an NFT auction for an NFT of their preferred rarity. Such auctions are generally done in a candle-style English auction for rarer NFTs (*i.e.*, Reignmakers NFTs). DraftKings receives all revenue from DraftKings NFT Primary Sales.

55.     On March 3, 2023, DraftKings sent out an e-mail to all users of DK Marketplace notifying them that the Legal Notice had been updated.[3] The e-mail outlined changes that indicate the level of control DraftKings has on DK Marketplace, including "lowering the minimum sale price for a [DraftKings NFT] Secondary Sale to twenty cents ($.20)" and "reserving the right to modify, delete, and/or replace the Content linked to, or associated with, your DraftKings NFT at any time with or without notice, as follows: (i) adding or removing third party brand names, logos,

---

[2] To obtain five unique members of the same team from one common "pack", the probability is 0.00001%.

[3]   A copy of the March 3, 2023 notice is available  at: https://myaccount.draftkings.com/documents/us-mkt-terms-of-use#:~:text=Content%20on%20the%20DraftKings%20Marketplace,written%20consent%20of%20the%20respective (last visited March 8, 2023).

or other intellectual property; (ii) updating sports statistics; (iii) changing designations associated with the DraftKings NFT gameplay (e.g. a "Superstar" designation for Reignmakers Football); (iv) modifications at the request or demand of a third party; or (v) correcting any errors in the Content." Furthermore, investors, including Plaintiff, could not access their DraftKings NFTs unless and until they agreed to the updated Legal Notice, giving them no choice but to accept a lower price floor for their investments and DraftKings' right to alter their DraftKings NFTs without notice.



56.     Notably, the ability of investors to participate (much less succeed) in these contests was entirely dependent upon the managerial efforts of DraftKings. Investors could not acquire packs or specific NFTs outside the DraftKings marketplaces (initial or secondary).

57.     Moreover, the purported "functionality" of the NFTs for purposes of contests was *de minimis*. The overwhelming majority of contests were won by a curiously select and limited number of NFT holders. The remaining and overwhelming majority investors received no money

from these contests. The Reignmakers contests were pretense for investors to purchase more NFTs.

### *DraftKings Controlled the Centralized Ledger*

58.     The DraftKings NFTs were not "decentralized" like other NFTs which may not be securities. Instead, they were highly centralized. DraftKings controlled every aspect of the NFTs, as well as the ledger. Investors were required to "acknowledge and agree that DraftKings has the right to record ownership of any Marketplace NFT on a DraftKings internal ledger and reflect such ownership in [the investor's] DraftKings Account." Legal Notice. DraftKings also retained sole discretion to allow transfers to self-custodial wallets, but even then retained authority to "continue to record future transfers of [the investor's] Marketplace NFT on its internal ledger."

59.     Per the Legal Notice, investors were required to establish a DraftKings "account." All DraftKings NFTs were bought, sold and held on or via the account. Other NFTs could not be maintained on the account. DraftKings had "sole discretion" to determine whether investors could hold its NFTs on their own personal, custodial wallet. *See* Legal Notice.

60.     DraftKings also retained 100% control of the secondary market. "Not all Marketplace NFTs are eligible for Secondary Sales on the DraftKings Marketplace, and you acknowledge and agree that DraftKings has sole discretion to determine which Marketplace NFTs are eligible to be listed for and bought and sold through Secondary Sales on the DraftKings Marketplace." Legal Notice. Even assuming an investor was permitted to sell a DraftKings NFT outside the DraftKings Secondary Sales Marketplace, DraftKings reserved the right to "collect from the purchaser a percentage of the gross transaction price of such Secondary Sale." Legal Notice.

### *The DraftKings NFTs Have No Utility*

61.     DraftKings, in carefully crafted language, reserved the right, but did not obligate itself, to offer "utility features" and "promotions" in connection with the NFTs.

62.     DraftKings merely offered that, "Owners of *certain* [emphasis added] Marketplace NFTs are eligible to receive utility features associated with such Marketplace NFTs," but "to have access to these utility features," they must "hold the Marketplace NFT in [their] DraftKings Account and meet all applicable terms, conditions, and eligibility requirements associated with the utility." Legal Notice. Thus, unlike a digital asset that operates as a currency that the owner can use anywhere that accepts the currency, here the investor could only use DraftKings NFTs on the DraftKings platform as DraftKings itself determined in its sole discretion.

63.     DraftKings made non-binding promises regarding other utility: "[f]rom time to time, DraftKings *may* [emphasis added] announce promotional giveaways, sweepstakes, contests, and other offers [] for DraftKings Marketplace fans." Legal Notice. None of this, however, obligated DraftKings to offer any, much less, a certain amount of money to DraftKings NFT investors via contests and the like.

64.     DraftKings also reserved the right to shut down the NFT platform: "In addition to any other legal or equitable remedy, DraftKings may, without prior notice, immediately revoke any or all of your rights granted hereunder, with or without cause. In such event, you will immediately cease all access to and use of the DraftKings marketplace." Legal Notice.

### *The DraftKings NFTs Are Not "Artwork"*

65.     The DraftKings NFTs are not visual artwork.

66.     As explained above, DraftKings expressly disclaims any conveyance of intellectual property rights, other than the right of the investor to view the content associated with the NFT,

which right is revocable by DraftKings at any time.

