**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JUSTIN DUFOE, on Behalf of Himself
and All Others Similarly Situated,

                Lead Plaintiff,

    v.

DRAFTKINGS INC., JASON D.
ROBINS, JASON K. PARK, and
MATTHEW KALISH,

             Defendants.

Case No. 1:23-cv-10524-DJC

***ORAL ARGUMENT REQUESTED***

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

WILMER CUTLER PICKERING
HALE and DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000

*Attorneys for Defendants*

Dated:  September 25, 2023

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......................................................................1

ALLEGATIONS OF THE COMPLAINT...................................................................3

    A.     The Parties ............................................................................3

    B.     The DraftKings Marketplace ...............................................4

    C.     The Polygon Blockchain.......................................................5

    D.     The Utility of Marketplace NFTs ........................................5

    E.     Plaintiff's Claims .................................................................8

ARGUMENT .........................................................................................8

I.     PLAINTIFF DOES NOT PLAUSIBLY ALLEGE THAT
     MARKETPLACE NFTs ARE SECURITIES ..................................8

    A.     The Complaint Fails To Plead a Common Enterprise ...........9

    B.     The Complaint Fails To Plead That DraftKings Led Customers To
     Reasonably Expect Profits Through the Efforts of Defendants...........16

    C.     The *Dapper Labs* Decision Confirms the Complaint Lacks Merit......................22

II.    PLAINTIFF HAS NO PRIVATE RIGHT OF ACTION
     TO ASSERT HIS EXCHANGE ACT CLAIMS ..............................25

III.   PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY
     AGAINST THE INDIVIDUAL DEFENDANTS ..........................26

IV.   PLAINTIFF'S STATE LAW CLAIMS FAIL FOR THE SAME REASONS ................26

CONCLUSION..........................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Adams* v. *Hyannis Harborview, Inc.*,
  838 F. Supp. 676 (D. Mass. 1993) ........................................................................ 26

*Allco Renewable Energy Ltd.* v. *Massachusetts Elec. Co.*,
  875 F.3d 64 (1st Cir. 2017) .................................................................................... 25

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ............................................................................................... 25

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 8

*Austin* v. *Bradley, Barry & Tarlow, P.C.*,
  1992 WL 560915 (D. Mass. June 17, 1992) ......................................................... 15

*Back Beach Neighbors Comm.* v. *Town of Rockport*,
  63 F.4th 126 (1st Cir. 2023) ............................................................................... 3, 8

*Brodt* v. *Bache & Co., Inc.*,
  595 F.2d 459 (9th Cir. 1978) ................................................................................ 14

*Bronstein* v. *Bronstein*,
  407 F. Supp. 925 (E.D. Pa. 1976) ........................................................................ 17

*Clorox Co. Puerto Rico* v. *Proctor & Gamble Com. Co.*,
  228 F.3d 24 (1st Cir. 2000) .................................................................................... 3

*Copeland* v. *Hill*,
  680 F. Supp. 466 (D. Mass. 1988) ........................................................... 10, 14, 15

*Curran* v. *Merrill Lynch*,
  622 F.2d 216 (6th Cir. 1980) ................................................................................ 14

*EMA Fin., LLC* v. *Vystar Corp.*,
  2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021) ...................................................... 25

*Fox Int'l Rels.* v. *Fiserv Sec., Inc.*,
  490 F. Supp. 2d 590 (E.D. Pa. 2007) .................................................................... 25

*Friel* v. *Dapper Labs, Inc.*,
  2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023) .................................................. 22-25

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  756 F.2d 230 (2d Cir. 1985) .................................................................................. 20

*Gener-Villar* v. *Adcom Grp., Inc.*,
    417 F.3d 201 (1st Cir. 2005) ........................................................... 19

*Geophysical Serv., Inc.* v. *TGS-NOPEC Geophysical Co.*,
    850 F.3d 785 (5th Cir. 2017) .......................................................18-19

*Grenader* v. *Spitz*,
    537 F.2d 612 (2d Cir. 1976) ........................................................... 21

*Hocking* v. *Dubois*,
    839 F.2d 560 (9th Cir. 1988) .......................................................... 10

*Hocking* v. *Dubois*,
    885 F.2d 1449 (9th Cir. 1989) ........................................................ 10

*ITOFCA, Inc.* v. *MegaTrans Logistics, Inc.*,
    322 F.3d 928 (7th Cir. 2003) .......................................................... 19

*Kaufman* v. *Magid*,
    539 F. Supp. 1088 (D. Mass. 1982) ................................................ 15

*Lehman Bros. Com. Corp.* v. *Minmetals Int'l Non-Ferrous Metals Trading Co.*,
    179 F. Supp. 2d 159 (S.D.N.Y. 2001) ............................................. 21

*Margaret Hall Found., Inc.* v. *Atl. Fin. Mgmt., Inc.*,
    572 F. Supp. 1475 (D. Mass. 1983) .........................................15-16, 26

*Marine Bank* v. *Weaver*,
    455 U.S. 551 (1982) ....................................................................... 18

*Marini* v. *Adamo*,
    812 F. Supp. 2d 243 (S.D.N.Y. 2011) ............................................ 14

*Marram* v. *Kobrick Offshore Fund, Ltd.*,
    442 Mass. 43 (2004) ...................................................................... 26

*Mechigian* v. *Art Cap. Corp.*,
    612 F. Supp. 1421 (S.D.N.Y. 1985) ................................................. 1

*Mehta* v. *Ocular Therapeutix, Inc.*,
    955 F.3d 194 (1st Cir. 2020) ........................................................... 26

*Milnarik* v. *M-S Commodities, Inc.*,
    457 F.2d 274 (7th Cir. 1972) ......................................................11-13

*Mordaunt* v. *Incomco*,
    686 F.2d 815 (9th Cir. 1982) ..................................................... 14, 15

iii

*Noa* v. *Key Futures, Inc.*,
638 F.2d 77 (9th Cir. 1980) ............................................................................ 20

*NTV Mgmt., Inc.* v. *Lightship Global Ventures, LLC*,
484 Mass. 235 (2020) ..................................................................................... 26

*Revak* v. *SEC Realty Corp.*,
18 F.3d 81 (2d Cir. 1994) ........................................................................*passim*

*Rodriguez* v. *Banco Cent.*,
777 F. Supp. 1043 (D.P.R. 1991) .................................................................... 18

*Rodriguez* v. *Banco Cent. Corp.*,
990 F.2d 7 (1st Cir. 1993) ...................................................................9, 16, 19

*Salameh* v. *Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013) ...................................................................16-17

*Schofield* v. *First Commodity Corp. of Bos.*,
638 F. Supp. 4 (D. Mass. 1985) ...................................................................... 15

*SEC* v. *Aqua-Sonic Prod. Corp.*,
687 F.2d 577 (2d Cir. 1982) ............................................................................ 20

*SEC* v. *Glenn W. Turner Enters., Inc.*,
474 F.2d 476 (9th Cir. 1973) .......................................................................20-21

*SEC* v. *Infinity Grp. Co.*,
212 F.3d 180 (3d Cir. 2000) ............................................................................ 10

*SEC* v. *LBRY, Inc.*,
2022 WL 16744741 (D.N.H. Nov. 7, 2022) ................................................... 18

*SEC* v. *Mut. Benefits Corp.*,
408 F.3d 737 (11th Cir. 2005) ........................................................................ 21

*SEC* v. *SG Ltd.*,
265 F.3d 42 (1st Cir. 2001) ......................................................................*passim*

*SEC* v. *Telegram Grp. Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...................................................... 17, 18

*SEC* v. *W.J. Howey Co.*,
328 U.S. 293 (1946) ................................................................................*passim*

*Sinva, Inc.* v. *Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
253 F. Supp. 359 (S.D.N.Y. 1966) ................................................................. 20

*Steinhardt Grp. Inc.* v. *Citicorp*,
    126 F.3d 144 (3d Cir. 1997) ................................................................................... 17

