**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JUSTIN DUFOE, on Behalf of Himself and All Others Similarly Situated,

Plaintiff,

v.

DRAFTKINGS INC., JASON D. ROBINS, JASON K. PARK, and MATTHEW KALISH,

Defendants.

Case No. 23-cv-10524-DJC

***ORAL ARGUMENT REQUESTED***

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 6

I. Overview .......... 6

II. Allegations Concerning the "Investment of Money" .......... 6

III. Allegations Concerning the "Common Enterprise" .......... 6

IV. Allegations Concerning the Expectation of Profits from Efforts of Defendants .......... 7

V. Unregistered Exchange or Broker Dealer Allegations .......... 8

VI. Lead Plaintiff's Investment Losses .......... 9

ARGUMENT .......... 9

I. DraftKings NFTs Are "Investment Contracts" and Therefore "Securities." .......... 9

A. The DraftKings NFT Marketplace is a "Common Enterprise." .......... 10

1. The Complaint Establishes *Horizontal* Commonality With DraftKings. .......... 11

a. DraftKings "Pools" Assets from Its NFT Investors. .......... 11

b. Investors Share in the Profits and Risks of the NFT Marketplace. .......... 13

2. The Complaint Establishes *Vertical* Commonality With DraftKings. .......... 15

a. The Complaint Establishes *Broad* Vertical Commonality With DraftKings. .......... 16

b. The Complaint Establishes *Narrow* Vertical Commonality With DraftKings. .......... 17

3. Commonality is Not Defeated by Individual Features or Values. .......... 18

B. Investors Have an Expectation of Profits from the Efforts of DraftKings. .......... 19

1. Investors in DraftKings NFTs Have an Expectation of Profits. .......... 20

2. The Profits Are to Come from the Managerial Efforts of DraftKings. .......... 23

II. A Private Right of Action Exists for Failure to Register under the Exchange Act. .......... 24

III. Control Person Liability Exists under the Securities Act and Exchange Act. .......... 25

IV. The Massachusetts Securities Law Claims Are Properly Alleged. ................................ 26

V. Lead Plaintiff Should Be Given an Opportunity to Amend, if Necessary...................... 26

CONCLUSION.............................................................................................................. 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Hyannis Harborview, Inc.*,
838 F. Supp. 676 (D. Mass. 1993) ........ 26

*Adams v. Zimmerman*,
73 F.3d 1164 (1st Cir. 1996) ........ 26

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........ 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 9

*Audet v. Fraser*,
605 F. Supp. 3d 372 (D. Conn. 2022) ........ 23

*Austin v. Bradley, Barry & Tarlow, P.C.*,
No. 85 Civ. 4767, 1992 WL 560915 (D. Mass. June 17, 1992) ........ 18

*Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340 (S.D.N.Y. 2019) ........ 10, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 9

*In re Bos. Sci. Corp. Sec. Litig.*,
646 F. Supp. 3d 249 (D. Mass. 2022) ........ 25

*Carmona v. Toledo*,
215 F.3d 124 (1st Cir. 2000) ........ 26

*Chase v. Merson*,
384 F. Supp. 3d 106 (D. Me. 2019) ........ 10, 11, 16, 17

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013) ........ 9

*Friel v. Dapper Labs, Inc.*,
No. 21 Civ. 5837, 2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023) ........ *passim*

*Glen-Arden Commodities, Inc. v. Costantino*,
493 F.2d 1027 (2d Cir. 1974) ........ 10

*Hays v. Adam*,
512 F. Supp. 2d 1330 (N.D. Ga. 2007) ........ 16

*Landegger v. Cohen*,
5 F. Supp. 3d 1278 (D. Colo. 2013) ........................................ 24, 25

*Marini v. Adamo*,
812 F. Supp. 2d 243 (E.D.N.Y. 2011)........................................ 17

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................ 25

*Miller v. Cent. Chinchilla Grp., Inc.*,
494 F.2d 414 (8th Cir. 1974) ........................................ 10

*Ocasio-Hernandez v. Fortuno-Burset*,
640 F.3d 1 (1st Cir. 2011)........................................ 9

*Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*,
678 F.2d 552 (5th Cir. 1982) ........................................ 25

*Revak v. SEC Realty Corp.*,
18 F.3d 81 (2d Cir. 1994) ........................................ 14

*Reves v. Ernst & Young*,
494 U.S. 56 (1990) ........................................ 3

*Rodriguez v. Banco Cent. Corp.*,
990 F.2d 7 (1st Cir. 1993)........................................ 3

*Sampson v. Invest Am., Inc.*,
754 F. Supp. 928 (D. Mass. 1990)........................................ 10

*Schofield v. First Commodity Corp. of Bos.*,
638 F. Supp. 4 (D. Mass. 1985)........................................ 18

*SEC v. Aqua-Sonic Prods. Corp.*,
687 F.2d 577 (2d Cir. 1982) ........................................ 23

*SEC v. Arbitrade Ltd.*,
No. 22 Civ. 23171, 2023 WL 2785015 (S.D. Fla. Apr. 5, 2023)........................................ 16

*SEC v. Edwards*,
540 U.S. 389 (2004) ........................................ 4, 20

*SEC v. Glenn W. Turner Enters., Inc.*,
474 F.2d 476 (9th Cir. 1973) ........................................ 16, 19, 20, 23

*SEC v. Infinity Grp. Co.*,
212 F.3d 180 (3d Cir. 2000) ........................................ 14

*SEC v. Int'l Loan Network, Inc.*,
968 F.2d 1304 (D.C. Cir. 1992) .......... 10

*SEC v. Kik Interactive Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020) .......... 10, 14, 15

*SEC v. LBRY, Inc.*,
639 F. Supp. 3d 211 (D.N.H. 2022) .......... *passim*

*SEC v. Nat. Diamonds Invest. Co.*,
No. 19 Civ. 80633, 2019 WL 13277296 (S.D. Fla. May 28, 2019) .......... 16

*SEC v. Ripple Labs, Inc.*,
No. 20 Civ. 10832, 2023 WL 4507900 (S.D.N.Y. July 13, 2023) .......... 10

*SEC v. Ripple Labs, Inc.*,
No. 20 Civ. 10832, 2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) .......... 24

*SEC v. SG Ltd.*,
265 F.3d 42 (1st Cir. 2001) .......... *passim*

*SEC v. Telegram Group, Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......... *passim*

*SEC v. Terraform Labs Pte. Ltd.*,
No. 23 Civ. 1346, 2023 WL 4858299 (S.D.N.Y. July 31, 2023) .......... 10, 24

*SEC v. Tropikgadget FZE,*
146 F. Supp. 3d 270 (D. Mass. 2015) .......... 10

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) .......... *passim*

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979) .......... 25

*United Hous. Found., Inc. v. Forman*,
421 U.S. 837 (1975) .......... 20, 21

**Statutes**

15 U.S.C. § 77b .......... 22

15 U.S.C. § 77e .......... 2

15 U.S.C. § 77l .......... 2

15 U.S.C. § 77o .......... 2, 25

15 U.S.C. § 78cc ........................................................................................................ 2

15 U.S.C. § 78e .......................................................................................................... 2

15 U.S.C. § 78o .......................................................................................................... 2

15 U.S.C. § 78t(a) .................................................................................................. 2, 25

