## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUSTIN DUFOE, on Behalf of Himself and All Others Similarly Situated,<br><br>       Lead Plaintiff,<br> v.<br><br>DRAFTKINGS INC., JASON D. ROBINS, JASON K. PARK, and MATTHEW KALISH,<br><br>       Defendants. | Case No. 1:23-cv-10524-DJC<br><br>***ORAL ARGUMENT REQUESTED*** |

### REPLY MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

| | |
|---|---|
| WILMER CUTLER PICKERING<br>HALE and DORR LLP<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000 | SULLIVAN & CROMWELL LLP<br>125 Broad Street<br>New York, NY 10004<br>Telephone: (212) 558-4000<br><br>*Attorneys for Defendants* |

Dated:  December 11, 2023

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

I.   THE OPPOSITION CONFIRMS PLAINTIFF'S FAILURE TO PLEAD THAT
     MARKETPLACE NFTs ARE SECURITIES. ................................................................2

     A.   Plaintiff Fails to Plead the Requisite "Common Enterprise." ..................................2

     B.   The Opposition Makes Clear Defendants Did Not Lead NFT Purchasers to
          Expect Investment Profits from DraftKings' Managerial Efforts.............................8

II.  PLANTIFF CANNOT ASSERT EXCHANGE ACT CLAIMS. .......................................13

III. PLAINTIFF'S REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED. .............13

CONCLUSION.................................................................................................................13

## TABLE OF AUTHORITIES

**Cases**

*Allco Renewable Energy Ltd.* v. *Massachusetts Elec. Co.*,
    875 F.3d 64 (1st Cir. 2017) ..................................................................................................13

*Austin* v. *Bradley, Barry & Tarlow, P.C.*,
    1992 WL 560915 (D. Mass. June 17, 1992) ........................................................................7, 8

*Balestra* v. *ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ................................................................................6, 11

*Chase* v. *Merson*,
    384 F. Supp. 3d 106 (D. Me. 2019) .........................................................................................8

*Copeland* v. *Hill*,
    680 F. Supp. 466 (D. Mass. 1988) ...........................................................................................8

*Davis* v. *Rio Rancho Ests., Inc.*,
    401 F. Supp. 1045 (S.D.N.Y. 1975) .......................................................................................12

*Friel* v. *Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) .............................................................................passim

*Revak* v. *SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) .........................................................................................................5

*Rodriguez* v. *Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. ) ..............................................................................................................12

*Scott* v. *Bluegreen Vacations Unlimited, Inc.*,
    2020 WL 3296190 (E.D. Cal. June 18, 2020) .......................................................................13

*SEC* v. *Aqua-Sonic Prod. Corp.*,
    687 F.2d 577 (2d Cir. 1982) ...................................................................................................10

*SEC* v. *Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ............................................................................5, 6, 11

*SEC* v. *LBRY, Inc.*,
    639 F. Supp. 3d 211 (D.N.H. 2022) ..................................................................................6, 11

*SEC* v. *Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) ............................................................................................12-13

*SEC* v. *Ripple Labs, Inc.*,
    2023 WL 4507900 (S.D.N.Y. July 13, 2023) ........................................................................11

*SEC* v. *SG Ltd.*,
   265 F.3d 42 (1st Cir. 2001) .................................................................................... *passim*

*SEC* v. *Telegram Group, Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ............................................................................ 6, 10

*SEC* v. *Terraform Labs Pte. Ltd.*,
   2023 WL 4858299 (S.D.N.Y. July 31, 2023) .................................................................. 6, 11

*SEC* v. *W.J. Howey Co.*,
   328 U.S. 293 (1946) ................................................................................................ *passim*

*Teamsters* v. *Daniel*,
   439 U.S. 551 (1979) ........................................................................................................ 2

*United Hous. Found., Inc.* v. *Forman*,
   421 U.S. 837 (1975) .................................................................................................. 2, 11

**Statutes**

Securities Act of 1933
   Section 2(a)(1), 15 U.S.C. § 78b(a)(1) ............................................................................ 11

Securities Exchange Act of 1934
   Section 3(a)(10), 15 U.S.C. § 78c(a)(10) ........................................................................ 11

**Other Authorities**

*Framework for "Investment Contract" Analysis of Digital Assets*,
   SEC Staff Publication (Apr. 3, 2019) ................................................................................. 3

*In the Matter of Impact Theory, LLC*,
   Release No. 11226, File No. 3-21585 (Aug. 28, 2023) ...................................................... 6