67.     The rights associated with the NFTs are of little or no value. The analogy to art would be akin to a photographer (or subject of a photo) selling a right to view a photo in a building that the photographer (or subject) owns and controls, for as long as the photographer (or subject) allows it.

### The DraftKings NFTs Are Not "Collectibles"

68.     The DraftKings NFTs are not "collectibles," like baseball cards. Baseball cards exist in a "decentralized" environment. Buyers own them outright and can trade them when and where they choose, and the original seller does not get a commission on such sales. Indeed, if Upper Deck or Topps, two longtime producers of physical sports trading cards, were to go out of business, the value of the cards they sold would be wholly unaffected, and may even increase, much like posthumously discovered art.

69.     Here, by contrast, DraftKings holds a revocable interest in the NFTs, they may only be sold or transferred via the DraftKings Marketplace for as long as it exists, and all sales must include a commission paid to DraftKings. If DraftKings or the DK Marketplace cease to exist then the NFTs are worthless.

### The DraftKings NFTs are Securities

70.     At the most basic level, a security is a financial asset or instrument that has value and can be bought, sold, or traded. Some of the most common examples of securities include stocks, bonds, options, mutual funds, and ETFs. Securities are interests representing rights in something else of value. Securities "differ significantly from other things that are traded in commerce to the extent that [they] are intangible and are neither produced nor consumed."

71.     The Securities Act controls the registration and sale of securities. The Exchange Act of 1934 (the "Exchange Act") controls trading of those securities after issue. Both are governed

by the SEC.

72.    Under the Exchange Act, a "security" has an exceptionally broad definition, encompassing the instruments detailed above, and more. Notably, under Section 2(a)(1) of the Exchange Act, an "investment contract" is considered a security, 15 U.S.C.A. § 77b(a)(1).

73.    The Supreme Court has adopted a test to determine if an instrument is an investment contract and likewise a security in *SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946). Under *Howey*, investment contracts are defined as "a contract transaction or scheme whereby a person invests [their] money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by normal interests in the physical assets employed in the enterprise." *Id.* at 298–299.

74.    DraftKings NFTs are securities because they constitute investment contracts under the definition set out in *Howey*. DraftKings NFTs are an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. Further, the circumstances surrounding the creation of DraftKings NFTs and the manner in which they are offered, sold, and/or resold to investors are what makes them securities under the law.

75.    The SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," (the "Framework") in April 2019, providing "a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of digital assets are securities transactions." DraftKings NFTs are securities under the SEC's Framework.

76.    The Framework explains the basics of the Howey test:

The U.S. Supreme Court's Howey case and subsequent case law have found that an "investment contract" exists where there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "Howey test" applies to any contract, scheme, or transaction, regardless of

whether it has any of the characteristics of typical securities. The focus of the Howey analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary marker sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

77.     Investors who bought DraftKings NFTs invested money or other valuable consideration in a common enterprise—DK Marketplace, DraftKings Reignmaker, and, by extension, DraftKings itself. Investors invest because they have a reasonable expectation of profit, and such profit is derived from DraftKings' managerial efforts to promote and market their platforms and thus maintain investor profits.

78.     Furthermore, DraftKings NFTs are securities because they are crypto assets, alienable instantaneously, hyped up as investments, issued and maintained by DraftKings and sold on the secondary marketplace that DraftKings controls, promotes, supports and continues to make profits from. Moreover, not only does DraftKings retain an interest in the price of DraftKings NFTs and the underlying asset rights, but the overall price is dependent on DraftKings' efforts and ability to succeed in stimulating demand, to convince creators to offer digital work on DK Marketplace, to establish and produce network effects on the DK Marketplace, and to grow its platform.

### DraftKings NFT Purchasers Invested Money

79.     Investors purchasing DraftKings NFTs made an investment of money or other valuable consideration for the purposes of the Howey test. As the SEC states in its Framework: "The first prong of the Howey test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

80.     Individuals can only purchase DraftKings NFTs with United States Dollars and

receive a DraftKings NFT in return. This clearly satisfies the "investment of money" portion of the Howey test.

### *DraftKings NFT Investors Participated in a Common Enterprise*

81.     The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

82.     Defendants supported and endorsed DK Marketplace, thereby, individually and together, constituting a common enterprise to which the fortunes of digital asset purchasers are linked to each other and to the success of the Defendant promoter's efforts, and which are subject to network effects caused and expanded by the efforts and promotion of Defendants.

83.     Investors who buy DraftKings NFTs are passive participants in the enterprise, with the profits of each investor deeply intertwined with the fate of DK Marketplace. Unlike Bitcoin, which is decentralized, here Defendants control the enterprise, sharing in both profits and risks by marketing and maintaining the exchange in hopes of maximizing both investor and their own owner profits. After investors purchase DraftKings NFTs, the investor is entirely reliant on the DK Marketplace to make a profit through its marketing and promotion efforts to find a purchase in either the primary or secondary markets, but also to get one's funds and assets out. Without DK Marketplace, the DraftKings NFTs are essentially worthless. Accordingly, investors in DraftKings NFTs participate in a common enterprise in which their digital asset fortunes are linked to each other and to the success of the Defendant promoter's efforts.