*Stenger* v. *R.H. Love Galleries, Inc.*,
    741 F.2d 144 (7th Cir. 1984) ................................................................................. 13

*Teamsters* v. *Daniel*,
    439 U.S. 551 (1979) ................................................................................................. 9

*United Hous. Found., Inc.* v. *Forman*,
    421 U.S. 837 (1975) ......................................................................................... 19, 21

*U.S.* v. *Leonard*,
    529 F.3d 83 (2d Cir. 2008) ................................................................................... 16

*Wals* v. *Fox Hills Dev. Corp.*,
    24 F.3d 1016 (7th Cir. 1994) ............................................................... 10, 12, 13-14

*Yan* v. *ReWalk Robotics Ltd.*,
    973 F.3d 22 (1st Cir. 2020) ................................................................................... 26

## Statutes and Rules

Securities Act of 1933
    Section 2(a)(1), 15 U.S.C. § 77b ......................................................................... 8-9
    Section 5, 15 U.S.C. § 77e ...................................................................................... 8
    Section 12(a)(1), 15 U.S.C. § 77l .......................................................................... 8
    Section 15, 15 U.S.C. § 77o .................................................................................... 8

Securities Exchange Act of 1934
    Section 3(a)(10), 15 U.S.C. § 78c ........................................................................ 8-9
    Section 5, 15 U.S.C. § 78e ................................................................................ 8, 25
    Section 15(a)(1), 15 U.S.C. § 78o .................................................................. 8, 25, 26
    Section 20, 15 U.S.C. § 78t .............................................................................. 8, 26
    Section 29(b), 15 U.S.C. § 78cc ............................................................................. 8

Mass. Gen. Laws Ch. 110A
    § 201(a) ............................................................................................................. 8, 26
    § 301 ................................................................................................................. 8, 26

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 1

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AC or Complaint | Amended Complaint for Violation of the Federal Securities Laws (Dkt. No. 38) |
| AC Ex. | Exhibit attached to the Complaint |
| Decl. Ex. | Exhibit attached to the Declaration of Andrew Dulberg, dated September 25, 2023 |
| DraftKings | DraftKings, Inc. |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78rr |
| Marketplace | DraftKings Marketplace |
| NFT | Non-fungible token |
| Polygon | Polygon Labs |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | Securities Act of 1933, 15 U.S.C. §§ 77a-77aa |

Defendants respectfully submit this memorandum in support of their motion to dismiss Plaintiff's Amended Complaint ("Complaint" or "AC") (Dkt. No. 38) pursuant to Rule 12(b)(6).

## PRELIMINARY STATEMENT

"In our mercantile economy, we should not try to turn every 'thing' which might be purchased and sold into a 'security.'" *Mechigian* v. *Art Cap. Corp.*, 612 F. Supp. 1421, 1428 (S.D.N.Y. 1985). Yet this is exactly what Plaintiff seeks to do through this action. The digital images of professional athletes that Plaintiff purchased are collectibles and trading cards, some of which may be used in online fantasy sports-style contests. They are plainly not "securities" under well-established law. This case should be dismissed.

In August 2021, DraftKings began to sell non-fungible tokens ("NFTs"), a type of digital asset that is created on a "blockchain" and linked to another asset such as a photograph, a video, or other intellectual property.[1] DraftKings customers can buy and sell NFTs created by DraftKings or third parties through the online DraftKings Marketplace (the "Marketplace"). At first, the NFTs available through the Marketplace were digital images (primarily of professional athletes) that functioned solely as collectibles. Later, in May 2022, DraftKings launched its "Reignmakers" fantasy sports-style contests. Reignmakers contestants buy and sell Reignmakers NFTs that are used to compete for prizes in contests based on the real-world performance of the athletes associated with the NFTs. All of Plaintiff's claims are rooted in the notion that these NFT collectibles and game pieces qualify as securities under federal and Massachusetts securities laws. Even accepting Plaintiff's well-pleaded allegations as true, that is clearly incorrect.

---

[1] An NFT is a unique digital token "minted" on a blockchain using smart contracts. It is separate and distinct from the asset with which it is linked or associated. (AC ¶ 29.) Like the Complaint (AC ¶ 1), for simplicity Defendants here use the term NFT to refer to both the token and its linked asset, unless the context requires treating them separately.

Plaintiff asserts that the Marketplace NFTs he bought and sold constitute securities because they purportedly are "investment contracts" under the Supreme Court's decision in *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946).  *Howey* held that an "investment contract" is a "transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298-99.  Yet, Plaintiff concedes that the contract governing his transactions on the Marketplace expressly provides that he and other Marketplace users agree that an NFT "does not grant the owner any rights associated with owning a security," and no user would "tak[e] any action that has the effect of resulting . . . in the treatment of any DraftKings NFT as a security."  (AC ¶ 32.)  Plaintiff's effort to contradict his own contract falls miles short of pleading facts establishing that Marketplace NFTs satisfy the *Howey* test.

*First*, Plaintiff fails to plead that, by purchasing NFTs on the Marketplace, he invested in a "common enterprise" with DraftKings.  Plaintiff bought goods with unique utility and intrinsic value, not instruments entitling him to share in DraftKings' profits or giving him other rights common to a security.  And Plaintiff does not and cannot plead that DraftKings pooled the revenue generated from NFT sales in the Marketplace to tie Plaintiff's fortunes to those of other NFT customers and to the fortunes of DraftKings.  *See SEC* v. *SG Ltd.*, 265 F.3d 42, 50 (1st Cir. 2001).  NFT owners thus lack commonality with DraftKings, or among themselves.

*Second*, the claims here fail for the separate reason that Plaintiff does not establish that DraftKings led purchasers of Marketplace NFTs to expect that they would realize investment profits on NFTs due to the managerial efforts of DraftKings.  *Id.* at 53-55.  Plaintiff cites no example—because there is none—where any Defendant promoted Marketplace NFTs as securities or investments in DraftKings such that they might have induced NFT owners reasonably to expect profits based on the managerial efforts of DraftKings.  Instead, Plaintiff's own allegations establish that DraftKings promoted the NFTs as collectibles (similar to baseball or Pokémon cards) or

Reignmakers game pieces that would *depreciate* in value correlating to their declining utility in contests over time, not as a means to participate in future DraftKings profits as an enterprise. And the value of each NFT was tied to forces entirely outside of Defendants' control—including the performance of individual athletes—not Defendants' managerial efforts. Indeed, the Complaint concedes the lack of correlation between DraftKings' business results and the value of any NFT. Plaintiff's focus on the prizes that Marketplace NFT owners can win through their own skillful competition against other NFT owners in Reignmakers contests entirely defeats Plaintiff's claims.

Because all of Plaintiff's federal and state law claims rest on the incorrect premise that Marketplace NFTs are securities, this action should be dismissed with prejudice in its entirety.

## ALLEGATIONS OF THE COMPLAINT[2]

### A.    The Parties

DraftKings is "a digital sports entertainment and gaming company" that offers fantasy sports contests, sports betting and online casino products to its customers. (AC ¶¶ 3, 10.) DraftKings also owns and operates the Marketplace, an online platform where customers can buy and sell NFTs. (AC ¶ 10.) In 2022, DraftKings earned revenues in excess of $2.24 billion, of which no more than $70 million—*about 3%*—derived from the Marketplace. (AC ¶ 23.) Plaintiff alleges that DraftKings lost in excess of $1.1 billion in each of 2020, 2021, and 2022, with losses peaking at $1.5 billion in 2021, when Marketplace launched, and dropping to $1.1 billion in 2022, the same year Plaintiff contends NFT values "experienced incredible downturn." (AC ¶¶ 22, 145.)