**Other Authorities**

Douglas R. Emery *et al.*,
*A closer look at Black-Scholes option thetas*, 32 J. Econ. Fin. 59 (2008) ................................ 22

*In the Matter of Impact Theory, LLC*,
Release No. 11226, File No. 3-21585 (Aug. 28, 2023)............................................................ 4

*In the Matter of Stoner Cats 2, LLC*,
Release No. 11233, File No. 3-21655 (Sept. 13, 2023) ........................................................... 4

**Regulations**

Mass. Gen. Laws Ch. 110A § 201 ........................................................................... 2, 26

Mass. Gen. Laws Ch. 110A § 301 ........................................................................... 2, 26

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AC or Complaint | Amended Complaint for Violations of the Federal Securities Laws (ECF No. 38) |
| AC Ex. | Exhibit attached to the Complaint |
| Decl. Ex. | Exhibit attached to the Declaration of Andrew Dulberg, dated September 25, 2023 |
| DraftKings | DraftKings Inc. |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78rr |
| Marketplace | DraftKings Marketplace |
| Motion | Defendants' Motion to Dismiss the Amended Complaint (ECF No. 46) |
| Def. Br. | Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint (ECF No. 47) |
| NFT | Non-fungible token |
| Polygon | Polygon Labs |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | Securities Act of 1933, 15 U.S.C. §§ 77a-77aa |

**PRELIMINARY STATEMENT**

Justin Dufoe ("Lead Plaintiff") respectfully requests the Court deny in its entirety the Motion to Dismiss filed by DraftKings Inc. ("DraftKings"), Jason D. Robins, Jason K. Park, and Matthew Kalish (collectively, "Defendants").

**Overview of Claims and Causes of Action**

This case arises from DraftKings' sale of its non-fungible tokens ("NFTs" or "DraftKings NFTs"). DraftKings creates or "mints" new NFTs and sells them in initial public offerings, which it calls "drops." ¶ 4.[1] The drops take place on the DraftKings "Marketplace," where investors pay DraftKings directly for the NFTs. ¶¶ 3, 38. DraftKings requires investors to keep the NFTs on the DraftKings Marketplace. ¶¶ 33, 69. Investors only know what NFTs they have rights to by accessing their internal DraftKings Marketplace account. ¶ 69. Investors are precluded from taking their NFTs out of the Marketplace and storing them in their own "crypto wallets." ¶¶ 33-69. Investors can only sell their NFTs on the Marketplace, a secondary market, which DraftKings also built and controls. ¶ 76. Buyers in these secondary market transactions pay the purchase price directly to DraftKings, which acts as the financial intermediary and keeps a 5-15% commission on all secondary market sales and deposits the remainder of the funds into the seller's DraftKings Marketplace account. ¶ 38.

DraftKings pools 100% of the proceeds that it receives from the sale of NFTs in the initial public offerings and from its secondary market commissions. ¶¶ 36, 38. DraftKings uses these proceeds either as profits for itself, or to maintain and develop the Marketplace and to promote its NFT Marketplace to new investors. ¶¶ 39, 40. Defendants tout, and investors are motivated by, potential capital appreciation on their NFT investments. ¶¶ 39, 110-112. Capital appreciation can

[1] Paragraphs of the Amended Complaint (ECF No. 38) are cited as "¶ ___."

only occur if Defendants continue to maintain the Marketplace. ¶¶ 126-130, 141-142. If the Marketplace shuts down, investors, who have no right to remove their NFTs from the Marketplace, will be left with nothing. ¶ 81.

Lead Plaintiff alleges that the DraftKings NFTs are "investment contracts" and therefore "securities" under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). Defendants did not register the NFTs as securities pursuant to the Securities Act, nor did they register the Marketplace as an exchange pursuant to the Exchange Act. Liability also arises under the Massachusetts securities laws, which are harmonious with the federal laws. Lead Plaintiff asserts seven causes of action: (i) failure to register the NFTs as securities, in violation of Sections 5 and 12 of the Securities Act, 15 U.S.C. §§ 77e and 77l; (ii) control person liability for failure to register under Section 15 of the Securities Act, 15 U.S.C. § 77o; (iii) failure to register the DraftKings Marketplace as an exchange under Sections 5 and 29 of the Exchange Act, 15 U.S.C. §§ 78e and 78cc; (iv) failure to register the Marketplace as a broker-dealer under Sections 15 and 29 of the Exchange Act, 15 U.S.C. §§ 78o and 78cc; (v) control person liability under Section 20 of the Exchange Act for failure to register, 15 U.S.C. § 78t(a); (vi) failure to register the Marketplace as a broker-dealer in violation of Section 201 of the Massachusetts General Laws, Mass. Gen. Laws Ch. 110A § 201; and (vii) sale of unregistered securities in violation of Section 301 of the Massachusetts General Laws, Mass. Gen. Laws Ch. 110A § 301.

Defendants' motion to dismiss hinges almost entirely on their fact-intensive argument that the NFTs at issue are not "investment contracts" and therefore are not "securities." *See* Def. Br. 1-3, 8-25. Defendants' arguments cannot be reconciled with the Securities Act and Exchange Act's "sweeping definitions" of securities. *SEC v. SG Ltd.*, 265 F.3d 42, 46 (1st Cir. 2001). Congress

intended "to encompass a wide array of financial instruments, ranging from well-established investment vehicles (e.g., stocks and bonds) to much more arcane arrangements," including the "elusive, essentially protean, concept of an investment contract." *Id.* "In defining the scope of the market that it wished to regulate, Congress painted with a broad brush." *Id.* at 48 (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990)). "It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *SG Ltd.*, 265 F.3d at 48 (quoting *Reves*, 494 U.S. 60-61). By including the phrase "investment contract" in the definition of "security," Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *SG Ltd.*, 265 F.3d at 48 (quoting *Reves*, 494 U.S. 60-61).

In its seminal decision, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court set forth a flexible "tripartite test to determine whether a particular financial instrument constitutes an investment contract (and, hence, a security)." *SG Ltd.*, 265 F.3d at 46. Three elements must be shown: "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely[2] from the efforts of the promoter or a third party." *Id.* (citing *Howey*, 328 U.S. at 298-99). The tripartite *Howey* test "must be applied in light of the economic realities of the transaction," with "substance govern[ing] form." *SG Ltd.*, 265 F.3d at 46-47 (quoting *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993)). In *SG Ltd.*, the First Circuit stated, the "Supreme Court has long espoused a broad construction of what constitutes an investment

[2] As explained below, the term "solely" is not to be read literally, and courts have uniformly held that plaintiffs need only allege that the profits are expected to derive from the entrepreneurial or managerial efforts of the promoter. *See SG Ltd.*, 265 F.3d at 53-55.

contract, aspiring 'to afford the investing public a full measure of protection.'" 265 F.3d at 47 (quoting *Howey*, 328 U.S. at 298).

"Over time, courts have classified as investment contracts a kaleidoscopic assortment of pecuniary arrangements that defy categorization in conventional financial terms, yet nonetheless satisfy the *Howey* Court's three criteria." *SG Ltd.*, 265 F.3d at 47 (collecting cases); *see also Howey*, 328 U.S. at 298 (citrus grove land sale and service contracts); *SEC v. Edwards*, 540 U.S. 389, 391 (2004) (payphone and site sale and lease agreements). In *SG Ltd.*, the First Circuit held that shares in fictitious companies sold in an online game—where all of the investors knew the companies were fictitious and that they were participating in a game—constituted investment contracts. 265 F.3d at 44-45. Recently, several courts have overwhelmingly held that digital assets are "investment contracts."