*In the Matter of Stoner Cats 2, LLC*,
   Release No. 11233, File No. 3-21655 (Sept. 13, 2023) ...................................................... 6

## TABLE OF ABBREVIATIONS

| AC or Complaint | Amended Complaint for Violation of the Federal Securities Laws (Dkt. No. 38) |
|---|---|
| AC Ex. | Exhibit attached to the Complaint |
| Decl. Ex. | Exhibit attached to the Declaration of Andrew Dulberg, dated September 25, 2023 (Dkt. No. 48) |
| DraftKings | DraftKings, Inc. |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78rr |
| Marketplace | DraftKings Marketplace |
| Motion or Br. | Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint (Dkt. No. 47) |
| NFT | Non-fungible token |
| Opposition or Opp. | Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 55) |
| SEC | U.S. Securities and Exchange Commission |

## PRELIMINARY STATEMENT

Plaintiff's opposition brief ("Opposition" or "Opp.") abandons the central premise of the Complaint—that, by marketing and selling NFTs[1] that purchasers could use to play Reignmakers fantasy sports-style games and potentially earn *cash prizes*, DraftKings offered and sold investment contracts that qualify as securities. Instead, Plaintiff now claims that Reignmakers prizes were merely a "promotional" gimmick (Opp. 22) designed to induce investors to buy NFTs supposedly for the real (but unstated) purpose of investing in DraftKings in the hope of profiting in the form of NFT "capital appreciation" driven by the success of DraftKings' Marketplace (Opp. 1). That theory is nonsensical and unpled, but it is also entirely self-defeating. By abandoning reliance upon the cash prize potential of NFTs, Plaintiff concedes the absence of any "common enterprise," and he dispenses with any theory that DraftKings promoted NFTs for profit.

Beyond this, the Opposition—like the Complaint—concedes that Defendants never promised to use the proceeds of *any* NFT sales to develop anything for the benefit of NFT purchasers, or suggested that purchasers' NFTs would appreciate in value as a result of any such efforts. To the contrary, the Opposition admits, fatally, that DraftKings made clear from the outset that Reignmakers NFT values would *depreciate*, by design, as a result of their declining utility as the sports season progressed. (Opp. 22.) NFT owners were pitted against one another in contests of skill seeking to earn prizes *from DraftKings* using the particular NFTs they owned; they were not investing alongside each other for common profit. This is the opposite of a common enterprise.

Rather than confront the fatal defects in his claims, Plaintiff refers repeatedly to cases holding that wildly dissimilar investments in various other "digital assets" can be investment contracts under the securities laws. (Opp. 4, 10.) But far from painting all digital assets with the

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in Defendants' opening brief in support of their motion to dismiss ("Motion" or "Br.").

same broad brush, those cases—virtually all involving *fungible* cryptocurrencies (not, as here, *non-fungible* tokens)—only underscore Plaintiff's inability to plead a securities claim here. Plaintiff's cryptocurrency cases each involved coin offerings explicitly touted as investments that would increase in value as the sale proceeds were recycled into the proprietary coin blockchain that was the only "business" of the promoter. (*See infra* at 6 & 11.) Nothing of this sort is at issue here. Plaintiff relies primarily on *Friel* v. *Dapper Labs, Inc.*, but that case held that "[n]ot all NFTs offered or sold by any company will constitute a security." 657 F. Supp. 3d 422, 450 (S.D.N.Y. 2023). Plaintiff acknowledges that his effort to transform NFTs into securities is "fact-intensive" (Opp. 2), but Plaintiff must *plead* the facts establishing a security "to a very substantial degree," *Teamsters* v. *Daniel*, 439 U.S. 551, 560 (1979). He has not done so.

The whole point of the test established in *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946) is to distinguish ordinary commercial activity from transactions that are the functional equivalent of equity investments—*i.e.*, capital contributions pooled together and used to fund a business, with investors sharing in the fruits of the endeavor via earnings participation or capital appreciation. *United Hous. Found., Inc.* v. *Forman*, 421 U.S. 837, 849 (1975) ("The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes."). *Howey* itself is illustrative. There, investors technically bought tracts of land, but the value proposition purchased and marketed to them was not the land (the asset); it was the pro rata participatory interest in the orange production business (the enterprise) that mimicked an equity investment. 328 U.S. at 299-300. Plaintiff tries to contort this case to fit that mold, but the facts in the Complaint, and the documents it cites, contradict this thesis at every turn.