84.     The test for establishing the existence of Common Enterprises has two facets. A plaintiff must either show horizontal commonality or strict vertical commonality—both facets are present here.

85.     Here, Plaintiff can establish strict vertical commonality because DraftKings shares in between 5 and 15% of the proceeds for the sale of DraftKings NFTs on its primary and secondary markets. Not only does DraftKings share in proceeds, but an investor's success is entirely dependent on DraftKings's continued maintenance and promotion of DK Marketplace.

86.     Alternatively, Plaintiff can establish a Common Enterprise through horizontal commonality. Specifically, "[i]n an enterprise marked by horizontal commonality, 'the fortunes of each investor in a pool of investors' are tied to one another and to the 'success of the overall venture.'"[4] DraftKings clearly represents in its Legal Notice that DraftKings receives all proceeds from the initial sales on the DraftKings website (*i.e.*, DraftKings NFT Primary Sales) and collects DraftKings Fees on all DraftKings NFT Secondary Sales. This pooling of assets demonstrates the common enterprise in which all investors contribute. As a result, the proceeds of investor's purchases in DraftKings NFTs are pooled together by DraftKings, which in turn, works to stir up interest in the marketplace for DraftKings NFTs by using the pooled money in advertisements and the Reignmaker contests, which have network effects further driving interest, traffic, and money to the DK Marketplace. Thus, the value of existing DraftKings NFTs increases as more investors purchase DraftKings NFTs, transact on DK Marketplace, and participate in Reignmaker contests. Without continued traffic in the primary and secondary marketplace and interest and faith in the DK Marketplace, the investments necessarily fail.

87.     Courts have found that when a promoter sells crypto assets to investors and uses the proceeds to strengthen its ecosystem—which in turn supports the value of the crypto asset—horizontal commonality is met. Again, as detailed above, this standard is likewise met here.

---

[4] *Balestra v. ATBCOIN LLC,* 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019).

*Like any Investment, DraftKings NFT Investors had a Reasonable Expectation of Profit*

88.     The SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market." Further, while the Howey Test sets forth the objective framework, the subjective intent of purchasers is most probative on the issue of what a reasonable investor would expect.

89.     In particular, the SEC's Framework identifies a number of factors to help assess whether the "reasonable expectation of profits" element is met:

The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:

The digital asset gives the holder rights to share in the enterprise's income **or profits or to realize gain from capital appreciation of the digital asset.**

> **The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.**

> This also can be the case where the digital asset gives the holder rights to dividends or distributions.

**The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.**

**Purchasers reasonably would expect that an AP's [Active Participant, or promoter] efforts will result in the capital appreciation of the digital asset and therefore be able to earn a return on their purchase.**

The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

(Emphasis added.)

90.     On August 13, 2021, a Reddit user (u/thedkexperience) wrote that "the least expensive card listed on the app resale market is going for $5750 at the moment" amid DraftKings

drops of various well-known athlete cards, including a Tom Brady collection. The user continued, "Literally all you need to do is be a US resident with a DraftKings account and have enough money in your account to buy one should you be lucky enough to get a good number from the queue lottery." The title of the Reddit post was "DraftKings NFT Resale Market has a Ridiculous ROI".[5]

91.    On October 26, 2022, an article was published on 4for4.com titled "Buying Low and Selling High: Draftkings Reignmaker Marketplace Strategy." According to the article, "[t]he Reignmaker marketplace behaves like many other marketplaces do, with card values fluctuating based on events that occur or are expected to occur." The article also describes how "as you go up in tier level, the required minimum investment increases, but so does potential profit." As a rule of thumb, the author writes, "[w]hatever tier you're targeting, you'll ultimately want to be specific about how you want to approach Reignmakers. As long as you have a clear plan and don't haphazardly buy and sell at different rarity levels without a goal, there are a lot of different ways to have fun AND profit." As such, the expectation of profit is implicitly (and repeatedly) stated throughout the article.

92.    A different article published on August 30, 2022 on FTNdaily.com stated that, in the DK Marketplace, "If you don't have enough player cards to enter a showdown slate, you can invest and buy them from sellers in the marketplace. Alternatively, you can sell players in the marketplace to create some liquidity for yourself." The author continued that he is "not looking at Reignmakers in the context of a collector, so eventually the utility of these cards, beyond 2022, will depreciate considerably. This is a factor season long in how I will manage the roster I have."[6]

---

[5] (u/thedkexperience), Reddit (Aug. 13, 2019), DraftKings NFT Resale Market has a Ridiculous ROI, https://www.reddit.com/r/CryptoCurrency/comments/p3sobn/draftkings_nft_resale_market_has_a_ridiculous_roi/.

[6] Andrew Phillips, *DraftKings Reignmakers: What It Is, How To Play*, FTN Daily (Aug. 30, 2022),

93.     On October 28, 2022, a Reddit user (u/dublisto) posted a suggestion that DraftKings start to allow an "open to offers" option on players' cards or portfolios. In its absence, users are currently required to research the "floor" of each edition of the type of card they want to sell. [7] As noted in the Legal Notice, DraftKings will only let DK Marketplace participants trade NFTs in regular currency. The user also suggested that DraftKings "allow an option to see the marketplace when entering lineups while you own a version of the card (core/rare/etc.)."