Defendant Jason Robins is one of the founders of DraftKings and serves as its CEO and

---

[2] Although rife with inaccuracies and half-truths, Defendants accept Plaintiff's well-pleaded allegations as true solely for purposes of this motion. *Back Beach Neighbors Comm.* v. *Town of Rockport*, 63 F.4th 126, 130 (1st Cir. 2023). That said, Defendants' explication of the facts relevant to their motion also draws on certain materials relied upon in the Complaint, which the Court can and should consider at this stage. *Clorox Co. Puerto Rico* v. *Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000). "Were the rule otherwise, a plaintiff could maintain a claim . . . by excising an isolated statement from a document and importing it into the complaint." *Id.*

Chairman.  (AC ¶ 11.)  Defendant Matthew Kalish is also one of the founders of DraftKings and is currently the President of DraftKings North America.  (AC ¶¶ 13, 120.)  Defendant Jason Park is DraftKings' CFO.  (AC ¶ 12.)

Plaintiff alleges that he is a resident of Illinois who bought and sold various NFTs on the Marketplace between February 2022 and February 2023.  (AC ¶ 9; AC Ex. 1.[3])  Plaintiff does not specify which NFTs he bought, whether he purchased them from DraftKings or from third-party sellers, or how he made use of the NFTs.  And, despite having claimed to have conducted over 9,000 NFT transactions, Plaintiff does not match any NFT purchase with any sale, or deduct the prize money he won from participating in Reignmakers contests, such that he might establish some cognizable injury to demonstrate his standing to sue here.

### B.        The DraftKings Marketplace

NFTs are unique digital assets that are created, or "minted," on a "blockchain," a technology that records ownership and transfers of digital assets.  (AC ¶¶ 18-19.)  Initial sales of NFTs are referred to as "drops."  (AC ¶ 19.)

In August 2021, DraftKings launched its Marketplace, a platform through which DraftKings customers can buy NFTs directly from DraftKings or from third parties and sell NFTs to other Marketplace customers.  (AC ¶¶ 25-26; AC Ex. 3, at 3.)  In May 2022, DraftKings launched "Reignmakers Football," an NFT collection featuring players from the National Football League Players' Association designed for use in fantasy sports-style contests in which contestants deploy Reignmakers NFTs to build lineups of real-world athletes to compete against other DraftKings customers.  (AC ¶¶ 43-45.)  In early 2023, DraftKings began offering Reignmakers NFTs and contests for two other professional sports.  (AC ¶¶ 50, 54 n.3.)

---

[3] Citations to "AC Ex." refer to exhibits attached to the Complaint.  Citations to "Decl. Ex." refer to additional materials relied upon in the Complaint attached as exhibits to the Declaration of Andrew S. Dulberg accompanying Defendants' motion.

The Complaint alleges that DraftKings generates revenue from the Marketplace through (i) selling NFTs in initial "drops" on the Marketplace (referred to as "primary sales") (AC ¶ 52), and (ii) percentage-based fees charged on resales of NFTs by individuals in the secondary market (referred to as "secondary sales") (AC ¶ 53).   In a secondary sale, the individual reselling the NFT sets the price in U.S. dollars, and DraftKings collects a transaction fee that is a percentage of the sales price.  (AC ¶ 57.)  Marketplace NFTs can also be bought and sold on third-party platforms, with DraftKings' permission.  (*See* AC Ex. 4, at 9.)

### C.    The Polygon Blockchain

Marketplace NFTs are minted on a public blockchain developed by Polygon Labs ("Polygon") (AC ¶ 26), which is a wholly distinct company unaffiliated with DraftKings.  The Polygon blockchain serves as a platform for a multitude of digital assets built on blockchain technology.  (AC ¶ 42.)  Every Marketplace NFT is minted on the Polygon blockchain and recorded on its public ledger.  (AC ¶¶ 19, 26.)

### D.    The Utility of Marketplace NFTs

As the Complaint alleges, the Marketplace includes two types of NFTs.  The first, barely mentioned in the Complaint, is linked to static or animated collectible images, most of which are of professional athletes.  (AC ¶ 41.)  The Complaint and the materials it cites recognize that these NFTs have utility as collectibles.   In his Marketplace agreement, for example, Plaintiff "acknowledge[d] and affirm[ed] that [he is] purchasing Marketplace NFTs for purposes of acquiring digital collectibles and not for any investment or speculative purposes."  (AC Ex. 3, at 18; AC Ex. 4, at 22.)  Likewise, Plaintiff relies on press reports stating that the Marketplace is "a particularly strong option if you are looking to trade sports collectibles," but there are better NFT options "if you want to buy or sell artwork, gaming avatars and so on."  (Decl. Ex. 1 (referenced in AC ¶ 119); *see also* AC ¶ 43 (referring to Marketplace NFTs as "collectibles").)

The focus of the Complaint—and the various anonymous commentary it cites regarding the Marketplace—concerns a different category of NFTs:  Reignmakers NFTs that are used in Reignmakers fantasy sports-style contests, primarily relating to professional football. Reignmakers contestants assemble a roster of player-athletes by acquiring the associated Reignmakers NFTs for use in skill contests.  (AC ¶ 45.)  Reignmakers NFTs are sold in digital packs of multiple NFTs (like traditional sports trading card packs), through auctions, or on the secondary market.  (AC ¶¶ 47, 56, 59.)  Packs of Reignmakers NFTs sell for different prices depending on the rarity "tier," but each pack is comprised of "random" player content such that the pack contents and rarity (and, thus, its utility) are largely up to "chance."  (AC ¶¶ 47-48.)

For any Reignmakers contest, each contestant selects a roster of athletes (from the Reignmakers NFTs that they own) to build a lineup for that specific contest, and then competes against other competitors who likewise create a competing lineup from among the Reignmakers NFTs that they own.  Like fantasy sports contests, the winners are based on the actual collective statistical performance of each selected real-world athlete in the designated event, and each contest awards cash "prize pots" of up to $125,000, as well as NFTs and other "prizes."[4]  (AC ¶ 54; *see also* AC ¶ 43 (referring to "the features of gamified NFT collections").)  Thus, competitors in a Reignmakers contest do not share the profits of any enterprise, but *compete against each other* to win prizes in a fantasy sports-style contest.  And their ability to win those prizes is based on their own skill in assembling a roster and choosing a lineup for a particular contest that will score the highest point total based on the actual performance of the athletes in real-world sporting contests. Put differently, successful Reignmakers contestants win money at the expense of DraftKings and

---

[4] The mechanics of the Reignmakers game and its prize pools are explained in a DraftKings YouTube video referenced in the Amended Complaint.  (AC ¶ 108.)  In that video—a transcript of which is included as Exhibit 2 for the Court's convenience—Defendant Kalish explains, among other things, that players "use the cards" to "compete against other users of the game for millions of prizes throughout the season."  (Decl. Ex. 2, at 2:15-18 ([YouTube video at 0:37]).)

the non-winning contestants.  (AC ¶ 54) ("prize pot" shared by "the top 44 contestants").

The Complaint concedes that the utility and value of Reignmakers NFTs go hand-in-hand, and both depreciate as the real-world professional sports season progresses.  (AC ¶ 117 ("the utility of these cards, beyond [the] 2022 [football season], will depreciate considerably").)   As Plaintiff concedes, the price of the primary "drops" of Reignmakers NFT *decreases* as the sports season progresses (AC ¶ 113), and DraftKings stops selling the packs altogether as the regular season draws to a close (AC ¶ 114).  Indeed, DraftKings announced in advance that prices of all packs would decrease by 10%, 20%, 30% and 40% at the conclusion of weeks 5, 9, 12 and 15 of the NFL 2022 regular season.  (AC Ex. 5, at 7.)  As the documents relied upon in the Complaint explain, far from being duped into an investment for future profit, NFT users understood that they "should expect cards to be *worth about 10% of current prices by the end of the season* [and] should also expect cards to *go down little by little as the season goes on* because there will be *less weekly utility*."  (Decl. Ex. 3, at 5 (emphases added); AC Ex. 5, at 8 ("We estimate that 2022 cards will be valued at approximately 10% of their franchise core leaderboard value in 2023").)