In *Friel v. Dapper Labs, Inc.*, No. 21 Civ. 5837, 2023 WL 2162747, at *1 (S.D.N.Y. Feb. 22, 2023), the court denied a motion to dismiss in a case alleging that NBA player NFTs are investment contracts. In *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 222 (D.N.H. 2022), the court denied a motion for summary judgment in a case alleging that crypto-coins that allowed users to share digital content were unregistered securities. In *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 375-76 (S.D.N.Y. 2020), the court denied a motion to dismiss in a case alleging that digital assets were unregistered investment contracts because investors were dependent on the defendants' managerial efforts with respect to the digital asset ecosystem. Each of these cases has direct parallels to this case involving DraftKings NFTs. Finally, in addition, two recent SEC orders found that respondents NFTs were securities. *In the Matter of Stoner Cats 2, LLC*, Release No. 11233, File No. 3-21655 (Sept. 13, 2023); *In the Matter of Impact Theory, LLC*, Release No. 11226, File No. 3-21585 (Aug. 28, 2023).

**<u>DraftKings NFTs Are "Investment Contracts" Under the *Howey* Test</u>**

Lead Plaintiff's claims (Counts I-VII) are premised on the well-pled allegation that DraftKings' Marketplace NFTs are "investment contracts." The *Howey* test requires: (1) an investment of money (2) in a common enterprise (3) with the expectation of profits to come solely from the efforts of the promoter or third parties. 328 U.S. at 301. Here, investors in DraftKings NFTs paid money to a single entity—DraftKings—for the NFTs. Their investment dollars were pooled in the Marketplace, the common enterprise. The investors expected a capital appreciation on their investments based on DraftKings' further development of the NFT Marketplace and its promotional efforts to lure new investors. Defendants' contrary arguments are nothing more than efforts to rebut—rather than accept—the well-pled facts. *See* Argument Section I, *infra*.

**<u>Private Right of Action Under the Exchange Act</u>**

Contrary to Defendants' arguments, the courts have recognized a private right of action for failure to register as an exchange or as a broker-dealer under the Exchange Act (Counts III and IV). *See* Argument Section II, *infra*.

**<u>Control Person Liability</u>**

Contrary to Defendants' arguments, Lead Plaintiff plausibly alleges the underlying failure to register violations, and therefore the individual Defendants are liable as "control persons" under the Securities Act and Exchange Act (Counts II and V). *See* Argument Section III, *infra*.

**<u>State Law Claims</u>**

Contrary to Defendants' arguments, for the same reasons that they violated the federal securities laws, they also violated the Massachusetts securities laws (Counts VI and VII), which are interpreted in harmony with their federal counterparts. *See* Argument Section IV, *infra*.

## STATEMENT OF FACTS

### I. Overview

This case involves DraftKings NFTs, which are governed by the DraftKings' Legal Notice. ¶¶ 69, 75, 76. DraftKings controls the entire DraftKings NFT ecosystem. It controls the initial public offering, or "drops," of its NFTs, as well as the secondary market sale of NFTs on its "Marketplace." ¶¶ 36, 76. DraftKings maintains all NFTs owned by investors in a single wallet controlled by it. ¶¶ 70-75, 77. DraftKings has a reversionary interest in each DraftKings NFT. ¶¶ 33-35. DraftKings has sole power to authorize or deny transfers to third-party wallets. ¶ 33. DraftKings controls the NFT prices on its Marketplace. ¶ 62, AC Ex. 5 at 3-4. DraftKings reserves the right to shut down the entire Marketplace without prior notice. ¶ 81. DraftKings states that each DraftKings NFT is recorded on the Polygon public ledger, but it is designated as the sole holder of record on the public ledger. ¶¶ 70-75, AC Ex. 5 at 3-6. Investors can only see which DraftKings NFTs they have limited rights to by viewing their internal Marketplace account, ¶¶ 19, 26, which is hard to decipher. ¶¶ 70-75; AC Ex. 5 at 3-6.

### II. Allegations Concerning the "Investment of Money"

To purchase DraftKings NFTs, investors must register for a DraftKings Marketplace account. ¶ 147. DraftKings NFTs may then be purchased with U.S. dollars. ¶ 96.

### III. Allegations Concerning the "Common Enterprise"

DraftKings collects all proceeds from primary sales of packs of DraftKings NFTs ("DraftKings Primary Sales"). ¶¶ 36, 49, 59, 104. DraftKings also collects 5-15% on secondary sales, with the sole discretion to determine which DraftKings NFTs are eligible to be listed on its Marketplace. ¶¶ 36, 76, 103. After purchasing DraftKings NFTs, investors are entirely reliant on DraftKings to earn a profit through DraftKings' marketing and promotional efforts that lure in

other investors and DraftKings' continued functioning, which is necessary to cash out. ¶ 101. DraftKings NFTs cannot be removed from, and may only be sold on, the Marketplace and all proceeds and fees are pooled by DraftKings. ¶ 104. Proceeds are then used by DraftKings to advertise and promote (through Reignmaker contests) the investment and develop and maintain the Marketplace. *Id.* The value of existing DraftKings NFTs increases as more investors become interested in investing in DraftKings NFTs, transact on DraftKings Marketplace, and participate in Reignmaker contests. *Id.*

## IV. Allegations Concerning the Expectation of Profits from Efforts of Defendants

In an analyst call for DraftKings, Defendant Robins noted that the DraftKings NFTs offered a "logical cross-sell opportunity with our existing customers," an enhancement in "customer stickiness" in lifetime value, "potential for new customer acquisition," and "has very attractive economics." ¶ 39. Defendant Kalish guaranteed scarcity "will not be amended" because it is "a fundamental premise of the whole game." ¶ 109; AC Ex. 5 at 7. Defendant Kalish later stated that purchasers "earn money in order to use their IP in cards that you own forever." ¶ 111; AC Ex. 5 at 7. In response to whether DraftKings NFT purchasers "own the cards," Defendant Kalish stated that purchasers will "keep the open market profit" and, "at worst," would be "prevent[ed] from making more money." ¶ 112; AC Ex. 5 at 7. Throughout August 11, 2021 to the present ("the Class Period"), DraftKings released promotional videos and messages about DraftKings NFTs and Reignmakers. ¶¶ 108, 109, 113-115, 123, 125-128.

The Marketplace pages show an investment-like view for the NFTs and packs. *See* AC Ex. 5 at 3-4. For example, all transactions are shown to the viewer, including NFTs sold, open, won, rewarded, burned, or crafted. *Id.* at 3. The page highlights the floor price, number of owners, and

top offer for each DraftKings NFT. *Id.* For the packs in AC Exhibit 5, the page does not distinguish or note any serial numbers relevant to packs for sale. *Id.* at 3-4.