I.  **THE OPPOSITION CONFIRMS PLAINTIFF'S FAILURE TO PLEAD THAT MARKETPLACE NFTs ARE SECURITIES.**

   A.  **Plaintiff Fails to Plead the Requisite "Common Enterprise."**

Plaintiff begins his defense of his common enterprise allegations with a quote from an SEC

Staff commentary (Opp. 10), but he neglects to mention that the same publication explained that the SEC does *not* adhere to the commonality tests adopted by "federal courts."  SEC Staff, *Framework for "Investment Contract" Analysis of Digital Assets*, n.10 (Although "federal courts require that there be either 'horizontal commonality' or 'vertical commonality,' . . . [t]he Commission, on the other hand, does not require vertical or horizontal commonality *per se*, nor does it view a 'common enterprise' as a distinct element of the term 'investment contract.'").  As the SEC Staff acknowledges, the Framework "is not a rule, regulation, or statement of the Commission, . . . and it does not replace or supersede existing case law [or] legal requirements." *Id.* n.1.  Plaintiff relies upon snippets of this inapt *Framework* (while ignoring portions of it that contradict his thesis) because the governing case law so clearly defeats his claims.

        **1.**        **Plaintiff Cannot Plead Horizontal Commonality.**

Plaintiff concedes that, to show the "pooling" of investment proceeds required for horizontal commonality (*see* Br. 10-11), he must demonstrate that the "funds received by the promoter" are "reinvested by the promoter into the business" for the benefit of all investors in the common enterprise (Opp. 11 (quoting *Dapper Labs*, 657 F. Supp. 3d at 436)).  The Opposition makes clear Plaintiff fails to do so here.

After first pronouncing that NFT "investment dollars were pooled in the Marketplace, the common enterprise" (Opp. 5), the Opposition proceeds to demonstrate the inaccuracy of that premise.  Plaintiff instead says the funds were "pooled into DraftKings"—not the Marketplace—and that "DraftKings received all proceeds" from NFT transactions.  (Opp. 12.)  The Complaint admits that DraftKings co-mingled NFT funds with its vast trove of other revenues (AC ¶ 44), at least **97%** of which have nothing to do with NFTs (Br. 3).  And the Opposition concedes that DraftKings does what it wishes with NFT sales proceeds—including simply keeping them as "profits for itself" (Opp. 1)—and DraftKings never agreed or promised to use NFT revenues for

the benefit of the Marketplace or NFT purchasers. This alone is fatal to Plaintiff's claims, because all agree the pooled funds *must* be used for the specific "enterprise" in which investors purportedly have an interest, not the company as a whole. (*See* Opp. 15 ("[T]he focus is on the enterprise, not the company, when horizontal commonality is considered.").)

Unlike many of the cryptocurrency cases Plaintiff cites where coins were sold to the public in order to fund the development of the promoter's nascent proprietary blockchain, the Marketplace was built by DraftKings with its own money before the first NFT ever was sold. (AC ¶¶ 25-26.) The Complaint says that about half of all NFT revenues are given away in prize pools, tens of millions more dollars are paid in license fees, and others are used in "operations unrelated to its NFTs" (AC ¶ 44 & Ex. 5, at 8; Br. 15), all while "DraftKings has failed to develop and grow the NFT platform" at all (AC ¶ 24). Hence, Plaintiff defeats his own claim by arguing that DraftKings does *not* deploy pooled investor funds in the Marketplace.[2]

Plaintiff mischaracterizes *SEC* v. *SG Ltd.*, 265 F.3d 42 (1st Cir. 2001). That decision turned on the defendant's "unambiguous[] represent[ation] to its clientele that participants' funds were *pooled in a single account used to settle participants' on-line transactions*." *Id.* at 50 (emphasis added). By contrast, Plaintiff here alleges that NFT sale proceeds were merely "pooled into DraftKings" for use however it saw fit. (Opp. 12; Br. 11.) His contention that *SG Ltd.* held that horizontal commonality exists whenever an enterprise is "dependent upon a continuous influx of new money to remain in operation" is false. (Opp. 13.) The "enterprise" in that case was a *Ponzi*

---

[2] Plaintiff bizarrely argues that "further proof of pooling" is alleged because "DraftKings itself . . . holds the NFTs." (Opp. 12.) That makes no sense. Again, DraftKings is *not* the enterprise, and its record ownership of the digital token does not in any way show that all NFT purchasers have some proportionate share "in the profits and risks of the enterprise." *SG Ltd.*, 265 F.3d at 50. Nor is Plaintiff's claim, that, "if DraftKings or the DK Marketplace cease to exist, the Marketplace NFTs will be worthless," indicative of anything. (Opp. 13 (quoting AC ¶ 37).) Even if true (it is not (*see* Br. 24)), it serves only to confirm the absence of any obligation or expectation that DraftKings would use NFT funds to support the Marketplace, and to reiterate (again) that Plaintiff fails to allege the required correlation between the *success* of DraftKings or the Marketplace and NFT purchasers' *profits*. (Br. 23 n.9.)