94.     Esports.net, a website dedicated to Electronic Sports ("Esports") news, Esports betting, fantasy Esports, and crypto news, stated "DraftKings is a trusted brand in the realm of online gambling, and it represents a safe option for anyone looking to invest in NFTs for the first time."[8]

95.     Defendant Kalish co-hosts a podcast, "Props & Drops with Matt Kalish and Gary Vee" ("Props & Drops"), with serial entrepreneur Gary Vaynerchuk. Published by DraftKings, the co-hosts discuss the future of the NFTs and opportunities for users to make money via DK Marketplace and Reignmakers.

96.     In a Props & Drops episode publishing a Discord Ask Me Anything ("AMA"), Kalish and Vaynerchuk respond to questions on the cross-over of NFT and sports, predictions of usage of blockchain technology, and grading of NFT projects.[9] When asked about the combination of NFTs and sports, Kalish states that "it's through talking to our customers and understanding what they are doing with their time and attention that really drives what we build at DraftKings."

---

https://www.ftndaily.com/articles/FTN/60994/draftkings-reignmakers-what-it-is-how-to-play.

[7]          (u/dublisto),          Reddit          (Oct.          28,          2022), https://www.reddit.com/r/DraftKingsDiscussion/comments/yg09av/dk_reignmakers_suggestions/.

[8] https://www.esports.net/crypto/draftkings-nft/.

[9] *Props & Drops with Matt Kalish & GaryVee*, *Audio Airdrops – Discord AMA with GaryVee & Matt Kalish*, Spotify (March 15, 2022) (streamed on the Spotify app).

When asked about tools that their teams use to understand generalized assumptions about an NFT project at 3:55, Vaynerchuk states that he'll "invest by the person in charge of the project, not by data." Kalish then responds that he and Vaynerchuk would "do our 10-20 hour check in to something and then we'll get our hands dirty . . . We start buying NFTs, start jumping in Discord rooms, and really being part of the community. Often, you get a sense for is this a short-term fad or is this something here for the long run."

97.     In Props & Drops Episode 20 published on May 17, 2022, entrepreneur Kevin Rose stated at 10:41, "when you think about the health of . . . any of these NFTs, it all comes down to the health of the underlying community. If you have people that believe in what you are building and are getting value from what you are creating, then you are in a good spot." At 28:27, Vaynerchuk stated "some people are saying NFTs were a fad, is anybody writing that the stock market is a fad? Because it's getting annihilated." To this statement, Kalish responded, "I think the general idea is that if you hear a marketing message that is related to returns that obviously doesn't make sense, then it's a Ponzi scheme . . . just don't put yourself in that position and, if you do, just do it from the mindset of you know it's going to be bad in the end." At 47:40 of the same episode, Vaynerchuk asked Kalish, "stock is one thing because it's stock but I'm a little bit more concerned with NFTs . . . what are your general thoughts about NFT buy-back by companies? Is it good? Is it bad? Is it neither?" In response, Kalish said, "I think that it is so informal that as long as you are very transparent, you indicate what you are doing . . . because the stock market for companies is crazy, you are reporting things to the SEC and there is a whole process . . . and this is not that. So, I don't think it's as much about that as what the community thinks about what you are doing."[10]

---

[10] *Props & Drops with Matt Kalish & GaryVee, Episode 20: Kevin Rose, Moonbirds & Proof.xyx*

98.     On May 22, 2022, the official Props & Drops podcast Twitter account tweeted, "NFTs are the opportunity to invest in startups, artists, operators and entrepreneurs all at once. Do you agree? @garyvee and @kevinrose do!"[11]

99.     In Props & Drops Episode 24, Kalish notes at 34:54 that he chooses the prizes for Reignmaker' VeeFriends League, a partnership between DraftKings and Vaynerchuk's company. By 39:45, Kalish chose a VeeFriends NFT that would be a prize for one of the contests. At 40:25, Vaynerchuk states that "this will be the summer of people picking up some stuff on fire sale that twelve years from now was like 'oh my god, how much did you pay in August 2022?'"[12]

100.    DraftKings maintains at least two Twitter pages related to DraftKings NFTs and DK Marketplace. @DKReignmakers tweets about new drops (i.e., DraftKings Primary Sales), current contests, and links related to DraftKings NFTs. @DK_Marketplace provides links to purchase DraftKings NFTs in DraftKings Primary Sales and retweets or replies to investors who have recently purchased DraftKings NFTs.

101.    On December 23, 2022, @DKReignmakers tweeted out "Who are the biggest risers and fallers on @DK_Marketplace right now? @Hunter_Himself breaks down the current Reignmakers market:" and provided a link a page to a page on draftkings.com that detailed the largest price increases and "observations" about price changes in the upcoming week.

102.    On September 9, 2022, @DK_Marketplace tweeted a video with Kalish hyping the Momentum pack drop and stating that $1 million of Momentum packs would be given to their top

---

and The Crypto Crash, Spotify (May 17, 2022) (streamed on the Spotify app).
[11]    @PropsAndDrops, Twitter, (May 22, 2022, 1:11 PM), https://twitter.com/PropsAndDrops/status/1528423191483281408?cxt=HHwWgMCjre6yhrYqAAAA.
[12]    *Props & Drops with Matt Kalish & GaryVee*, *Episode 24: Deep Dive on DraftKings Reignmakers NFT Fantasy Football Season 1*, Spotify (August 3, 2022) (streamed on the Spotify app).