Plaintiff nevertheless claims that Defendants promoted and sold Marketplace NFTs as "securities" under federal and state securities law.  (AC ¶ 1.)  Plaintiff cites nothing to back up this bald assertion, and it is demonstrably untrue.  As Plaintiff concedes (AC ¶ 32), the terms and conditions that every Marketplace NFT purchaser is required to accept clearly state:  "An NFT is not a medium of exchange or convertible virtual currency and *does not grant the owner any rights associated with owning a security*."  (AC Ex. 4, at 3 (emphasis added); *see also id.* at 22 ("You acknowledge and affirm that you are purchasing Marketplace NFTs for purposes of acquiring digital collectibles and not for any investment or speculative purposes.  Any economic benefit that may be derived from appreciation in the value of the Marketplace NFT is not guaranteed and is incidental to obtaining it for its collectible purpose.").)

### E.        Plaintiff's Claims

The Complaint purports to assert claims (i) against DraftKings and the individual defendants for selling unregistered securities in violation of §§ 5 and 12(a)(1) of the Securities Act (AC ¶¶ 158-169), (ii) against DraftKings for operating an unregistered securities exchange under §§ 5 and 29(b) of the Securities Exchange Act of 1934 ("Exchange Act") (AC ¶¶ 176-185), (iii) against DraftKings for operating as an unregistered broker-dealer under §§ 15(a)(1) and 29(b) of the Exchange Act (AC ¶¶ 186-196), (iv) against the individual defendants for "control person" liability under § 15 of the Securities Act and § 20 of the Exchange Act (AC ¶¶ 170-175, 197-202), (v) against DraftKings for operating as an unregistered broker-dealer under Mass. Gen. Laws Ch. 110A § 201(a) (AC ¶¶ 203-208), and (vi) against DraftKings and the individual defendants for selling unregistered securities in violation of Mass. Gen. Laws Ch. 110A § 301 (AC ¶¶ 209-213).

### ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). Although courts must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the [plaintiff]'s favor," they "credit neither conclusory legal allegations nor factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Back Beach*, 63 F.4th at 130 (cleaned up).

Plaintiff does not plausibly allege that any Marketplace NFTs constitute securities under federal or state law. As such, all of Plaintiff's claims are subject to dismissal with prejudice.

## I.        PLAINTIFF DOES NOT PLAUSIBLY ALLEGE THAT MARKETPLACE NFTs ARE SECURITIES.

The federal securities laws define "security" to include, in addition to the more common forms of securities such as stocks and bonds, "any investment contract." *See* 15 U.S.C.

§§ 77b(a)(1) & 78c(a)(10).  Under the Supreme Court's *Howey* decision, "a particular financial instrument" may "constitute an investment contract (and, hence, a security)" only if it "comprises (1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party."[5]  *SG Ltd.*, 265 F.3d at 46.  Plaintiff must plead each element "to a very substantial degree," *Teamsters* v. *Daniel*, 439 U.S. 551, 560 (1979), for it is critical that market participants have "easily ascertainable and predictable limits on the types of financial instruments that will qualify as securities," *SG Ltd.*, 265 F.3d at 50.

Here, Plaintiff does not allege that any NFT he purchased "is a security-like interest in a 'common enterprise' that, through the efforts of the promoter or others, is expected to generate profits for the security holder, either for direct distribution or as an increase in the value of the investment."  *Rodriguez* v. *Banco Cent. Corp*., 990 F.2d 7, 10 (1st Cir. 1993).  Plaintiff alleges the opposite.  Plaintiff purchased goods with specified utility, including as collectibles or as a means to compete for prizes in Reignmakers fantasy sports-style contests.  He did not passively invest in *DraftKings* through purchasing NFTs, and he nowhere claims he did, nor could he reasonably have believed that any NFT would enable him to profit on DraftKings' business success or from the efforts of DraftKings.  Plaintiff is trying to fit a square peg into a round hole.

### A.     The Complaint Fails To Plead a Common Enterprise.

To establish the "common enterprise" element of the *Howey* test, the First Circuit has endorsed the "horizontal commonality" theory, which requires all similarly situated investors to share in the profits and risks of a company on a pro rata basis.  *SG Ltd.*, 265 F.3d at 50.  A few other courts have also accepted an alternative "vertical commonality" test, which focuses on whether the "investor's fortunes are tied to the *promoter's* success rather than to the fortunes of

---

[5] Although many Marketplace NFTs are given away through promotions and contest prizes, Defendants do not here debate the "investment of money" prong of the *Howey* test.

his or her fellow investors." *Id.* at 49 (emphasis added). Plaintiff claims to plead a "common enterprise" under both tests. (*See* AC ¶ 102.) But the facts alleged flatly contradict the requirements of both.

### 1.       Plaintiff Cannot Allege Horizontal Commonality.

"Horizontal commonality" requires "[1] the pooling of assets from multiple investors [2] in such a manner that all share in the profits and risks of the enterprise." *SG Ltd.*, 265 F.3d at 50. In other words, for horizontal commonality to be present, investors must "pool their investments together and split the net profits and losses in accordance with their pro rata investments." *Hocking* v. *Dubois*, 839 F.2d 560, 566 (9th Cir. 1988), *adhered to on reh'g*, 885 F.2d 1449 (9th Cir. 1989). By "pooling their assets and giving up their claims to any profit or loss attributable to their particular investments, investors make their collective fortunes dependent on the success of a single common enterprise." *Id.*; *see also Wals* v. *Fox Hills Dev. Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994) ("pooling of profits" is "essential to horizontal commonality"). By contrast, horizontal commonality is lacking where, as here, an individual purchaser may "make profits or sustain losses independent of the fortunes of other purchasers." *Revak* v. *SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994). "The fortunes of each investor must be intertwined with the success of the pool." *Copeland* v. *Hill*, 680 F. Supp. 466, 468 (D. Mass. 1988).

"Pooling" requires combining investors' funds into an undifferentiated mass in which the investors maintain discernable participatory financial interests and from which the promoter conducts the operations of a common enterprise, ultimately distributing profits to investors. *See*, *e.g.*, *Howey*, 328 U.S. at 296, 300 (investors shared in pro rata profits based on overall production); *SEC* v. *Infinity Grp. Co.*, 212 F.3d 180, 187 n.8 (3d Cir. 2000) ("'Horizontal commonality' examines the relationship among investors in a given transaction, requiring a pooling of investors' contributions and distribution of profits and losses on a pro rata basis."). For instance, in *Revak*,

the Second Circuit held that individual condominium owners who bought their units from the same property company lacked horizontal commonality because the "rents and expenses attributable to each unit were not shared or pooled in any manner, but were instead the sole responsibility of the unit owner."  18 F.3d at 88.

Plaintiff does not plausibly plead horizontal commonality here.  The Complaint does not allege that Marketplace NFTs give each owner some participatory interest in a common pool of DraftKings assets.  Nor does Plaintiff allege that proceeds from the sales of Marketplace NFTs are deposited into a single pool from which NFT purchasers can draw any profits.  Instead, DraftKings deploys its revenues across its many businesses as it sees fit.  (AC ¶¶ 24 ("[F]unds received from the [NFT] sales [are used] to fund DraftKings' development and growth."), 44 (NFT revenues are used "to develop its NFT platform and potentially for other operations unrelated to its NFTs.").) NFT buyers (unlike DraftKings' stockholders) do not receive voting rights or dividends.  Fatally, Plaintiff alleges only an *inverse* relationship between Marketplace NFT values and DraftKings' business success, contending that NFT *values were highest* in the year that DraftKings' *losses peaked*, and NFT values thereafter *fell* as DraftKings' business *improved*.  (AC ¶¶ 22, 145.)