Investors acknowledge that they purchase or would purchase DraftKings NFTs for investment purposes. ¶¶ 115-119. As early as August 13, 2021, potential investors recognized that DraftKings NFTs could be sold for "ridiculous" returns on investments. ¶ 115. One article noted that "as you go up in tier level, the required minimum investment increases, but so does potential profit." ¶ 116. In the same article, the author noted that "[a]s long as you have a clear plan . . . there are a lot of different ways to have fun AND profit." *Id.* Another article noted that "you can invest and buy them from sellers in the marketplace," later noting that the author is "not looking at Reignmakers in the context of a collector." ¶ 117.

Users of DraftKings' official Discord channel for Reignmakers expressed a similar expectation of profit based on DraftKings' efforts. ¶¶ 130-136. One user called Reignmakers a "daily fantasy meets stock market," while another noted that "it's just like stocks." ¶¶ 130-131, 134-135. One user noted that DraftKings' lack of structure and pack release information made it "[h]ard to invest," ¶ 133, while another noted that DraftKings NFTs are "just like any investment, [so long as you] do your due diligence." ¶ 136.

**V. Unregistered Exchange or Broker Dealer Allegations**

DraftKings markets, sells, and facilitates the sale of DraftKings NFTs for compensation. ¶ 190. DraftKings regularly sells its NFTs, has regular customers, and provides customers with access to services that allow the purchase and sale of its NFTs. ¶ 192. DraftKings is not registered as an exchange or as a broker-dealer. ¶ 193.

### VI. Lead Plaintiff's Investment Losses

Lead Plaintiff has provided a transaction list of all DraftKings NFTs he purchased or sold. *See* AC Ex. 1, Sch. A. Lead Plaintiff estimates investing more than $70,000 in DraftKings NFTs. *Id.* Lead Plaintiff has suffered at least $14,000 in investment losses. ¶ 9.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The question confronting a court on a motion to dismiss is whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2011) (emphasis in original). Rather than imposing a probability requirement, the standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" wrongdoing. *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) (quoting *Twombly*, 550 U.S. at 556).

Here, Lead Plaintiff plausibly alleges that the DraftKings NFTs constitute securities under federal and state law.[3]

### I. DraftKings NFTs Are "Investment Contracts" and Therefore "Securities."

Under the *Howey* test, an investment contract "comprises (1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party." *SG Ltd.*, 265 F.3d at 46 (citing *Howey*, 328 U.S. at 298-99). As the

[3] Defendants suggests Lead Plaintiff lacks "some cognizable injury to demonstrate his standing to sue here." Def. Br. at 4. Defendants ignore the allegations. ¶ 8 ("Lead Plaintiff . . . [has] suffered significant damages"), ¶ 9 ("Lead Plaintiff's current losses exceed $14,000"), ¶ 146 ("the [DraftKings] platform ultimately experienced a downturn"), ¶ 149 ("Lead Plaintiff . . . [has] lost substantial amounts of money and [has] suffered significant damages").

First Circuit has observed, "substance governs form," the test is "versatile in practice," and it "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SG Ltd.*, 265 F.3d at 47 (quoting *Howey*, 328 U.S. at 299). It has applied to a "kaleidoscopic assortment of pecuniary arrangements." *SG Ltd.*, 265 F.3d at 47.[4] Several courts have repeatedly and overwhelmingly held that NFTs and other digital assets constitute "investment contracts." *See SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2023 WL 4507900, at *1 (S.D.N.Y. July 13, 2023) (denying motion for summary judgment); *LBRY, Inc.*, 639 F. Supp. 3d at 222 (same); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (same); *Dapper Labs*, 2023 WL 2162747, at *1 (denying motion to dismiss); *SEC v. Terraform Labs Pte. Ltd.*, No. 23 Civ. 1346, 2023 WL 4858299, at *18 (S.D.N.Y. July 31, 2023) (same); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) (same); *Telegram*, 448 F. Supp. 3d at 352 (granting plaintiff's motion for preliminary injunction).

**A. The DraftKings NFT Marketplace is a "Common Enterprise."**

In its "*Framework for 'Investment Contract' Analysis of Digital Assets*," the Staff of the SEC stated:

> Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts. *See SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307 (D.C. Cir. 1992).

---

[4] *See*, *e.g.*, *Howey*, 328 U.S. at 295-96 (citrus grove land sales contracts coupled with service contracts); *SG Ltd.*, 265 F.3d at 45-46 (virtual shares in fictitious company depicted in online game); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1030 (2d Cir. 1974) (warehouse receipts for barrels of scotch whiskey); *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414, 415-416 (8th Cir. 1974) (contracts for the sale of chinchillas); *Chase v. Merson*, 384 F. Supp. 3d 106, 110-111 (D. Me. 2019) (standby letters of credit); *Sampson v. Invest Am., Inc.*, 754 F. Supp. 928, 929-931 (D. Mass. 1990) (contracts for solar powered hot water systems); *SEC v. Tropikgadget FZE,* 146 F. Supp. 3d 270, 274 (D. Mass. 2015) (multi-level marketing scheme).

U.S. Securities and Exchange Commission, n.11 (Last Modified Mar. 8, 2023), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

The "common enterprise" element is satisfied by alleging that the fortunes of investors are linked to each other or to the success of the promoter's efforts. *SG Ltd.*, 265 F.3d at 49. Courts identify two ways of establishing a common enterprise: *horizontal* commonality and *vertical* commonality. *Id*. at 49-50 (collecting cases). In *SG Ltd.*, the First Circuit held that a showing of horizontal commonality suffices, while reserving ruling on whether vertical commonality also suffices. *See id.* at 50. At least one district court in the First Circuit has employed vertical commonality. *See Chase*, 384 F. Supp. 3d at 113-15. Lead Plaintiff addresses both below.

**1. The Complaint Establishes *Horizontal* Commonality With DraftKings.**

Horizontal commonality requires the "[1] pooling of assets from multiple investors [2] in such a manner that all share in the profits and risks of the enterprise." *SG Ltd.*, 265 F.3d at 50. In *SG Ltd.*, the First Circuit held that horizontal commonality was established where investors' assets were pooled in fictitious online companies to support the enterprise. *Id.* at 50-52. Similarly, the courts handling more recent digital asset cases have overwhelmingly found horizontal commonality to be present. *See*, *e.g.*, *Dapper Labs*, 2023 WL 2162747, at *10.

**a. DraftKings "Pools" Assets from Its NFT Investors.**

"Pooling" is satisfied if investors' funds are "accumulated" into the enterprise. *SG Ltd.*, 265 F.3d at 50. "Generally, pooling occurs when the funds received by the promoter through an offering are, essentially, reinvested by the promoter into the business." *Dapper Labs*, 2023 WL 2162747, at *11. In digital asset cases, the courts "have found pooling satisfied where allegations plausibly tied the funds received by the promoter through the offering to an improvement of the ecosystem" for the digital asset. *Id.*

Here, the Complaint specifically alleges the "pooling" of funds. DraftKings received all proceeds from DraftKings NFT Primary Sales and at least 5-15% of DraftKings NFT Secondary Sales. ¶¶ 25, 53, 100-105. "In reality, the NFT drops were designed to secure or replace funds that DraftKings needed to develop its NFT platform." ¶ 44. "The DraftKings NFTs were not 'decentralized' like other NFTs which may not be securities." ¶ 69. "DraftKings NFTs are in wallets wholly controlled by DraftKings, not in the individual owner's wallet." ¶ 70. Thus, pooling is alleged. *See*, *e.g.*, *SG Ltd.*, 265 F.3d at 50 (investors' funds "pooled in a single account used to settle participants' on-line transactions.").