*scheme* that, by its very nature, satisfied the commonality test because of the need to recycle new money to repay old investors. *SG Ltd.*, 265 F.3d at 50-52. Plaintiff's claim that *SG Ltd.* rejected the notion that the enterprise's profits must be shared pro rata among investors is irrelevant (Opp. 14), since he fails to allege profit sharing of *any sort*. But it is also wrong; the investors in *SG Ltd.* bought shares in a fictitious company and were promised common profits on a *per share* basis. *SG Ltd.*, 265 F.3d at 49. *SG Ltd.* is of no help to Plaintiff here.

Beyond his failure to plead pooling, Plaintiff does not explain how there can possibly be commonality across Marketplace NFT purchasers when their fortunes are not tied to one another (because each NFT is individually priced based on its unique characteristics and utility) and, with respect to Reignmakers contests, necessarily are the *inverse* of each other (because players are competing against each other for the same prizes). (Br. 11-12.) Horizontal *commonality* requires a *common* value proposition across similarly situated investors proportionate to their relative participatory interests in the enterprise. *Revak* v. *SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994) (no horizontal commonality where an individual purchaser may "make profits or sustain losses independent of the fortunes of other purchasers"). That is utterly lacking here. And Plaintiff's assertion that "courts" have found that commonality may exist even where investors gain or lose at the same time (Opp. 14) is wrong. The *lone* case Plaintiff cites held the opposite—noting that whether investors "could sell . . . whenever they pleased" and thus not "reap their profits at the same time" was "not dispositive" *so long as* "investors' profits at any given time are tied to the success of the enterprise," but commonality is *absent* where, *as here*, the "profits [of each investor] remain independent." *SEC* v. *Kik Interactive Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020).

Grasping at straws, Plaintiff resorts to a generic pronouncement that "recent digital asset cases" have "found horizontal commonality to be present." (Opp. 11.) Plaintiff cites only *Dapper Labs*, but that case is of no help to Plaintiff here. As more fully explained in the Motion (Br. 22-

25), the court in *Dapper Labs* found commonality to exist solely because of the interdependence of Dapper's Moments NFTs and its propriety FLOW blockchain—together, Dapper's *entire* business—which that court found adequately "tie[d] the *value* of Moments [NFTs] to *Dapper Labs's success*." 657 F. Supp. 3d at 438. None of the factors found dispositive in *Dapper Labs* is present here, and the Opposition nowhere contends otherwise. Plaintiff elsewhere offers an undifferentiated string cite to a series of cases about "other digital assets" (Opp. 10), accompanied by no argument or even an assertion that they involved analogous facts or equally applicable legal conclusions, because the cases actually serve only to illustrate what is *absent* here. The cases all concerned firms—having no other business—that issued digital assets tied expressly and ineluctably to the success of the firm itself, the entire premise of which was that investment proceeds would be continuously recycled to build up the currency or its blockchain for the benefit of investors.[3] The Complaint here alleges nothing of this sort.

Recognizing that "each NFT has some 'intrinsic value,'" Plaintiff argues erroneously that *Howey* found the "intrinsic value" of the asset exchanged in a transaction irrelevant to whether the transaction is an investment contract. (Opp. 19.) Not so. The Supreme Court found the land acquired by investors was "purely incidental" to their investment in an equity-like "opportunity to