25,000 "customers".

103.    Upon information and belief, DraftKings' employees had control over the Twitter account, @DKNFTBot, which releases notifications whenever a DraftKings NFT sells for more than $500. As of the filing of this complaint, @DKNFTBot is still followed by @DKReignmakers.

104.    DraftKings also maintains a Discord channel for individuals who purchased DraftKings NFTs. Discord users who apply and are accepted into the Discord channel can chat with other NFT holders in several channels. DraftKings also has dedicated Discord moderators who can ban users, remove messages, and take other actions on the channel. Notably, the Discord channel has a "Buy & Sell" chat, an "NFT Chat", and a "Locker Room" chat. In each, users discuss DraftKings NFTs as potential investments.

105.    DraftKings relied on the Discord channel to teach new users. On August 7, 2022 at 6:39 PM in "Locker Room," user fantasy.theory.optimal wrote "DK directs us here to learn. I am baffled trying to put the pieces together." On August 7, 2022 at 6:40 PM in "Locker Room," user candyhorse wrote "daily fantasy meets stock market" in response to fantasy.theory.optimal's comment.

106.    Several investors recognized that DK Marketplace was similar to the stock market. On August 8, 2022 at 12:51 PM in "Locker Room," user Synseer wrote (in an edited comment) "it's just like stocks ... the secondary market is flooded so there is no real supply and demand ... and the prices for the "rare" stuff is not in sync with the value." On September 17, 2022 at 10:53 AM in "Locker Room," user afmarko99 wrote "Stock Market goes up and down. These markets will be no different. There are rational and irrational reasons cards will be expensive or cheap. Buy the irrational cheap sell-offs, sell the irrational FOMO buying." On October 2, 2022 at 1:01 AM in "Locker Room," user CyberpunkMatt wrote "[j]ust like the stock market, most people lose

money." On November 7, 2022 at 3:02 AM in "Locker Room," user afmarko99 wrote "[t]his literally is the stock market in a nutshell[.]" On November 7, 2022 at 1:49 PM in "Locker Room," user Stephen wrote "[i]t's just like the stock market, once the weak hands sell, supply dries up[.]"

107.    On August 25, 2022 at 5:07 PM in "Locker Room," user datadriven78 wrote "We are early, it's like the stock market!  We are in what would be considered the accumulation stage, this is where early birds get cheap seats before the influx of buying pressure. The influx comes with the Season kickoff!"

108.    Investors also complained about the lack of functionality. On August 19, 2022 at 4:04 A.M. on "Buy & Sell," user Grex wrote "Rainmaker was touted to have the biggest prize pools. So far a miss. Genesis was touted to be the best pack to reward early investors. So far true but I'm wary. I don't care that elevate was 'better players' they're all rookies and it's a weak claw. If they don't structure the main set either way more expensive or with similar level players on average as genesis it's gonna rattle the market and a lot of feathers. Hard to invest when we don't know those details yet[.]"

109.    Individuals also considered themselves investors after spending enough time on DK Marketplace. On September 1, 2022 at 7:55 PM on "NFT Chat," user jetslifebryan wrote "I was originally going to just collect, flip and have fun.  Now I am playing and collecting.  The market place is like the stock market, people buy and hold, people buy and sell value." Similarly, on September 11, 2022 at 6:03 PM in "Locker Room," user Brian K wrote "I don't think i realized how much this is gonna be like stock market gonna be fun knowing when to hold em and when to sell em put your hunt's up now!!!!"

110.    On November 22, 2022 at 2:01 AM in "Locker Room," user afmarko99 wrote DK Marketplace was "[l]ike the stock market. I put an order in for say Diggs. Some options might be

serial and price. So I put my order on the MP [, *i.e.*, DK Marketplace,] as such: Diggs, Elite, serial 1-20, max bid $1000[.]"

111.    On September 2, 2022 at 10:51 P.M. on "Buy & Sell," user Grindtime wrote "[m]y collection was recently built, only 2 elite packs and rest Market place, rank is in top 500 currently and 3.5k in with 135 NFT and mostly rare and elite. You can make money with this and is the future. It's just like any investment, do your due diligence."

112.    As shown above, Defendants are clearly promoting and encouraging investors to purchase DraftKings NFTs on their Platform and have done so in such a way to provide investors with a reasonable expectation of profit. Investors furthermore view the DraftKings NFTs as investments with a reasonable expectation of profit and treat them as such.

### *DraftKings NFT Investors relied on the Managerial Efforts of DraftKings to Make and Maintain their Profits*

113.    The final Howey prong requires consideration of whether profits are derived from the efforts of others. This element is met where the promoters' efforts are "undeniably significant ones[.]"

114.    The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: (i) does the purchaser reasonably expect to rely on the efforts of an [Active Participant] and (ii) are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

115.    The Framework continues:

Although no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the "efforts of others":

**An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an**

**AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.**

> Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network."

**An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.**

**An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset.** In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

**An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network…**

(Emphasis added.)