As demonstrated by the thousands of highly varied NFT transactions by Plaintiff (AC Ex. 1), each NFT is unique.  The prices vary widely and do not move in tandem.  The thousands of unique Marketplace NFTs lack any profit or loss commonality with other NFTs, and no horizontal commonality exists because at any time individual NFT purchasers may "make profits or sustain losses independent of the fortunes of other purchasers." *Revak*, 18 F.3d at 88.[6]  In other words, horizontal commonality is lacking because "the success or failure of those other [NFTs] had no direct impact on the profitability of plaintiffs' contract." *Milnarik* v. *M-S Commodities*,

---

[6] For example, the NFTs of an athlete that suffers a season-ending injury will naturally depreciate in value, or, conversely, the NFTs of an athlete that enjoys a break-out season may appreciate in value.  Holders of other NFTs would not share in that depreciation or appreciation.

*Inc.*, 457 F.2d 274, 276 (7th Cir. 1972).  Indeed, Plaintiff's own NFTs share no commonality even among themselves.

Moreover, purchasers of the Reignmakers NFTs that are the focus of the Complaint have no commonality at all.  Nor could they.  Reignmakers contestants compete *against* one another. Contestants first compete to assemble their roster of players.  Contestants thereafter compete for the opportunity to win prizes, yielding both winners and losers.  (AC ¶ 64.)  Their success varies from contest to contest and is highly individualistic, determined solely by their ability to select the players who perform the best on the field.  This is the opposite of commonality.  *Wals*, 24 F.3d at 1019 (registration and disclosure requirements of securities laws make sense only "if the investors are obtaining the same thing, namely an undivided share in the pool of assets and profits").

Plaintiff's bald assertion that unspecified "proceeds" from the sales of Marketplace NFTs are "pooled together" and employed "to stir up interest . . . by using the pool money in advertisements and the Reignmakers contests" (AC ¶ 104) is of no help to him.  Besides contradicting Plaintiff's other allegations that DraftKings deploys NFT revenues throughout its business (AC ¶ 44) and "failed to develop and grow the NFT platform and DraftKings Marketplace" (AC ¶ 24), this contortion of commonality has no basis in *Howey* and its progeny and would transform virtually every widget sold by a modern company into a security.  After all, every company reinvests some portion of its revenues into "advertisements" and other marketing initiatives.  What matters under *Howey* is whether a single pool of money is used to conduct a common enterprise, the profits of which are then distributed to investors based on their shares in the enterprise.  Where, as here, funds are not placed into a collective pot and investors obtain no participatory interests, the requisite commonality is absent.  *See Revak*, 18 F.3d at 88 ("[t]he rents and expenses attributable to each unit were not shared or pooled in any manner"); *Milnarik*, 457 F.2d at 278 (separate agreements to trade commodities futures involved no "pool of capital to be

used in furthering a common enterprise"); *cf. SG Ltd.*, 265 F.3d at 50 (pooling established because defendants "unambiguously represented to its clientele that participants' funds were pooled in a single account used to settle participants' on-line transactions").

Plaintiff does not allege that DraftKings has ever committed to use revenue generated from sales of NFTs to develop the Marketplace. He instead concedes that NFT revenues—like all DraftKings revenues—are available for use in any part of DraftKings' multi-faceted business in whatever amounts or allocation that management sees fit. (AC ¶ 44.) Any collective profit (or loss) from those businesses inure to the sole benefit (or detriment) of DraftKings and its equity shareholders. Plaintiff shares not one iota of DraftKings' profits or losses.

## 2. DraftKings' Fees Are Insufficient to Plead Vertical Commonality.

Vertical commonality, which generally focuses on the relationship between the promoter and investors (rather than between investors), has two types: (1) "[b]road vertical commonality requires that the well-being of all investors be dependent upon the promoter's expertise"; and (2) "narrow [or strict] vertical commonality requires that the investors' fortunes be 'interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'" *SG Ltd.*, 265 F.3d at 49 (citations omitted). The Complaint purports to satisfy only the test for strict vertical commonality. (*See* AC ¶¶ 102-103.) It does not do so.

While declining to rule definitively on the question, the First Circuit has at least "hinted at a preference for horizontal commonality" in order to meet the "common enterprise" prong of the *Howey* test. *SG Ltd.*, 265 F.3d at 50, 50 n.2. Other Circuits have rejected outright vertical commonality. *See*, *e.g.*, *Stenger* v. *R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984) ("This Circuit has strictly adhered to a 'horizontal' test of common enterprise."). Consistent with the hints from the First Circuit in *SG Ltd.*, this Court should reject vertical commonality because, without the pooling of assets that typifies horizontal commonality, the "essential properties of a

debt or equity security" are missing.  *Wals*, 24 F.3d at 1018; *see also Curran* v. *Merrill Lynch*, 622 F.2d 216, 221-22 (6th Cir. 1980).

But even if some vertical commonality theory is viable, Plaintiff fails to plead facts that establish its presence here.  Strict vertical commonality turns on a "direct relation between the success or failure of the promoter and that of his investors."  *Mordaunt* v. *Incomco*, 686 F.2d 815, 817 (9th Cir. 1982).  Something more is needed than a bare "link" between the "fortunes of investors" and the "efforts of the promoter."  *Revak*, 18 F.3d at 88.  Rather, strict vertical commonality exists only where the "fortunes of the investor are *interwoven with* and *dependent upon* the efforts and success of those seeking the investment or of third parties."  *Brodt* v. *Bache & Co., Inc.*, 595 F.2d 459, 460 (9th Cir. 1978) (emphases added).  Critically, vertical commonality does not exist if an investor's fortunes can rise or fall independent from those of the promoter— *i.e.*, if an investor can profit while the promoter loses (or vice versa), there is no vertical commonality.  *Mordaunt*, 686 F.2d at 817; *Marini* v. *Adamo*, 812 F. Supp. 2d 243, 256 (S.D.N.Y. 2011) ("[S]trict vertical commonality exists where there is a 'one-to-one relationship between the investor and investment manager' such that there is 'an interdependence of both profits and losses of the investment.'"); *Copeland*, 680 F. Supp. at 468 (same).

The only profits alleged in the Complaint come, if at all, from participating in the Reignmakers contests and from potential increases in the value of the NFTs.  (AC ¶¶ 54, 141.) But these alleged profit opportunities are not correlated in any way to the profits or losses of DraftKings.  Winners of Reignmakers contests earn prizes that have no relation to the success of DraftKings.  Reignmakers NFTs lose value as the professional season wanes on.  Other Marketplace NFTs trade at prices set according to supply and demand, in either case independent of any success of DraftKings.

Furthermore, Marketplace NFT revenues are alleged to amount to about 3% of DraftKings' total revenues.  Plaintiff contends that a significant portion of those $70 million annual revenues are paid in licensing fees to the sports leagues (AC ¶ 65), and at least $33 million was paid out in total prizes for the 2022 Reignmakers Football contests alone (AC Ex. 5, at 8).  Plaintiff alleges derisively that "DraftKings is not a profitable business" and that it has lost substantial sums in each year at issue here.  (AC ¶¶ 21-22.)  This allegation necessarily concedes that NFT purchasers can profit while DraftKings loses, which defeats commonality.  *Mordaunt*, 686 F.2d at 817.  As this Court observed in the context of rare coins, vertical commonality is absent because "[t]he primary risks and rewards—appreciation or depreciation in market value—rested on" NFT owners. *Copeland*, 680 F. Supp. at 468.