In *Dapper Labs*, pooling was established where earlier and later investors' funds would support the continued development of the blockchain, and their profits "were dependent upon the success of the [blockchain]." 2023 WL 2162747, at *11. Contrary to one of Defendants' arguments, Def. Br. at 11-12, the court made clear that "pro-rata" distribution of profits is not necessary for pooling. *Dapper Labs*, 2023 WL 2162747, at *12. Further, the court drew the reasonable inference that the capital raised in the sale of the NBA NFTs is used to develop and maintain the blockchain. *Id*. Likewise, in this case, the DraftKings NFTs' investor proceeds supported the continued development of the DraftKings Marketplace. ¶¶ 40, 104, 123, 125-128.

Ignoring the well-pled allegations, Defendants argue that the Complaint does not allege that the proceeds of the NFT drops are deposited into a common pool. Def. Br. at 11. To the contrary, investors' money DraftKings receives from initial and secondary sales is pooled into DraftKings, which uses it to maintain, further develop and promote its NFT Marketplace. ¶ 104.

As further proof of pooling, DraftKings itself (not the individual investors) holds the NFTs, as evidenced by the public Polygon ledger. ¶¶ 70-75. *See also Telegram*, 448 F. Supp. 3d at 369-70 (the digital assets "themselves continue to represent the [purchasers'] pooled funds").

Individual investors can look at their DraftKings Marketplace account to see which NFTs they have limited rights to. However, on the public ledger, DraftKings is the public owner of record of these securities, which it holds in a single wallet. ¶¶ 74-75. Individual investors cannot move their DraftKings NFTs off the DraftKings platform and into their own wallets. ¶ 33. Finally, as further indicia of pooling, "[i]f DraftKings or [the] DK Marketplace cease to exist, the Marketplace NFTs will be worthless." ¶ 37.

**b. Investors Share in the Profits and Risks of the NFT Marketplace.**

Horizontal commonality also requires that "investors share in the profits and risks of the enterprise." *SG Ltd.*, 265 F.3d at 50. The "fortunes of each investor" must be "tied to the success of the overall venture." *Dapper Labs*, 2023 WL 2162747, at *13. This may be shown where the common enterprise is "dependent upon a continuous influx of new money to remain in operation." *SG Ltd.*, 265 F.3d at 50. It is also shown where a portion of the revenue is used to support the enterprise. *Id.* In digital asset cases, it is shown "where the digital asset's value is tied, and depends upon, the continued success of the blockchain" or infrastructure supporting the asset. *Dapper Labs*, 2023 WL 2162747, at *13.

Here, each of these factors is present. The DraftKings Marketplace is dependent upon new investor money, and a portion of that money is used to support the Marketplace. ¶¶ 36, 54-56. Likewise, the DraftKings NFTs' values are tied to, and depend upon, the continued success of the Marketplace. ¶¶ 54-59.

In *Dapper Labs*, the court held that the complaint adequately alleged tied the fortunes of investors with the enterprise because: the defendant "controls the enterprise" including the ecosystem in which the digital assets were held; the NBA NFTs, "once purchased in packs, can be sold only in the Marketplace, which again, is controlled by" defendant; and "purchasers of [the

NBA NFTs] are hitching their wagons to the continued success of" the enterprise. 2023 WL 2162747, at *13 (internal quotation marks omitted). Here, Lead Plaintiff alleges each of these types of facts with respect to DraftKings NFL NFTs. ¶¶ 33, 37, 76, 81, 144-47 (DraftKings controls the enterprise); ¶¶ 33-35 (the NFTs cannot be removed from, and can only be resold on, the DraftKings Marketplace); ¶¶ 131-36 (investors are pinning hopes on the continued success of the DraftKings Marketplace).

Defendants suggest horizontal commonality may only be demonstrated if the subject investors "share in the profits and risks of a company on a pro rata basis." Def. Br. at 9. However, there is no requirement that the profits are shared on a "pro rata" basis. *SG Ltd.*, 265 F.3d at 53 n.6 ("If more were needed–and we doubt that it is," pro-rata distribution "boost[s] the SEC across the legal threshold for horizontal commonality."). Indeed, the courts have found horizontal commonality satisfied even where some investors gain while others lose. *See*, *e.g.*, *Kik Interactive*, 492 F. Supp. 3d at 179 ("the key feature is not that investors must reap their profits at the same time; it is that investors' profits at any given time are tied to the success of the enterprise.").[5] Thus, although pro-rata distribution of profits may be evidence of horizontal commonality, "such a formalized profit-sharing mechanism is not required." *ATBCOIN LLC*, 380 F. Supp. 3d at 354.

Defendants also argue that the NFTs must give each owner "some participatory interest in a common pool of DraftKings assets" such that the value of DraftKings NFTs must rise when DraftKings—the company as a whole—has financial success. Def. Br. at 11. In a similar vein,

[5] Defendants' reliance on *SEC v. Infinity Group Co.*, 212 F.3d 180 (3d Cir. 2000), for the "pro rata" proposition, is misplaced. In that case, the Third Circuit considered whether a fixed rate of return removed an instrument from the definition of a security, not whether a "pro rata" distribution was necessary for horizontal commonality. *See id.* at 189 ("mere fact that the expected rate of return is not speculative does not" mean the instrument is not an investment contract). Defendants' reliance on *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994), is misplaced because plaintiffs in *Revak* failed to allege any sharing or pooling of rents and expenses.

Defendants argue that because each NFT has its own value, and the values do not rise and fall in tandem, horizontal commonality is lacking. *Id.* To the contrary, the focus is on the enterprise, not the company, when horizontal commonality is considered. For example, in *Kik Interactive*, the court rejected the defendants' attempt to "create additional requirements for a common enterprise" by pointing to purchasers' ability to sell at any time. 492 F. Supp. 3d at 178. Noting that horizontal commonality could be defeated when profitability was "purely a function of the transactions executed," the court noted that horizontal commonality arose from the pooling of sale proceeds "in an effort to create an infrastructure for [the digital asset], and thus boost the value of the investment." *Id.* at 179. "The stronger the ecosystem that [defendants] built, the greater the demand for [the digital asset], and thus the greater the value of each purchaser's investment." *Id.* Here, the initial funds DraftKings raised for its early NFTs allowed it to build the Marketplace and to branch out into different sports. ¶ 50.

Finally, Defendants argue that their "Reignmaker" cash prize contests defeat horizontal commonality. Def. Br. at 12. However, such economic inducements to potential investors, support rather than defeat, horizontal commonality. A "continuous influx of new money to remain in operation" "inherently involve[s] the sharing of profit and risk among investors." *SG Ltd.*, 265 F.3d at 50-51. Similarly, a "promise to divert a portion of [the company's] profits . . . to support the [scheme]" establishes a tying of "the collective fortunes" of purchasers. *Id.* at 51.