---

[3] *See SEC* v. *Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *13 (S.D.N.Y. July 31, 2023) ("[D]efendants used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves."); *SEC* v. *LBRY, Inc.*, 639 F. Supp. 3d 211, 217 (D.N.H. 2022) ("long-term value proposition of LBRY is tremendous, but also dependent on our team . . . building this thing"); *SEC* v. *Telegram Group, Inc.*, 448 F. Supp. 3d 352, 370 (S.D.N.Y. 2020) (development of blockchain funded with cryptocurrency proceeds); *Kik Interactive*, 492 F. Supp. 3d at 178, 180 (company "deposited the funds into a single bank account" and "promised to 'provide startup resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand'"); *Balestra* v. *ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019) (coin sale proceeds "were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of" coins). Plaintiff also notes two irrelevant SEC settlements involving NFTs sold as equity-like interests in the issuer's business in exchange for cryptocurrency. *See In the Matter of Stoner Cats 2, LLC*, Release No. 11233, File No. 3-21655 (Sept. 13, 2023) (NFT proceeds funded animated web series in which NFTs had profit share); *In the Matter of Impact Theory, LLC*, Release No. 11226, File No. 3-21585 (Aug. 28, 2023) (NFTs sold as an investment in the issuer that would increase as the company became the next Disney).

contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents." *Howey*, 328 U.S. at 299-300. Any utility of the strips of land alone would "seldom be economically feasible due to their small size"; instead, the "tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area"—*i.e.*, the "common enterprise." *Id.* The strips of land in *Howey* simply "serve[d] as a convenient method of determining the investors' allocable shares of the profits." *Id.* Here, by contrast, the entire value proposition of the NFTs at issue is based on their utility as game pieces and collectibles. That the game pieces are embodied in NFTs is purely incidental to their utility. (Decl., Ex. 3, at 6 (Reignmakers "was not an NFT project but a new NFL skill game that had multiple levels of strategy"); *id.* at 3 ("[Y]ou don't need to think of it as a NFT. It's nothing more than your fantasy roster and players on your team, similar to what you do for your season long leagues.").

### 2. Plaintiff Cannot Plead Vertical Commonality.

Plaintiff's alternative vertical commonality theory fares no better. As the Opposition concedes (Opp. 11, 16), the First Circuit expressed skepticism in *SG Ltd.* that vertical commonality is even a viable means to establish a common enterprise, but declined to rule definitively on the issue (Br. 13). This Court should follow the lead of other courts in rejecting any vertical commonality theory. (Br. 13-14; Opp. 16.)

The Opposition advocates both "broad" and "strict" vertical commonality (Opp. 11), but Plaintiff *admitted in his Complaint* that broad vertical commonality is insufficient, conceding that he "must either show horizontal commonality or *strict* vertical commonality." (AC ¶ 102 (emphasis added).) Plaintiff argues that some district courts have accepted vertical commonality (Opp. 15-16), but he omits that courts in *this* district have consistently rejected broad vertical commonality because it "merges the second element of the *Howey* test with the third element, thus eliminating one prong." *Austin* v. *Bradley, Barry & Tarlow, P.C.*, 1992 WL 560915, at *6 (D.

Mass. June 17, 1992); *see also*, *e.g.*, *Copeland* v. *Hill*, 680 F. Supp. 466, 468 (D. Mass. 1988) (same). Thus, only "strict" vertical commonality—"interdependence of the fortunes of both the investor and the promoter," *Austin*, 1992 WL 560915, at *6—might conceivably apply.

Plaintiff comes nowhere close to pleading the type of interdependence between the fortunes of DraftKings and NFT purchasers necessary for strict vertical commonality. (Opp. 17.) Whether Plaintiff makes money on his particular NFTs bears no relation to whether DraftKings makes money. Indeed, the Complaint alleges an inverse relation between NFT values and DraftKings' profitability. (Br. 14-15.) And, as the Opposition acknowledges, even the *Dapper Labs* case that Plaintiff tries (and fails) to emulate rejected the same argument that the percentage-based fees DraftKings charges on secondary market NFT transactions give rise to interdependence, because DraftKings collects those fees regardless of whether the seller makes or loses money. 657 F. Supp. 3d at 441. Courts in this district have uniformly agreed.[4] (Br. 15-16.) Plaintiff protests that he alleges "additional facts," but those allegations simply repackage his inapt broad vertical commonality theory (that NFT purchasers depend on DraftKings' maintenance of the Marketplace) and repeat allegations in *Dapper Labs* (that DraftKings would suffer if the Marketplace fails (Opp. 18-19; Br. 23)), but inapt here given the Marketplace's minute revenues.

### B. The Opposition Makes Clear Defendants Did Not Lead NFT Purchasers to Expect Investment Profits from DraftKings' Managerial Efforts.