116.     Investors in DraftKings NFTs are entirely reliant on the managerial efforts of the issuers for their potential profits. Due to the fact that DraftKings NFTs can be purchased only from primary sale "drops" in packs, or bought on the DK Marketplace that DraftKings controls, DraftKings continued management and efforts to develop the platform, both technologically and through promotion, are critical to DraftKings NFTs retaining and increasing in value. The success of DraftKings' ability to maintain the DraftKings craze is essentially what controls the investment. Furthermore, DraftKings' Legal Notice prohibits the transfer of DraftKings NFTs off DK Marketplace without explicit approval from DraftKings, an exercise of judgment concerning which platform DraftKings NFTs may be sold on. Even when transferred, the Legal Notice states

that DraftKings still collects fees through smart contracts[13] on any subsequent sales off-platform, as these are covered by the definition of DraftKings NFT Secondary Sale in the Legal Notice.

117.    Investors' profits in DraftKings NFTs are to be derived from the managerial efforts of others, specifically of DraftKings and the Individual Defendants. Most immediately, should DraftKings fail to mint new DraftKings NFTs, investor profits will dry up. In addition, should DraftKings fail to maintain the DK Marketplace or close the DK Marketplace, DraftKings NFTs will be worthless and investor profit will take a hit as well. Moreover, DraftKings creates and supports both the market for and the initial price of the digital assets, controlling the creation and issuance of the digital assets and taking other actions as set forth herein to support a market price of the digital asset, such as by limiting supply, ensuring scarcity, and limiting who can purchase in the primary market for resale on the secondary market.

### DraftKings Uses its Control over the Platform to Prevent Investors from transferring their NFTs to Other Platforms

118.    After investors purchase DraftKings NFTs, they are entirely reliant on DK Marketplace and Reignmakers contests to make a profit—by both finding a purchaser for resale in the DK Marketplace, and through winning money from Reignmakers contests.

119.    The strict Legal Notice prohibit investors from transferring DraftKings NFTs to other platforms in hope of higher returns. Even if successful in transferring DraftKings NFTs off DK Marketplace, the Legal Notice contemplates that DraftKings still retains control over the DraftKings NFTs themselves through DraftKings Fees that travel with the DraftKings NFTs and DraftKings' Reversionary Interest.

---

[13] Smart contracts are another blockchain-based technology. It allows payment once certain preconditions are met. In this context, it would likely track a sale of the NFT and require sending payment of the DraftKings fees to a DraftKings wallet, either concurrently or at some point in the near future.

***The Class Has Suffered Significant Damages from Defendants' Actions***

120.    In some cases, Plaintiff and the Class have invested enormously in the DK Marketplace in hopes of setting themselves up for retirement, providing for their children's education, or purchasing a home. In the meantime, while DraftKings has gladly welcomed these investments, the market for DraftKings NFTs—as well as the crypto market as a whole—has experienced incredible downturn and frightening gyrations. At its height in 2020–2021, DraftKings was trading in volumes in the billions. At that time, artists were able to make upwards of $3 million from a single drop on the DK Marketplace.

121.    Because of DraftKings' business strategy—focusing on curating hyped up drops and celebrity cash grabs aimed at gaining new customers—the platform ultimately experienced a downturn. As quickly as DraftKings became a top marketplace, it lost its position to other marketplaces with more verbose NFT content.

122.    Ultimately, as a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in DraftKings NFTs and were denied the information that would have been contained in the materials required from the registration of the DraftKings NFTs—have lost substantial amounts of money and have suffered significant damages in an amount to be proven at trial.

## Class Action Allegations

123.    Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on his own behalf and as a representative of the Class, consisting of all those who purchased or otherwise acquired DraftKings NFTs during the Class Period and were damaged thereby ("Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

124.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or its affiliates and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sales of DraftKings NFTs.

126.    Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation.

127.    Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether Defendants violated the Securities Act;

- Whether DraftKings NFTs constitute securities under federal law and, specifically,

whether DraftKings NFTs constitute "investment contracts" under federal law, including finding that purchasing and/or investing in DraftKings NFTs entails:

- o   An investment of money;

- o   In a common enterprise;

- o   With the expectation of profit;

- o   To be derived from the efforts of others;

- whether the DraftKings NFTs can potentially qualify for an exemption from registration under the Securities Act;

- whether investors are entitled to rescission for failure to comply with the Securities Act; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

128.   A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

129.   Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for DraftKings and the Individual Defendants.

130.   Plaintiff is unaware of any difficulties that are likely to be encountered in the

management of this action that would preclude its maintenance as a class action.

## V.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Sale of Unregistered Securities**
**Violation of §§ 5 and 12(a)(1) of the Securities Act**
**(against the Company and Individual Defendants)**

131.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

132.    The DraftKings NFTs are securities within the meaning of § 2(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77b(a)(1).

133.    Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect. Section 5(c) prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed. Offers and sales must either be registered or meet the requirements of an exemption from registration. Section 12(a)(1) of the Securities Act provides for civil liability for "[a]ny person who . . . offers or sells a security in violation" of Section 5 of the Securities Act. The remedy available under Section 12(a)(1) is rescission.