Plaintiff is left to contend that fees allegedly charged by DraftKings on secondary market sales are sufficient to establish vertical commonality.  (AC ¶¶ 36, 38, 56, 57, 103.)  Not so.  The percentage-based transaction fees that DraftKings collects from all secondary market transactions do not depend upon, or correlate to, whether or to what extent the NFT seller made a profit or loss on the transaction, breaking any interdependency between DraftKings and the purchaser.  *See Schofield* v. *First Commodity Corp. of Bos.*, 638 F. Supp. 4, 7 (D. Mass. 1985) ("'[N]arrow vertical commonality' also was lacking because the broker's profits were not influenced by the success or failure of the trading in the account."), *aff'd*, 793 F.2d 28 (1st Cir. 1986).  Courts in this district uniformly reject theories of vertical commonality based on the payment of predetermined transaction fees to the promoter.  *See Kaufman* v. *Magid*, 539 F. Supp. 1088, 1097 (D. Mass. 1982) ("commission arrangement alone is not enough" to establish interdependent fortunes); *Austin* v. *Bradley, Barry & Tarlow, P.C.*, 1992 WL 560915, at *7 (D. Mass. June 17, 1992) (plaintiffs "failed to demonstrate strict vertical commonality" because neither the company's annual fee nor its percentage-based commissions were "inherently contingent upon the plaintiffs' potential profits

or losses"); *Margaret Hall Found., Inc.* v. *Atl. Fin. Mgmt., Inc.*, 572 F. Supp. 1475, 1483 (D. Mass. 1983) (agreement setting "compensation at a percentage of value of a client's portfolio," but not "directly to profits" was "insufficient to turn the agreement into a 'common enterprise'").

**B.      The Complaint Fails To Plead That DraftKings Led Customers To Reasonably Expect Profits Through the Efforts of Defendants.**

Even if the NFTs here were a means to participate in a "common enterprise," they are still not securities because they do not satisfy *Howey*'s final prong, which requires an investment to be made on the "expectation that [the investor] would earn a profit solely through the efforts of the promoter or of someone other than themselves."  *Howey*, 328 U.S. at 298.  This prong has two elements.  *First*, the instrument must be sold as a profit-making investment rather than as an item to be used or consumed.  *See SG Ltd.*, 265 F.3d at 53-54; *U.S.* v. *Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (inquiry is whether "under all the circumstances, the scheme was being promoted primarily as an investment").  *Second*, profits must derive principally from managerial efforts rather than market forces or the purchaser's own actions.  *SG Ltd.*, 265 F.3d at 54-55.  Plaintiff fails to plead either element.

**1.      DraftKings' NFT Marketing Did Not Lead Customers To Reasonably Expect Investment Profits.**

"The Supreme Court has recognized an expectation of profits in two situations, namely, (1) capital appreciation from the original investment, and (2) participation in earnings resulting from the use of investors' funds."  *SG Ltd.*, 265 F.3d at 53; *see also Rodriguez*, 990 F.2d at 10 (profits must be from "direct distribution or as an increase in the value of the investment").  "These situations are to be contrasted with transactions in which an individual purchases a commodity for personal use or consumption."  *SG Ltd.*, 265 F.3d at 53.

There is a critical distinction between investments that have some utility, and utilitarian purchases that may have some investment value.  The former may give rise to an "investment

contract"; the latter cannot.  For instance, in *Salameh* v. *Tarsadia Hotel*, the Ninth Circuit held that purchases of condominiums were not "investment contracts" because they served as "short-term vacation homes" rather than as investment properties.  726 F.3d 1124, 1132 (9th Cir. 2013); *see Bronstein* v. *Bronstein*, 407 F. Supp. 925, 930 (E.D. Pa. 1976) (distinguishing ventures with "an eye towards personal use or consumption of the underlying interest" from those with "the purpose of acquiring an interest in a profit-making venture").  "The inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant."  *SEC* v. *Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 371 (S.D.N.Y. 2020).

The Complaint alleges a variety of efforts by DraftKings to market NFTs to its customers, but it does not and cannot allege that DraftKings led customers to reasonably expect to profit on capital appreciation or earnings participation.  To the contrary, all of the alleged profit-centric representations described in the Complaint are statements about the prospect of *winning prizes* in Reignmakers contests through skillful deployment of NFTs (*i.e.*, through consumptive use).[7]  An investment contract simply cannot exist where, as here, the supposed profits are the fruits of the purchaser's own actions.  *Steinhardt Grp. Inc.* v. *Citicorp*, 126 F.3d 144, 153 (3d Cir. 1997) ("[A]n investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have 'little direct effect upon receipt by the participant of the benefits promised by the promoters.'" (citation omitted)).

Plaintiff cites only to alleged comments by third parties—internet accounts of individuals, some of whom claim to participate in the Marketplace—to support the proposition that some customers transacted in NFTs with a profit-making objective.  (*See*, *e.g.*, AC ¶¶ 115, 118, 122,

---

[7] *See*, *e.g.*, AC ¶¶ 56 (customers can "round out a [fantasy] team" by purchasing NFTs on the secondary market), 108 ("access to over $12 million *in prizes* this season"), 109 ("win a share of over one million dollars *in prizes* every week of the NFL season"), 148 ("DraftKings released promotional videos and other materials expressing, without reservation, the potential to win millions of dollars *from prizes*.") (emphases added).

124, 130-135.)   Yet, Plaintiff conflates references to contestants who hoped to win prizes in Reignmakers contests with some supposed profit expectations.   More importantly, only representations *by Defendants* can give rise to relevant profit expectations under the securities laws.   *See Marine Bank* v. *Weaver*, 455 U.S. 551, 556 (1982) ("[T]he test is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."); *SG Ltd.*, 265 F.3d at 54 (discussing *defendant's* "persistent representations"); *SEC* v. *LBRY, Inc.*, 639 F. Supp. 3d 211, 217 (D.N.H. 2022) (discussing expectations resulting from "multiple statements by" defendants); *Telegram Grp. Inc.*, 448 F. Supp. 3d at 371 ("A transaction does not fall within the scope of the securities laws when a reasonable purchaser is motivated to purchase by a consumptive intent."); *Rodriguez* v. *Banco Cent.*, 777 F. Supp. 1043, 1059 (D.P.R. 1991) ("Characterization of the inducement cannot be accomplished without a thorough examination of the representations made *by the defendants* as the basis of the sale." (cleaned up) (emphasis added)).   Plaintiff cites not one statement by Defendants expressing or suggesting that NFT purchasers could share in DraftKings' profits, or in any way tying the success of DraftKings to the pricing of NFTs.

Plaintiff seeks to avoid pleading any actual efforts by Defendants to promote a primarily investment profit-making objective for Marketplace NFTs through extensive and irrelevant arguments about the limited rights in the underlying likenesses and other intellectual property conveyed to an NFT purchaser in accordance with DraftKings' Terms of Use.   (AC ¶¶ 27-38.) Plaintiff contends that the limited rights conveyed to NFT owners means that they are neither "artwork" nor "collectibles."   (AC ¶¶ 82-87.)   This is wrong, and betrays a basic misunderstanding of licenses and intellectual property laws reflected in the Terms of Use.   Outside of the NFT context, the purchaser of a collectible or artwork receives no rights or interest in the intellectual property of the item purchased, nor any right to profit from the intellectual property.   *Geophysical*

*Serv., Inc.* v. *TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 794 (5th Cir. 2017) ("The owner of a lawfully made copy or phonorecord is still forbidden from copying it, preparing derivative works based on it, publicly performing it, or publicly displaying it, any of which would violate one of the copyright owner's other exclusive rights (absent some other limitation or defense)."). Ownership of tangible art entails little more than the right to display and sell the object. *Gener-Villar* v. *Adcom Grp., Inc.*, 417 F.3d 201, 203 n.1 (1st Cir. 2005) ("[A] collector who buys a painting from an artist may hang it in his house or sell it to a third party. However, the collector does not acquire, solely by buying the painting, the right to make and distribute prints of it."). A license to intangible intellectual property is more limited: "a mere copyright licensee is permitted only to make a single copy, and that for his own use only, not for sale to another." *ITOFCA, Inc.* v. *MegaTrans Logistics, Inc.*, 322 F.3d 928, 930 (7th Cir. 2003). Thus, purchasers of NFTs receive similar limited rights in the content as any other purchaser of a collectible or art.