### 2. The Complaint Establishes *Vertical* Commonality With DraftKings.

"Vertical" commonality requires allegations that "an investor's fortunes are tied to the promoter's success rather than to the fortunes of his or her fellow investors." *SG Ltd.*, 265 F.3d at 49. Broad vertical commonality requires that "the well-being of all investors be dependent upon the promoter's expertise," whereas narrow vertical commonality requires that "the investors'

fortunes be 'interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'" *Id.* (quoting *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973)). Courts outside the First Circuit have rejected one or both forms of vertical commonality. *See SG Ltd.*, 265 F.3d at 50. In *SG Ltd.*, the First Circuit expressly reserved judgment on whether vertical commonality is acceptable. *See id.* at 50 n.2. Following the First Circuit's decision in *SG Ltd.*, district courts within the First Circuit have considered vertical commonality when assessing investment contracts. *See*, *e.g.*, *Chase*, 384 F. Supp. 3d at 114 (investment scheme satisfied both "broad and narrow vertical tests").

**a. The Complaint Establishes *Broad* Vertical Commonality With DraftKings.**

Broad vertical commonality requires that "the well-being of all investors be dependent upon the promoter's expertise." *SG Ltd.*, 265 F.3d at 49. In digital asset cases, the courts have overwhelmingly found broad vertical commonality present because the investors are entirely dependent upon the promoter's ability to maintain and further develop the digital asset ecosystem. *See SEC v. Arbitrade Ltd.*, No. 22 Civ. 23171, 2023 WL 2785015, at *5 (S.D. Fla. Apr. 5, 2023) (broad vertical commonality applied to cryptocurrency); *SEC v. Nat. Diamonds Invest. Co.*, No. 19 Civ. 80633, 2019 WL 13277296, at *9 (S.D. Fla. May 28, 2019) (same applied to purchase and sale of rough diamond parcels); *Hays v. Adam*, 512 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007) (same applied to mobile billboard investments).

Here, DraftKings promises to develop and implement programs in the future that will support the value of its NFTs, including beyond the current football season. ¶ 111, AC Ex. 5 at 7. These ongoing efforts are described both on the DraftKings website and in DraftKings promotional YouTube videos. ¶ 108. NFT investors will only profit if Defendants continue to maintain and grow the DraftKings Marketplace. ¶¶ 60, 69, 70-75, 96. Further, investors cannot take their NFTs

away from the Marketplace, and they are unable to sell them anywhere but the Marketplace. ¶¶ 33-35. If the Marketplace shuts down, their investments will be worthless. ¶ 81. Thus, investors' well-being is "dependent upon" DraftKings' expertise. ¶ 37.

#### b. The Complaint Establishes *Narrow* Vertical Commonality With DraftKings.

Narrow vertical commonality, sometimes referred to as "strict vertical commonality," requires allegations that "the investor's profits and the promoter's profits are 'interwoven' or interdependent." *Chase*, 384 F. Supp. 3d at 113. In *Chase*, the court found that a success fee and "$15 million in fees to participants" that was "provided for upon the success of the transaction" was sufficient to establish strict vertical commonality. *Id.* at 114 (cleaned up). In *Telegram*, narrow vertical commonality was present because "each [purchaser's] anticipated profits were directly dependent on Telegram's success in developing and launching the TON Blockchain," Telegram "would suffer financial and reputational harm if the TON Blockchain failed prior to launch," and failure to launch by the contractual deadline would "require Telegram to return any unspent funds." 448 F. Supp. 3d at 370.

Here, the profits of investors and DraftKings alike are interwoven together in several respects. Defendants concede that the Amended Complaint alleges that investors can profit from increases in the value of individual NFTs or the collective NFTs together. Def. Br. at 14; *see also* ¶¶ 95, 101, 112, 142-143. Defendants likewise would profit from increases in the values of individual NFTs and the overall NFT infrastructure. The most obvious interdependence relates to the secondary sales, in which DraftKings charged 5-15% of the sales price, meaning both DraftKings and the selling investors alike stood to profit from increases in value. ¶ 53; *see also* *Marini v. Adamo*, 812 F. Supp. 2d 243, 260 (E.D.N.Y. 2011) ("if [defendant] were to receive a commission on the sale of the coins, his fortunes would be inextricably tied to those of

[plaintiff's]"). Defendants' reliance on "fixed" or "flat" transaction fee cases is misplaced. *See* Def. Br. at 15, 22 (citing *Schofield v. First Commodity Corp. of Bos.*, 638 F. Supp. 4, 7 (D. Mass. 1985), *aff'd*, 793 F.2d 28 (1st Cir. 1986) ("fixed fee"); *Austin v. Bradley, Barry & Tarlow, P.C.*, No. 85 Civ. 4767, 1992 WL 560915, at *7 (D. Mass. June 17, 1992) (flat fee)). First, DraftKings' transactional fee is a percentage (5-15%) of the secondary sales price, not a fixed or flat fee. ¶ 53. Second, Defendants do not dispute that the increased value of the NFTs in the Marketplace would prompt new investor interest, such that even if its fees were fixed or flat, it would generate more investors and opportunities to profit from subsequent drops or secondary sales. ¶¶ 96, 146. It should be noted that in *Dapper Labs* the court found that a "five percent fee" on transactions, standing alone, was insufficient to give rise to narrow vertical commonality. 2023 WL 2162747, at *15. Lead Plaintiff respectfully submits that, in this case, additional facts are alleged, including that each investor's anticipated profits were dependent on DraftKings' "success" in continuing to develop the Marketplace, and that DraftKings would suffer "financial and reputational harm" if the Marketplace failed. *Telegram*, 448 F. Supp. 3d at 370.

**3. Commonality is Not Defeated by Individual Features or Values.**

Defendants argue that their NFT investors did not invest in a "common enterprise" because they invested in individual NFTs linked to individual NFL players. Def. Br. at 11-12. Courts have rejected similar arguments. In *Dapper Labs*, the NBA NFT case, the court rejected defendants' argument that the common enterprise was undermined by the "unique nature" of the NFTs in each investor's account, "comprising different [NBA] Moments from any other users." 2023 WL 2162747, at *12. The "key feature is not that investors must reap their profits at the same time; it is that investors' profits at any given time are tied to the success of the enterprise." *Id.* (citations omitted). The plaintiffs "adequately alleged that the value of [the NBA NFTs] is 'causally related

to the profitability of [Dapper Labs] as a whole' because their value depends on the success of" the ecosystem in which the NFTs resided. *Id.* (citations omitted). The same is true here. Lead Plaintiff alleges that the value of the NFL NFTs he purchased depended on the success of the DraftKings Marketplace. ¶ 141.

Defendants' related argument that each NFT has some "intrinsic value" (tied to the maturity of the football season or an individual NFL player's success on the field) is also meritless. Def. Br. at 2. In *Howey*, which involved citrus grove land contracts, the land itself had intrinsic value, but the Supreme Court "reject[ed] the suggestion . . . that an investment contract is necessarily missing . . . where the tangible interest which is sold has intrinsic value independent of the success of the enterprise as a whole." 328 U.S. at 301. The test is simply "whether the scheme involves an investment of money in a common enterprise with profits to come solely[6] from the efforts of others. If that test be satisfied, it is immaterial . . . whether there is a sale of property with or without intrinsic value." *Id.* "The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae" such as intrinsic value or individualized returns. *Id.* The same rationale applies in this case. Even assuming, *arguendo*, that the NFTs had value tied to particular NFL players, that fact alone does not defeat commonality.