Plaintiff also cannot satisfy the final prong of the *Howey* test because he does not plausibly allege that Defendants ever led Plaintiff to believe that Marketplace NFTs represented an opportunity to invest in DraftKings or the Marketplace. Notably, the Opposition nowhere even contends that Plaintiff had such a belief, that DraftKings induced it, or that it was the reason for

---

[4] Plaintiff's claim that *Chase* v. *Merson*, 384 F. Supp. 3d 106, 110 (D. Me. 2019), found vertical commonality based upon a "success fee" is both irrelevant (DraftKings' commission is unconnected to the "success" of any NFT purchase) and wrong—the *Chase* plaintiff was sold a "letter of credit" that "promised" that, "for every $250,000 he invested, he would receive approximately $10,000,000 in 7 to 12 days."

Plaintiff's NFT purchases. Having disclaimed his allegations that refer to profit potential in the form of Reignmakers prizes, Plaintiff is left with nothing to support the third *Howey* prong.

### 1. Plaintiff Alleges No Reasonable Expectation of Capital Appreciation.

To qualify as an investment contract, investors must be motivated by a reasonable expectation—*provoked by representations of the promoter*—that the investment enables them to profit on the success of the enterprise in which they are investing through earnings participation or capital appreciation. *SG Ltd.*, 265 F.3d at 53-56. Plaintiff says the *only* profit potential at issue here is "capital appreciation," and he contends that "Defendants tout[ed] . . . potential capital appreciation on [purchasers'] NFT investments." (Opp. 1.) But that pronouncement is totally unsupported by any factual allegation in the Complaint. Plaintiff cites **not one** piece of marketing material, advertisement, or other statement in which any Defendant stated that NFTs would appreciate in value (due to DraftKings' success or otherwise).

The only economic value that Defendants noted in relation to Marketplace NFTs was the opportunity to win cash prizes in Reignmakers contests. (Br. 17-18.) This is a centerpiece of the Complaint, which alleges many such marketing efforts (Br. 17), but the Opposition remarkably now disclaims entirely any reliance on those statements or prize awards to satisfy *Howey*'s third prong (Opp. 22). Beyond jettisoning his own pleading, Plaintiff's ground-shifting is an acknowledgement that the value attached to an opportunity to win prizes through deployment of NFTs is utilitarian (*i.e.*, value attributable to consumptive use), not the type of investment value proposition that accompanies a security. (Br. 17.) But Plaintiff's argument is precisely that the prospect of prizes was the "economic inducement" and the "lure" by which Defendants allegedly sold Marketplace NFTs. (Opp. 15, 22.)[5] This dooms his claims, because the "economic

---

[5] (Opp. 7 (Defendants "advertise and promote (through Reignmaker contests) the investment").) Plaintiff's contradictory assertion that "nothing in the Complaint suggests that these prizes were a significant motivation

inducement" under *Howey* **must** be earnings participation or capital appreciation, *SG Ltd.*, 265 F.3d at 53-54, and Plaintiff concedes expressly that prizes do not count.

The Opposition repeatedly attempts to backfill this gaping hole by citing the same few paragraphs of the Complaint, which Plaintiff incorrectly claims allege statements by Defendants that Marketplace NFTs would increase in value. (Opp. 1 (citing AC ¶¶ 39, 110-112); *see also id.* 7, 21.) Even if correct, snippets from four oral comments over more than two years do not make the requisite showing that, "under all the circumstances, the scheme was being promoted primarily as an investment." *SEC* v. *Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982); *SG Ltd.*, 265 F.3d at 54 (noting "persistent representations of substantial pecuniary gains").

More importantly, not one of these paragraphs says any such thing. One merely quotes a statement referencing the "potential revenue opportunity" *for DraftKings*, and how NFTs were a "logical cross-sell opportunity with existing customers" (*i.e.*, not a new investment). (AC ¶ 39.) Another quotes a statement from a chatroom *about Reignmakers* discussing the "scarcity" of particular NFTs as a "fundamental premise of the whole game" (*i.e.*, limiting the number of NFTs is necessary for the NFTs to have the desired utility in contests). (AC ¶ 110.) Another quotes a statement from the same chatroom that, far from touting the potential to sell NFTs at higher values, describes NFTs as "cards that you own forever" and that have "multiyear utility." (AC ¶ 111.) And the last quotes from an incomplete conversation, again from the same Reignmakers chatroom, in which Defendant Kalish responds to a user's questions about transferability of a card and whether the purchaser will "own the card" by stating that purchasers can "keep the open market profit of [their] cards." (AC ¶ 112.) On its face, this exchange simply concerns whether, like baseball trading cards, Reignmakers NFTs are owned and transferable by the purchaser. This