134.    Registration statements have two principal parts. Part One is the prospectus, that is, the legal offering or "selling" document that must be delivered to everyone who is offered or buys the securities. In the prospectus, the company must clearly describe important information about its business operations, financial condition, results of operations, risk factors, and management. The prospectus must also include audited financial statements. Part Two contains additional information and exhibits that the company does not have to deliver to investors but must file with the Securities Exchange Commission (SEC).

135.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means of instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

136.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security[.]" 15 U.S.C. § 77e(c).74. When issued, the DraftKings NFTs were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

137.    The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain. See *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 & 647 (1988). That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner. *Id*. at 647. The Company is a statutory seller.

138.    No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein. No exemption to the registration requirement applies. Defendants' failure to register the DraftKings NFT securities deprived Plaintiff and other class members investors of material financial and other significant information concerning the securities

being offered for public sale; and failed to protect investors from potential deceit, misrepresentations, and other fraud in the sale of securities. Defendants' failure to register the DraftKings NFT securities caused Plaintiff and class members investors significant monetary harm.

139.    During the Class Period, DraftKings and the Individual Defendants, each of them, engaged in the conduct prohibited by Sections 5(a) and 5(c), directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. As such, each of the Defendants have violated §§ 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a).

140.    Plaintiff and the Class seek rescissory damages and interest thereon with respect to DraftKings NFTs purchased during the Class Period.

### SECOND CAUSE OF ACTION

**Control Person Liability for Violations of the Securities Act**
**Violation of § 15 of the Securities Act**
**(Against Individual Defendants)**

141.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

142.    During the Class Period, the Individual Defendants were involved in the management and operation of DraftKings' business affairs. By virtue of their offices, ownership, agency agreements or understandings, and specific acts, the Individual Defendants were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77o. The Individual Defendants, and each of them,

had the power and influence and exercised the same to cause the unlawful offer and sale of the DraftKings NFTs as described herein.

143.    The Individual Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of DraftKings and the DK Marketplace through ownership of voting securities, by contract, subscription agreement, or otherwise.

144.    The Individual Defendants, separately or together, have sufficient influence to have caused the Company to submit a registration statement.

145.    The Individual Defendants, separately or together, jointly participated in DraftKings' failure to register the DraftKings NFTs.

146.    Based on the conduct described above, each of the Individual Defendants is liable for the violations committed by DraftKings pursuant to Section 15 of the Securities Act.

### THIRD CAUSE OF ACTION

**Contracts with an Unregistered Exchange**
**Violation of §§ 5 and 29(b) of the Exchange Act**
**(Against DraftKings)**

147.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

148.    Section 5 of the Exchange Act makes it unlawful "for any…exchange, directly or indirectly, to make use of…any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security…unless such exchange (i) is registered as a national securities exchange under Section 78f of this title, or (ii) is exempted from such registration. 15 U.S.C. § 78e. An "exchange" is defined as "any organization, association, or group of persons, whether

incorporated or unincorporated, which constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities…." 15 USC § 78c(a)(1); *see also* 17 C.F.R. § 240.3b-16.

149.    Throughout the Class Period and currently, DraftKings made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and/or subject to the United States to effect transactions in securities – *i.e.*, DraftKings NFTs. At all relevant times, DK Marketplace was not (i) registered as a national securities exchange under Section 78f without being registered as a national securities exchange under Section 78e, and they were not (ii) exempted from such registration.

150.    While operating as an unregistered exchange, DraftKings listed securities. DraftKings also contracted with Plaintiffs and class members for the purchase and sale of securities. These contracts were in violation of Section 5 of the Exchange Act.

151.    Each transaction in a DraftKings NFT constitutes a contract between DraftKings and a Plaintiff or Class member. Pursuant to these contracts, Plaintiffs and Class members paid DraftKings fees to fulfill orders for such DraftKings NFTs.

152.    Such contracts are null and void under Section 29(b) of the Exchange Act and, as a result, Plaintiffs and the Class are entitled to void those contracts and recover recessionary damages with respect to the purchase of DraftKings NFTs (each of which was an unregistered security listed on an unregistered national securities exchange), including any consideration and fees they have paid in connection with DraftKings NFTs, as well as costs, attorneys' fees, and interest.

153.    As a result of DraftKings' conduct, it is liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## FOURTH CAUSE OF ACTION

**Unregistered Broker and Dealer**
**Violation of §§ 15(a)(1) and 29(b) of the Exchange Act**
**(Against DraftKings)**

154.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

155.    It is unlawful for a broker or dealer engaged in interstate commerce in using the facility of an exchange, "for any broker or dealer…to make use of…any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security…unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

156.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78(a)(4)(A). Additionally, an entity is a broker if it assists issuers with structuring a securities offering, identifies a potential purchase, or advertises a securities offering.

157.    DraftKings operated as a broker during the Class Period by, among other things, facilitating the sale of DraftKings NFTs and tokens on the platform for compensation, facilitating the buying and selling of DraftKings NFTs, marketing DK Marketplace, DraftKings NFTs and other tokens to users and issuers and providing answers to user questions about transaction details.

158.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that entity's "regular business."

159.    DraftKings operated as a dealer during the Class Period by acting as a seller of securities on a regular basis, issuing DraftKings NFTs, facilitating the buying and selling of

DraftKings NFTs and tokens through its exchange, having regular customers, and providing customers with access to services that allow the purchase of such securities.