Finally, even if Plaintiff had some economic interest in purchasing NFTs beyond amassing collectibles or competing in a Reignmakers contest, it is the "type of economic interest [that] characterizes every form of commercial dealing." *United Hous. Found., Inc.* v. *Forman*, 421 U.S. 837, 858 (1975). As stated by the First Circuit, "one who buys raw land or even a building" may do so "hoping to profit from rents or the natural increase in the value of property, [but] is not under normal circumstances treated as purchasing a 'security.'" *Rodriguez*, 990 F.2d at 10 (citation omitted). "[E]ven if every buyer bought for investment, what was purchased in this case was not a share of a business enterprise and so not a security." *Id.* at 11. "What distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption." *Forman*, 421 U.S. at 858.

###### 2.   The Complaint Does Not Plausibly Allege That Any Profits Expected by DraftKings Customers Were Due to Managerial Efforts.

Marketplace NFTs fail to satisfy *Howey*'s final prong for a second reason.  For there to be an "investment contract," the expected profits from capital appreciation or earnings participation must be the result of "undeniably significant . . . [and] essential managerial efforts [that] affect the failure or success of the enterprise."  *SEC* v. *Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).  The Complaint alleges that "investors were entirely dependent on DraftKings' managerial efforts to realize any profits or avoid losses on their investment in the NFTs" because those efforts supposedly ensured the availability of a secondary NFT market.  (AC ¶ 46; *see also id.* ¶ 87.)  But operating a secondary market does not constitute "essential managerial efforts" that could transform NFTs into securities.  *See Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 756 F.2d 230, 240 (2d Cir. 1985).  The prize-earning potential of competing in a Reignmakers contest does not depend on managerial efforts; it depends on the skill of contestants assembling a lineup and the real-world performance of athletes.  *SEC* v. *Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 585 (2d Cir. 1982) ("If, by contrast, the reasonable expectation was one of significant investor control, a reasonable purchaser could be expected to make his own investigation of the new business" without the protections of the securities laws.).

The Ninth Circuit has held there was no "investment contract" where a business sold silver bars, given that "the profits to the investor depended upon the fluctuations of the silver market, not the [seller's] managerial efforts."  *Noa* v. *Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980).  The same is true of Marketplace NFTs bought for collecting, sentimental or utilitarian reasons, but whose value might thereafter fluctuate due to factors beyond DraftKings' control.  *Sinva, Inc.* v. *Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) ("In a sense anyone who buys or sells a horse or an automobile hopes to realize a profitable 'investment.' But the expected return is not contingent upon the continuing efforts of another.").

*Howey*'s requirement that profits come from "undeniably significant [and] essential managerial efforts," *Glenn W. Turner*, 474 F.2d at 482, demands something more than merely having the capacity to influence an NFT's price.  Managerial efforts must *drive* profit in order to satisfy *Howey*.  *See*, *e.g.*, *SEC* v. *Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) ("[I]f the realization of profits depends significantly on the post-investment operation of market forces, pre-investment activities by a promoter would not satisfy *Howey*'s third prong."); *Grenader* v. *Spitz*, 537 F.2d 612, 619 (2d Cir. 1976) ("While efficient management of the cooperative will enhance its desirability as a place of residence, it is hardly a factor which would result in the appreciation in value of the shares . . . . Realistically, that will depend upon the general housing market, the status of the neighborhood and the availability of credit."); *Lehman Bros. Com. Corp.* v. *Minmetals Int'l Non- Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (holding no investment contract where "any gain likely would result in large part from market movements, not from capital appreciation due to Lehman's efforts").

Plaintiff relies principally on allegations that Defendants' managerial efforts are necessary for a Marketplace NFT market to exist at all.  (*See* AC ¶¶ 141-142.)  Even if true, these allegations are insufficient under *Howey*, and the argument proves too much.  Every business exists only though the efforts of its management.  Plaintiff must show that Defendants sought "to attract investors by the prospect of *profits resulting from* the efforts of" Defendants.[8]  *Forman*, 421 U.S. at 853-54 (noting that the information bulletin that was provided to prospective residents "emphasized the fundamental nature and purpose" of purchasing the shares, which was to acquire a home to reside in, and not for investment purposes).  The ancillary services provided through the Marketplace are unconnected to the profitability of the supposed investment.  *Id.* at 857 ("[T]he

---

[8] For this reason, it is legally irrelevant that DraftKings allegedly held custody of the NFTs and tracked transfers of the NFTs on its internal ledger.  (AC ¶¶ 69-77.)  Neither activity creates any expectation of profits among buyers.

stores and services in question were established not as a means of returning profits to tenants, but for the purpose of making essential services available for the residents.").

The Complaint makes clear that any actual or expected *price appreciation* in particular Marketplace NFTs has no connection to managerial efforts by DraftKings.  The Complaint includes allegations about managerial efforts *only* in respect of Reignmakers NFTs.  (AC ¶¶ 141-142 (referencing "sale 'drops' in packs," a need to "maintain the DraftKings craze," "ensuring scarcity," and the need "to mint new [Marketplace] NFTs," all of which concern only Reignmakers).)  Yet there is no dispute that primary drops of Reignmakers NFTs occurred at pre-announced, *declining* fixed prices during the fantasy sports season, and prices for all NFTs available for sale on the secondary market are set by the NFT owner, not by DraftKings.  (AC ¶¶ 57, 113.)  Plaintiff acknowledges that prices for *all* Reignmakers NFTs experience a secular decline as the season progresses.  (*E.g.*, AC ¶¶ 113, 117; AC Ex. 5, at 7, 8.)  And, all agree that intermediate price fluctuations in Reignmakers NFTs are tied ineluctably to the functional utility of that NFT in fantasy sports-style contests, including the prospective performance of the athlete associated with the NFT.  (*See*, *e.g.*, Decl. Ex. 4, at 3 (Discord chat from Sept. 17, 2022) (referenced in AC ¶ 131) (noting that the price of a particular Reignmakers NFT was "dropping" because the player "already played this week so people want to sell [in order] to buy [NFTs featuring] guys" who were available to play in a current contest).)

### C.     The *Dapper Labs* Decision Confirms the Complaint Lacks Merit.

Despite not saying so, the entirety of the allegations here seek simply to mimic the allegations at issue in the only decision by any court that ever has found that an NFT could be a security, the out-of-circuit district court decision in *Friel* v. *Dapper Labs, Inc.*, 2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023).  That court's self-described "close call" and "narrow" decision, *id.* at

*8, rejected certain theories Plaintiff advances here, and found that the complaint there barely avoided dismissal based upon facts not remotely present here. Among other things:

(1) The *Dapper Labs* court rejected a vertical commonality theory because that complaint, as here, did not show that the promoter would profit only if investors profited. *Id.* at *15.

(2) The *Dapper Labs* court found horizontal commonality to be alleged adequately based on two facts not present here. First, pooling was established because Dapper's *entire business* was allegedly premised on the success of its proprietary FLOW Blockchain, and "the capital Dapper Labs raises through the offer of Moments [was] used to develop and maintain the Flow Blockchain." *Id.* at *12. In contrast, here, DraftKings does not have a proprietary blockchain; the Marketplace NFTs are minted on a public blockchain. Second, the *Dapper Labs* plaintiff had pled facts that "tie[d] the *value* of Moments [NFTs] to *Dapper Labs's success*." *Id.* at *13 (emphasis added). Here, by contrast, the value of Reignmakers NFTs is based on their utility in games and the contestant's ability to build competitive player lineups. Moreover, there is and could be no allegation that the value of any Marketplace NFT, or even DraftKings' entire NFT business, which comprises collectively 3% of its revenues, is correlated to DraftKings' overall business success.[9]

(3) The court reiterated repeatedly that "[t]he allegations that Dapper Labs created and maintains a *private* blockchain [was] fundamental to the Court's conclusion" that the defendant's managerial efforts drove the NFTs' investment value. *Id.* at *22 (emphasis in original). Dapper Labs created and owned the private Flow Blockchain on which its NFTs were minted. More importantly, FLOW tokens—a Dapper Labs cryptocurrency—"were used to validate transactions