**B. Investors Have an Expectation of Profits from the Efforts of DraftKings.**

The third prong of the *Howey* test requires the "expectation of profits solely from the efforts of others." *SG Ltd.*, 265 F.3d at 53. "Solely" as used by the Supreme Court in *Howey* in conjunction with "efforts of others" is not to be read literally: the "courts of appeals have been unanimous in

[6] "The fact that the investors here were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that the Plan or Adventure is an investment contract [because] [t]o do so would not serve the purpose of the legislation." *Turner Enters.*, 474 F.2d at 482; s*ee also SG Ltd.*, 265 F.3d at 55 (declining to give literal meaning to the word "solely" in this context).

declining to give literal meaning to the word 'solely' in this context, instead holding the requirement satisfied as long as 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Id.* at 55 (quoting *Turner Enters.*, 474 F.2d at 482). Thus, this requirement has been recast as "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Dapper Labs*, 2023 WL 2162747, at *16 (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)). The test is an "objective one," based on what purchasers "were led to expect by the promoter," as evidenced by the promoter's statements and investors' statements of their "subjective intent." *Dapper Labs*, 2023 WL 2162747, at *16 (internal citation omitted).

**1. Investors in DraftKings NFTs Have an Expectation of Profits.**

The expectation of profits may come in two forms: "(1) capital appreciation from the original investment" or, alternatively, "(2) participation in earnings resulting from the use of investors' funds." *SG Ltd.*, 265 F.3d at 53. "[W]hen we held that 'profits' must 'come solely from the efforts of others,' we were speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest." *Edwards*, 540 U.S. at 394 (quoting *Howey*, 328 U.S. at 301). "We used 'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, ***or the increased value of the investment.***" *Edwards*, 540 U.S. at 394 (quoting *Howey*, 328 U.S. at 301) (emphasis added).

The expected or touted profits need not be "persistent" or always occurring. *SG Ltd.*, 265 F.3d at 54. Similarly, "pitching a speculative value proposition" amounts to "precisely the 'not-very-subtle form of economic inducement' the First Circuit identified in [*SEC v. SG Ltd.*] as evidencing *Howey*'s 'expectation of profits.'" *LBRY, Inc.*, 639 F. Supp. 3d at 219 (cleaned up).

Finally, a "disclaimer cannot undo the objective economic realities of a transaction." *Id.* (citing *Telegram*, 448 F. Supp. 3d at 365).

In *Dapper Labs*, the court found the expectation of profits based on the defendants' statements, investor sentiment, and market commentary suggesting that the NBA NFTs would increase in value. 2023 WL 2162747, at *17-18. Likewise, here, Defendants touted the NFL NFTs as profit-generating, and market commentators and investors shared this sentiment. ¶ 117 (article author "not looking at Reignmakers in the context of a collector"), ¶ 126 (official DraftKings Twitter account linking to detailed financial look at DraftKings NFTs), ¶¶ 131-36 (DraftKings Discord channel users noting similarities to a stock market). Defendants do not address statements such as Mr. Kalish's statement that DraftKings NFT investors would "keep the open market profit of [their] cards [don't worry]. Maybe at worst this prevents you from making more money right?" ¶ 112; AC Ex. 5 at 7. DraftKings itself designed the NFT pages to provide a high-level financial look at each NFT. *See* AC Ex. 5 at 4. A reasonable investor would have recognized the DraftKings NFTs were being offered for its investment opportunities. *See LBRY, Inc.*, 639 F. Supp. 3d at 216-18 ("reasonable expectation of profits" gleaned from videos produced by defendant, statements that the cryptocurrency had room to grow, and comments from Reddit users on how to help with "investment decisions").

DraftKings argues that its NFL NFTs, like traditional player cards, may be "consumed" or used for games or prizes. Def. Br. at 16, 19-21. The same argument was rejected in *Dapper Labs*. The court observed that the Supreme Court in *Forman*, "left open the possibility that '[i]n some transactions the investor is offered both a commodity . . . for use and an expectation of profits.'" *Dapper Labs*, 2023 WL 2162747, at *18 (quoting *Forman*, 421 U.S. at 853 n.17). Whether investors purchased for consumption or expected profits "may raise difficult questions," but these

questions are "factual in nature and should not be answered in the current procedural posture," *i.e.*, a motion to dismiss. *Dapper Labs*, 2023 WL 2162747, at *18.

Relatedly, Defendants argue that DraftKings informs purchasers that NFT pack prices would decrease by 10-40% over time within an NFL season because there would be fewer future cash prize competitions as the NFL season wore on. Def. Br. at 7. Plaintiff notes that the quoted statements occurred on October 19, 2022 and December 22, 2022, much later than the first sale of DraftKings NFTs usable with Reignmaker contests. AC Ex. 5 at 7-8. The decaying time value or "theta" of these investments does not diminish their status as securities. Many securities decline in value over time. For example, options contracts have a higher "theta" or time value that is higher when the option is first issued, and which decreases as the option approaches expiry. *See* Douglas R. Emery *et al.*, *A closer look at Black-Scholes option thetas*, 32 J. Econ. Fin. 59 (2008). Options, however, are nonetheless securities. *See* 15 U.S.C. § 77b(a)(1). Defendants also suggest that the only "expectation of profit" could arise from the prospect of winning prizes and from an investor's "skillful deployment of NFTs." Def. Br. at 16-17. This suggestion ignores the allegations that the prizes were promotional efforts to lure investors. ¶¶ 80, 108-109. Furthermore, the profit expectation alleged throughout the complaint is the appreciation in value of the NFTs. ¶¶ 95, 107.

Similar arguments were rejected in *Dapper Labs*, where the court held that the allegations "are adequate to support a finding that [the NBA NFTs] were primarily purchased for an investment purpose." 2023 WL 2162747, at *18. Here, like in *Dapper Labs*, the utility of the NFTs is largely limited to "viewing" the NFTs on the DraftKings Marketplace and to "seek out certain players . . . in the Marketplace." *Id.* Although Defendants in this case offered prizes as part of their promotional efforts, nothing in the Complaint suggests that these prizes were a significant motivation for investing in the NFTs.

### 2. The Profits Are to Come from the Managerial Efforts of DraftKings.

The second component of the expectation of profits requirement is that the profits are to come from the efforts of the promoter. This component is satisfied "as long as the 'efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *SG Ltd.*, 265 F.3d at 55 (quoting *Turner Enters.*, 474 F.2d at 482). Though courts should "examine the offering from an objective perspective," *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982), and decide "based upon what purchasers were 'led to expect'" by the promoter, *Audet v. Fraser*, 605 F. Supp. 3d 372, 398 n.7 (D. Conn. 2022), "subjective intent" can be "probative on the issue of what a reasonable purchaser would have expected." *Dapper Labs*, 2023 WL 2162747, at *16 (internal citations omitted). Under the "Bahamas Test" adopted by several courts, the question is whether the digital asset would "exist in some form but would likely lack [] mass adoption, vibrancy, and utility" if the company "decamped" and "ceased all further efforts to support the [blockchain]." *Telegram*, 448 F. Supp. 3d at 375. Here, it is clear that if the DraftKings Marketplace ceased to exist, the NFTs which can only reside and trade on the DraftKings Marketplace would lose value and interest. Indeed, it would be impossible for investors to access their NFTs. ¶¶ 30-34, 69-77, 141.