---

for investing in the NFTs" (Opp. 22) is patently false (*see*, *e.g.*, AC ¶¶ 43, 45, 109, 113, 114, 133, 143, 148). Regardless, "[t]he inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Telegram*, 448 F. Supp. 3d at 371.

conversation had nothing to do with a promise of "capital appreciation" attributable to a common enterprise.[6]

The only thing Defendants *actually* told purchasers about the value of the NFTs is that prices *would go down* as the NFTs' utility in Reignmakers waned with the passage of time. (Br. 7.) Plaintiff admits as much, but dismisses that fatal fact as irrelevant because "[m]any securities" are designed to "decline in value over time." (Opp. 22.)[7] Even if that nonsensical assertion were true of some securities,[8] it cannot be true of *investment contracts*, which Plaintiff concedes must be accompanied by a reasonable expectation of *increasing* value. (Opp. 20.) And the notion that Defendants could have **induced** NFT purchasers to expect that their NFTs would appreciate in value by telling purchasers exactly the opposite is absurd.

Finally, Plaintiff concedes—as he must—that where, as here, "a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply." *Forman*, 421 U.S. 837 at 852-53; (Opp. 22 (admitting that the NFTs have independent utility); *id.* (acknowledging "DraftKings NFTs [are] usable with Reignmaker contests"); AC ¶¶ 114, 117.). Plaintiff again invokes *Dapper Labs*, claiming that the court in that case rejected an argument that

---

[6] The digital asset cases Plaintiff cites involved the type of touting of investment returns that are notably absent here. *See Terraform*, 2023 WL 4858299, at *14 (peddling "the possibility of profiting from their purchases . . . [in] investor meetings, excerpts of investor materials, and screenshots of social media posts"); *SEC* v. *Ripple Labs, Inc.*, 2023 WL 4507900, *10 (S.D.N.Y. July 13, 2023) ("promotional brochures . . . touted XRP as an investment tied to the company's success"); *Dapper Labs*, 657 F. Supp. 3d at 444 (marketing materials promoting price increases and profits "objectively led purchasers to expect that they would realize the same gains"); *LBRY*, 639 F. Supp. 3d at 217 ("long-term value proposition of" token is "tremendous"); *Kik Interactive*, 492 F. Supp. 3d at 179 (investors stood to "make a lot of money"); *Balestra*, 380 F. Supp. 3d at 355 ("participants finance the development of the company now in order to get revenue from it in the future").

[7] Plaintiff protests that these statements were first made in October 2022 (Opp. 22), but his Complaint concedes users understood Reignmakers NFTs "will depreciate considerably" over time by August 2022 (*i.e.*, before the first Reignmakers season (AC ¶ 117)). Plaintiff himself bought Marketplace NFTs long after October 2022, confirming that he lacked any supposed DraftKings-induced expectation of capital appreciation. (*See* AC Ex. 1 at 132-38.)

[8] Plaintiff's reference to the "decaying time value" of options is irrelevant (because an "option, or privilege on any security" is an enumerated security, *see* 15 U.S.C. §§ 78b(a)(1) and 78c(a)(10), *not an investment contract*), and only confirms that the declining value of Marketplace NFTs is a function of their decaying utility in skill contests.

NFTs were a security despite their consumptive use. (Opp. 21-22.) Not so. *Dapper Labs* found that hypothetical future uses were not dispositive when "none of this consumptive use was available at the time Moments [NFTs] were offered to Plaintiffs." 657 F. Supp. 3d at 445-46. Here, the gamified use of Marketplace NFTs was the entire point from the outset.

### 2. Plaintiff Cannot Plead Any Promise of Managerial Efforts.

The Opposition concedes Plaintiff must also establish that purchasers reasonably expected their investment profits to "come from the efforts of the promoter . . . . based upon what purchasers were led to expect by the promoter." (Opp. 23.) Here, the Complaint nowhere alleges that Defendants *promised* any managerial efforts,[9] and, as explained in the Motion, the only actual managerial efforts Plaintiff pleads in the Complaint relate to Reignmakers contests (Br. 22).[10] But the Opposition disavows any relevance of Reignmakers prizes, and agrees that Reignmakers NFT purchasers expected only capital *depreciation*. Plaintiff is thus left with no connection whatsoever between any NFT capital appreciation and any DraftKings' managerial effort.