160.   DraftKings made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange without being registered as a national securities exchange under section 78o, to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security.

161.   Each transaction in a DraftKings NFT constitutes a contract between DraftKings and a Plaintiff or Class member. Pursuant to these contracts, Plaintiffs and Class members paid DraftKings fees to fulfill orders for such DraftKings NFTs.

162.   Such contracts are null and void under section 29(b) of the Exchange Act and, as a result, Plaintiffs and the Class are entitled to void those contracts and recover recessionary damages with respect to purchases of DraftKings NFTs (each of which was an unregistered security listed on an unregistered national securities exchange), including any consideration and fees they have paid in connection with the purchase of the DraftKings NFTs, as well as costs, attorneys' fees, and interest.

163.   As a result of DraftKings conduct, it is liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

### FIFTH CAUSE OF ACTION

**Control Person Violations of the Exchange Act**
**Violation of § 20 of the Exchange Act**
**(Against Individual Defendants)**

164.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

165.   Plaintiffs assert this cause of action against Jason D. Robins, Jason K. Park, and

Matthew Kalish under Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

166.    The Individual Defendants, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of DraftKings and its employees, and to cause DraftKings to engage in the wrongful conduct detailed herein.

167.    The Individual Defendants, separately or together, have the power to direct or cause the direction of the management and policies of DraftKings.

168.    The Individual Defendants had sufficient control or influence to have caused DK Marketplace to register as an exchange and broker-dealer and refrain from effecting the transactions of securities as an unregistered exchange and unregistered broker-dealer, in violation of Sections 5 and 15 of the Exchange Act, 15 U.S.C. §§ 78e, 78o, and Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

169.    As a result of the Individual Defendants' conduct, they are liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## SIXTH CAUSE OF ACTION

### Unregistered Broker and Dealer (State Law)
### Violation of Mass. Gen. Laws. Ch. 110A § 201(a)
### (Against DraftKings)

170.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

171.    Section 201(a) of the Massachusetts General Laws provides that "[i]t is unlawful for any person to transaction business in this [C]ommonwealth as a broker-dealer [] unless he is so registered under this [Act]."

172.    Section 401(c) defines "broker-dealer" as "any person engaged in the business of

effecting transactions in securities for the account of others or for his own account." The "broker-dealer" definition in Section 401(c) does not include: "(1) an agent; (2) an issuer; (3) a bank[]; or (4) a person who has no place of business in the commonwealth[]."

173.     DraftKings operated as a broker-dealer during the Class Period by, among other things, facilitating the sale of DraftKings NFTs and tokens on the platform for compensation, facilitating the buying and selling of DraftKings NFTs, marketing DK Marketplace, DraftKings NFTs and other tokens to users and issuers, and providing answers to user questions about transaction details.

174.     As described above, DraftKings' acts violate Mass. Gen. Laws. Ch. 110A § 201.

## SEVENTH CAUSE OF ACTION

**Sale of Unregistered Securities (State Law)**
**Violation of Mass. Gen. Laws. Ch. 110A § 301**
**(Against DraftKings and Individual Defendants)**

175.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

176.     Section 301 of the Massachusetts General Laws provides: "[i]t is unlawful for any person to offer or sell any security in the [C]ommonwealth unless: – (1) the security is registered under this chapter; (2) the security or transaction is exempted under section 402; or (3) the security is a federal covered security."

177.     Section 414(a) of Chapter 110A provides that Section 301 "appl[ies] to person who sell or offer to sell when (1) an offer to sell is made in the commonwealth, or (2) an offer to buy is made and accepted in the commonwealth."

178.     DraftKings NFTs are not (1) registered under Ch. 110A, (2) are not an exempt security under Section 402(a) or an exempt transaction under Section 402(b), and (3) are not a

federal covered security. Furthermore, DraftKings sold DraftKings NFTs and offered to sell DraftKings NFTs in Massachusetts.

179.    As such, DraftKings' acts violate Mass. Gen. Laws. Ch. 110A § 301.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.  Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative;

2.  Awarding rescissory damages and interest thereon in favor of Plaintiff and members of the Class against DraftKings and the Individual Defendants, jointly and severally, for all damages sustained as a result of DraftKings' wrongdoing, in an amount to be proven at trial;

3.  Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

4.  Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

5.  Directing such further relief as it may deem just and proper.

## VII.    JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues so triable.

Dated: March 9, 2023

> **BERMAN TABACCO**
>
> */s/ Patrick T. Egan*
> Patrick T. Egan (BBO #637477)
> Justin N. Saif (BBO #660679)
> One Liberty Square
> Boston, MA 02109
> 617.542.8300
> pegan@bermantabacco.com
> jsaif@bermantabacco.com
>
> *Local Counsel for Plaintiff*

**KIRBY MCINERNEY**

Anthony F. Fata
Kirby McInerney LLP
211 West Wacker Drive, Suite 550
Chicago, Illinois 60606
312.767.5180
afata@kmllp.com

*Co-Counsel for Plaintiff*

**HANNAFAN & HANNAFAN, LTD.**

Blake T. Hannafan
Hannafan & Hannafan, Ltd.
161 North Clark Street, Suite 1700
Chicago, Illinois 60601
312.527.0055
bth@hannafanlaw.com

*Co-Counsel for Plaintiff*