---

[9] The *Dapper Labs* court found horizontal commonality buttressed by the notion that "the value of all Moments would drop to zero" if "Dapper Labs went out of business and shut down the Flow Blockchain." *Id.* at *13. This observation is backwards. The relevant inquiry is whether the *success* of the promoter will lead to *profits* for the investor. *Revak*, 18 F.3d at 87 ("the fortunes of each investor [must] depend upon the profitability of the enterprise as a whole"). Here, Plaintiff does not allege any connection between DraftKings' overall business success and NFT values.

on the Flow Blockchain" and to compensate validators, including in respect of the Dapper NFTs. *Id.* at *4. "The interplay among FLOW, the Flow Blockchain, and [the] Moments [NFTs] is *necessary* to the totality of the scheme at issue." *Id.* at *9 (emphasis added). The managerial efforts in developing and maintaining FLOW tokens and the Flow Blockchain were what the court found sufficient to "allege a scheme of directly correlated value between FLOW and Moments, insofar as FLOW is necessary to creating the value of Moments via blockchain validation." *Id.*

Hence, "the economic realities and technological interplay between FLOW, the Flow Blockchain, and Moments, as alleged by Plaintiffs, are what support[ed] the Court's conclusions." *Id.* Nothing of this sort is present here. *Id.* at *22 ("Not all NFTs offered or sold by any company will constitute a security."). Instead, Plaintiff admits that the NFTs sold on the DraftKings Marketplace are "minted on the Polygon blockchain," which is a public blockchain that exists entirely independently of DraftKings. (AC ¶¶ 26, 42.) Even if DraftKings were to dissolve today, *the NFTs and Polygon blockchain would continue to exist*. Moreover, the Complaint acknowledges that Marketplace NFTs can persist outside of the Marketplace. (AC ¶ 33.) Finally, unlike Dapper Labs and the FLOW cryptocurrency, Marketplace NFTs do not use or depend upon any DraftKings proprietary cryptocurrency.[10] *Dapper Labs*, 2023 WL 2162747, at *4. DraftKings has not created any cryptocurrency, and Marketplace NFTs are purchased only with cash.

(4) In finding a sufficient promise of profits, the *Dapper Labs* court dismissed language from the First Circuit in *SG Ltd.*, 265 F.3d at 54, suggesting that defendants' promises of profit ought to be "persistent," and found that defendants had all touted repeatedly the profit opportunity from Dapper NFTs. 2023 WL 2162747, at *16. No such statements are present here. Moreover,

---

[10] Plaintiff inexplicably notes that the SEC has alleged that the Polygon blockchain's native cryptocurrency (MATIC) is a security. (AC ¶¶ 66-67.) But Plaintiff alleges no connection between MATIC and Marketplace NFTs (beyond the legally irrelevant fact that they are minted on the same blockchain), because there is none.

the court found that the complaint sufficiently alleged that "Moments were primarily purchased for an investment purpose" because none of the "consumptive use[s]" of Moments in competitive games then existed or "'was available at the time' Moments were offered to Plaintiffs." *Id.* at *18-*19. Not so here with respect to the Reignmakers NFTs that are the focus of the Complaint.

## II.   PLAINTIFF HAS NO PRIVATE RIGHT OF ACTION TO ASSERT HIS EXCHANGE ACT CLAIMS.

Plaintiff alleges two claims under the Exchange Act: (1) a claim that DraftKings is unlawfully operating an unregistered securities exchange (AC ¶¶ 176-185), and (2) a claim that DraftKings is unlawfully operating as an unregistered broker-dealer (AC ¶¶ 186-196). Plaintiff alleges that, as a result, all Marketplace NFT transactions are "null and void" and, accordingly, that Plaintiff is entitled to rescission. (AC ¶¶ 183, 195.) These claims, like Plaintiff's other claims, should be dismissed because Marketplace NFTs are not securities. *See* 15 U.S.C. § 78e (unlawful for an unregistered "exchange . . . to effect any transaction in a *security*" (emphasis added)); 15 U.S.C. § 78o(a)(1) (unlawful for an unregistered "broker or dealer . . . to affect any transactions in, or to induce or attempt to induce the purchase or sale of, any *security*" (emphasis added)).

These claims should also be dismissed because Plaintiff has no private right of action to pursue them. Neither Exchange Act provision expressly grants such a right, and this Court should not read one into the statute. *Armstrong* v. *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 332 (2015) ("[A] private right of action under federal law is not created by mere implication, but must be 'unambiguously conferred.'" (citation omitted)). Indeed, an "overwhelming majority of courts to decide this issue" have concluded that there is no private right of action. *See Fox Int'l Rels.* v. *Fiserv Sec., Inc.*, 490 F. Supp. 2d 590, 611 (E.D. Pa. 2007) (collecting cases); *EMA Fin., LLC* v. *Vystar Corp.*, 2021 WL 1177801, at *3 (S.D.N.Y. Mar. 29, 2021). And binding precedent rules out creating a new, implied private right of action where, as here, Congress did not provide one. "'[P]rivate rights of action to enforce federal law must be created by Congress'"; "[s]tatutory intent

is dispositive, and '[w]ithout it, a cause of action does not exist and courts may not create one.'"

*Allco Renewable Energy Ltd.* v. *Massachusetts Elec. Co*., 875 F.3d 64, 69 (1st Cir. 2017) (quoting

*Alexander* v. *Sandoval*, 532 U.S. 275, 286 (2001)).

## III.   PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS.

Plaintiff's control person claims under Sections 15 and 20(a) of the Exchange Act fail along

with his underlying claims.  *See Yan* v. *ReWalk Robotics Ltd.*, 973 F.3d 22, 35 n. 5 (1st Cir. 2020)

(dismissing Section 15 claim after dismissing the requisite underlying securities claim); *Mehta* v.

*Ocular Therapeutix, Inc.*, 955 F.3d 194, 211 (1st Cir. 2020) (same for Section 20(a) claim).

## IV.   PLAINTIFF'S STATE LAW CLAIMS FAIL FOR THE SAME REASONS.

Plaintiff alleges that Defendants sold unregistered securities and operated as an

unregistered broker and dealer in violation of Chapter 110A, Sections 201(a) and 301 of the

Massachusetts General Laws.  (AC ¶¶ 203-208, 209-213.)  "The Massachusetts securities laws . . .

are substantially similar to the federal securities laws and therefore decisions construing the federal

statutory language are applicable to the state statute as well."  *Adams* v. *Hyannis Harborview, Inc.*,

838 F. Supp. 676, 685 n.9 (D. Mass. 1993), *aff'd sub nom. Adams* v. *Zimmerman*, 73 F.3d 1164

(1st Cir. 1996); *see also Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 50 (2004) ("The

Legislature has directed that we interpret [Chapter 110A] in coordination with the Securities Act

of 1933.").  Having failed to plead a violation of the federal securities laws, Plaintiff has also failed

to plead state securities law claims.  *See*, *e.g.*, *NTV Mgmt., Inc.* v. *Lightship Global Ventures, LLC*,

484 Mass. 235, 243 (2020); *Margaret Hall Found., Inc.*, 572 F. Supp. at 1483.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:    September 25, 2023          Respectfully submitted,

_/s/ Michael G. Bongiorno_

Michael G. Bongiorno (BBO #558748)
Andrew S. Dulberg (BBO #675405)
WILMER CUTLER PICKERING
HALE and DORR LLP
60 State Street
Boston, MA 02109
michael.bongiorno@wilmerhale.com
andrew.dulberg@wilmerhale.com
Tel: (617) 526-6000


Brian T. Frawley (admitted _pro hac vice_)
Benjamin R. Walker (admitted _pro hac vice_)
Charles H. Sullivan (admitted _pro hac vice_)
Howard H. Kim (admitted _pro hac vice_)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
frawleyb@sullcrom.com
walkerb@sullcrom.com
sullivanc@sullcrom.com
kimhow@sullcrom.com
Tel: (212) 558-4000

_Attorneys for Defendants DraftKings Inc.,_
_Jason D. Robins, Jason K. Park, and Matthew Kalish_