In *LBRY, Inc.*, the court found the expectation of profits derived from the managerial efforts of the promoters to be present notwithstanding the fact that the promoters did not overtly tout potential profits. 639 F. Supp. 3d at 217. "[E]ven if [the company] had never explicitly broadcast its views on the subject, any reasonable investor who was familiar with the company's business model [can understand] the connection [between profits and managerial efforts]." *Id.* at 219.

In this case, a reasonable investor would know that the expected profits were tethered to DraftKings' "essential managerial efforts." *Id.* at 216 n.2. Though Defendants imply that an

investor's skill trading in the secondary market overshadow its role as a manager, Def. Br. at 20-22, Defendants operate and control the entire scheme from the initial offering through any sales on the secondary market. ¶¶ 46, 52-60. Defendants' promotion and operation of its NFTs on the Marketplace are the essential "managerial efforts" needed for investors to profit. ¶¶ 141-43.

In each digital asset case to date, the forced intertwining of the company's and investor's fates (by the company) determined the extent of managerial efforts. *See Dapper Labs*, 2023 WL 2162747, at *19 ("Moments' value is derived almost entirely from the continued operation by Dapper Labs"); *Terraform*, 2023 WL 4858299, at *14 (defendants "coaxed investors to continue purchasing LUNA coins . . . by pointing out the possibility of future investment returns"); *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 762966, at *9 (S.D.N.Y. Mar. 11, 2022) (among other facts, "Ripple's activities were designed to protect the value of XRP," "XRP sales were funding Ripple's operations," and "[founder] understood that XRP was being sold to investors, [] including investors engaging in speculation").

Finally, Defendants argue that its contract disavows that the NFTs are securities. Def. Br. at 2. "[A] disclaimer cannot undo the objective economic realities of a transaction." *LBRY, Inc.*, 639 F. Supp. 3d at 219 (citing *Telegram*, 448 F. Supp. 3d at 365).

**II. A Private Right of Action Exists for Failure to Register under the Exchange Act.**

Defendants argue that there is no private right of action for unregistered exchange or unregistered broker-dealer claims under the Exchange Act, or, alternatively, that there is only such a right when Section 15(a) or 15(c) violations are alleged. Def. Br. at 25-26. To the contrary, courts have found that a private right of action exists. *See Landegger v. Cohen*, 5 F. Supp. 3d 1278, 1283 (D. Colo. 2013) (right of action when Sections 15(a) and 29(b) alleged); *see also Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 557-58 (5th Cir. 1982) ("private cause of

action can be founded upon section 29(b)”). To determine whether a private right of action exists, the courts “interpret the statute . . . to determine whether it displays an intent to create not just a private right but also a private remedy.” *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citations omitted). The creation of a private right of action can fairly be inferred if “the language of the statute itself . . . intended to benefit [a certain class of individuals] and . . . fairly implies a right to specific and limited relief in a federal court.” *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17-18 (1979). In *Landegger*, the court held that a private right of action exists under Section 15(a)(1) and Section 29(b) of the Exchange Act. 5 F. Supp. 3d at 1283. Section 15(a) creates the private right and Section 29(b) provides the private “remedy” language. *Id.* at 1290-91. Accordingly, a private right of action exists for Defendants’ failure to register as an exchange or broker-dealer.

## III. Control Person Liability Exists under the Securities Act and Exchange Act.

The “control person” provisions (Section 15(a) of the Securities Act, 15 U.S.C. § 77o, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)) require (i) an underlying violation by the entity and (ii) the individual defendant’s control of the entity. *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 293 (D. Mass. 2022); *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 308 (S.D.N.Y. 2013) (liability the same under Section 15(a) and Section 20). Defendants do not dispute their “control” of DraftKings, but instead contend only that no underlying registration violations are alleged. Def. Br. at 26. To the contrary, the NFTs should have been registered as “securities” and the Marketplace should have been registered as an “exchange” or “broker-dealer.” Accordingly, control person liability attaches.

## IV. The Massachusetts Securities Law Claims Are Properly Alleged.

Defendants violated Mass. Gen. Laws Ch. 110A, § 301 (Count VII for selling unregistered securities) and § 201(a) (Count VI for operating an unregistered broker-dealer). Defendants argue only that the state law claims fail for the same reasons as the federal claims. *See* Def. Br. at 26. However, the Massachusetts securities laws are "substantially similar to the federal securities laws" such that "decisions construing the federal statutory language are applicable to the state statute as well." *Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676, 684 n.9 (D. Mass. 1993), *aff'd sub nom. Adams v. Zimmerman*, 73 F.3d 1164 (1st Cir. 1996). Because the federal securities law claims are well-pled, the analog state securities law claims are not subject to dismissal.

## V. Lead Plaintiff Should Be Given an Opportunity to Amend, if Necessary.

Lead Plaintiff respectfully submits that no aspect of the Amended Complaint should be dismissed. If the Court disagrees, however, Lead Plaintiff respectfully requests an opportunity to amend. *See Carmona v. Toledo*, 215 F.3d 124, 136 (1st Cir. 2000) (plaintiff should be given an opportunity to amend following an initial dismissal unless there is undue delay, bad faith, dilatory motive, or futility).

## CONCLUSION

Plaintiff plausibly alleges that DraftKings NFTs are "investment contracts" and thus "securities" under the *Howey* Test. Defendants failed to register the DraftKings NFTs as securities and failed to register its Marketplace as an exchange or broker dealer. For these reasons, Defendants violated the Securities Act, the Exchange Act, and the Massachusetts securities laws. Accordingly, Defendants' motion to dismiss should be denied in its entirety.

Dated: November 10, 2023

Respectfully submitted,

**BERMAN TABACCO**
*/s/ Patrick T. Egan*
Patrick T. Egan (BBO #637477)
Justin N. Saif (BBO #660679)
1 Liberty Square
Boston, Massachusetts 02109
617.542.8300
pegan@bermantabacco.com
jsaif@bermantabacco.com
*Local Counsel for*
*Lead Plaintiff Dufoe*

**KIRBY McINERNEY**
*/s/ Anthony F. Fata*
Anthony F. Fata (*pro hac vice*)
Kirby McInerney LLP
211 West Wacker Drive, Suite 550
Chicago, Illinois 60606
312.767.5180
afata@kmllp.com

Sarah E. Flohr (*pro hac vice*)
Faisal Q. Haider (*pro hac vice*)
Kirby McInerney LLP
250 Park Avenue, Suite 820
New York City, New York
212.371.6600
sflohr@kmllp.com
fhaider@kmllp.com
*Lead Counsel for*
*Lead Plaintiff Dufoe*

**HANNAFAN & HANNAFAN, LTD.**
Blake T. Hannafan (*pro hac vice*)
Hannafan & Hannafan, Ltd.
161 North Clark Street, Suite 1700
Chicago, Illinois 60601
312.527.0055
bth@hannafanlaw.com
*Additional Counsel for*
*Lead Plaintiff Dufoe*

CERTIFICATE OF SERVICE

I, Patrick T. Egan, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 10, 2023.

Dated: November 10, 2023

*/s/ Patrick T. Egan*
Patrick T. Egan