In the end, all Plaintiff can muster is the claim that DraftKings must continue to exist for the Marketplace to continue to exist and thus for his NFTs to have any value at all. That is legally irrelevant, for the question the *Howey* test poses is whether investors reasonably and objectively believed the promotor's significant managerial efforts would produce *profits* for the investor. *See SEC* v. *Life Partners, Inc.*, 87 F.3d 536, 545 (D.C. Cir. 1996) (requirement satisfied only where "profits" are derived from the efforts of others). Plaintiff again resorts to citing a string of

---

[9] In *Rodriguez* v. *Banco Central Corporation*, despite a "company sales manual" emphasizing "capital appreciation as a prime selling point," the First Circuit held that plots of land were not securities under *Howey* because there was no evidence that "the promoter or any other obligated person or entity was promising the buyers to build or provide anything," leaving "no preten[s]e of a 'common enterprise' managed by the promoter." 990 F.2d 7, 11-12 (1st Cir. 1993). The same is true here.

[10] The Opposition vaguely references unspecified Marketplace improvements, but that is of no help to Plaintiff. *See Davis* v. *Rio Rancho Ests., Inc.*, 401 F. Supp. 1045, 1050 (S.D.N.Y. 1975) ("If defendants in fact built roads and other improvements, this is not the type of managerial service contemplated in *Howey* or *United Housing*.").

-12-

cryptocurrency cases (Opp. 23-24), but in those cases, the promotor's management of the blockchain underlying the currency and "mass adoption" of the currency through the promotor's marketing efforts were essential to the profit model (*see supra* at 6 & 11.)  Plaintiff nowhere argues that DraftKings promised similar efforts to generate profits for Marketplace NFT purchasers.

## II.     PLANTIFF CANNOT ASSERT EXCHANGE ACT CLAIMS.

Plaintiff plainly does not have a private right of action to assert his Exchange Act claims.  The decades-old cases cited in the Opposition have been superseded.  (*See* Br. 25-26.)  It is now clear that new private rights of action cannot be implied; they must be "'unambiguously conferred'" by Congress.  *Allco Renewable Energy Ltd.* v. *Massachusetts Elec. Co.*, 875 F.3d 64, 69-70 (1st Cir. 2017) (quoting *Armstrong* v. *Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1387-88 (2015)).  Because Plaintiff concedes that Congress has never "unambiguously conferred" a private right of action to bring Exchange Act claims, Plaintiff's claims must be dismissed.

## III.    PLAINTIFF'S REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED.

The Court should deny Plaintiff's perfunctory request for leave to amend the Complaint for a second time.  (Opp. 26.)  Plaintiff was appointed as lead plaintiff on May 23 and has already had months to investigate and attempt to muster sufficient allegations to plead viable claims.  It is clear from Plaintiff's allegations that Marketplace NFTs are not investment contracts as a matter of law.  No amount of repleading can change that.  *See*, *e.g.*,  *Scott* v. *Bluegreen Vacations Unlimited, Inc.*, 2020 WL 3296190, at *7 (E.D. Cal. June 18, 2020) (denying leave to amend where the "Plaintiffs c[ould] not allege that [the assets at issue] were securities.")

## CONCLUSION

For the foregoing reasons and the reasons explained in Defendants' opening brief, Defendants respectfully request that this Court dismiss this action in its entirety with prejudice.

| | |
|---|---|
| Dated: December 11, 2023 | Respectfully submitted, |
| | /s/ *Michael G. Bongiorno* |
| | Michael G. Bongiorno (BBO #558748) |
| | Andrew S. Dulberg (BBO #675405) |
| | WILMER CUTLER PICKERING |
| | HALE and DORR LLP |
| | 60 State Street |
| | Boston, MA 02109 |
| | michael.bongiorno@wilmerhale.com |
| | andrew.dulberg@wilmerhale.com |
| | Tel: (617) 526-6000 |
| | |
| | Brian T. Frawley (admitted *pro hac vice*) |
| | Benjamin R. Walker (admitted *pro hac vice*) |
| | Charles H. Sullivan (admitted *pro hac vice*) |
| | Howard H. Kim (admitted *pro hac vice*) |
| | SULLIVAN & CROMWELL LLP |
| | 125 Broad Street |
| | New York, NY 10004 |
| | frawleyb@sullcrom.com |
| | walkerb@sullcrom.com |
| | sullivanc@sullcrom.com |
| | kimhow@sullcrom.com |
| | Tel: (212) 558-4000 |
| | |
| | *Attorneys for Defendants DraftKings Inc., Jason D. Robins, Jason K. Park, and Matthew Kalish* |