UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

JUSTIN DUFOE,
on behalf of himself and all
others similarly situated,

                    Plaintiffs,        Civil Action
                                       No. 23-10524-DJC
V.

                                       December 19, 2023
DRAFTKINGS INC., et al,                2:58 p.m.

                    Defendants.
_____

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

```
 1      APPEARANCES:

 2      FOR THE PLAINTIFF:

 3      ANTHONY F. FATA, ESQ.
        Fata Law LLC
 4      611 Rosewood Ave.
        Winnetka, IL 60093
 5      773-562-8669
        afata@kmllp.com
 6
        PATRICK T. EGAN, ESQ.
 7      Berman Tabacco
        One Liberty Square
 8      Boston, MA 02109
        617-542-8300
 9      pegan@bermantabacco.com

10      FOR THE DEFENDANT:

11      MICHAEL G. BONGIORNO, ESQ.
        Wilmer Cutler Pickering Hale and Dorr LLP
12      7 World Trade Center, 250 Greenwich Street
        New York, NY 10007
13      212-937-7220
        michael.bongiorno@wilmerhale.com
14
        BRIAN T. FRAWLEY, ESQ.
15      Sullivan & Cromwell
        125 Broad Street
16      New York, NY 10004
        212-558-4000
17      frawleyb@sullcrom.com

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                    (The following proceedings were held in open

3    court before the Honorable Denise J. Casper, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    1 Courthouse Way, Boston, Massachusetts, on December 19, 2023.)

7                    THE CLERK:  All rise.

8                    (The Court entered the courtroom.)

9                    THE CLERK:  Court is in session.  Please be seated.

10                   Civil action 23-10524, Justin Dufoe v. DraftKings, et

11   al.

12                   Would counsel please state your name for the record.

13                   MR. FATA:  Good morning, your Honor.  Anthony Fata on

14   behalf of lead plaintiff and the putative class.

15                   THE COURT:  Good afternoon, counsel.

16                   MR. EGAN:  Good afternoon.  Patrick Egan from Berman

17   Tabacco, also on behalf of plaintiffs.

18                   THE COURT:  Good afternoon.

19                   MR. BONGIORNO:  Good afternoon, your Honor.  Mike

20   Bongiorno from WilmerHale for the defendants.

21                   THE COURT:  Good afternoon, counsel.

22                   MR. FRAWLEY:  Good afternoon, your Honor.  Brian

23   Frawley from Sullivan Cromwell for the defendants as well.

24                   THE COURT:  Good afternoon.

25                   Counsel, I know we're here on the defendants' motion

1    to dismiss.  I've had a chance to review the motion papers,

2    opposition, reply, and attachments.  I'm prepared to hear

3    argument, counsel.

4         MR. FRAWLEY:  Thank you, your Honor.  Would you like

5    me to stay here or use the podium?

6         THE COURT:  Either way.

7         MR. FRAWLEY:  Okay.

8         So, thank you.

9         Your Honor, again, for the record, it's Brian Frawley

02:59 10   from Sullivan Cromwell for the defendants.

11        I think I'll start with the good news.  I think that

12   there's a basic agreement on what law governs here, and that

13   the state law claims are governed by the federal standards and

14   the prime issue that we're here to talk about today the

15   application of how the Howey case from 80 years ago and its

16   progeny to the transactions and assets at issue here, the

17   non-fungible tokens of DraftKings.

18        The facts that are alleged here are fairly

19   straightforward, and frankly, from defendants' perspective, as

03:00 20   is perhaps evident from the papers, very few of them are

21   actually relevant to this Court's decision.

22        DraftKings sold two categories of NFTs:

23        One, which I'll refer to for simplicity here as

24   collectible NFTs or static or dynamic images of professional

25   athletes associated with an NFT.  There's virtually nothing in

1    the complaint about those -- that category of NFTs beyond

2    indicating that they existed and were sold initially and

3    through the Marketplace.

4        The second category of NFTs are Reinmaker NFTs, and

5    we're going to come back to that in our discussion today.  The

6    bulk of the allegations in the complaint about what managerial

7    efforts were undertaken, what profits were promised, or what

8    enterprise exists all relate to the NFTs from the Reinmakers

9    sports contest.  And as we'll come to in some detail, those

03:01 10   Reinmaker NFTs were effectively game pieces that were utilized

11   in fantasy sports contests much like the DraftKings daily

12   fantasy sports business that has existed for many years.

13       Before turning to the specific elements of the <u>Howey</u>

14   test, I want to level set slightly -- and part of this is in

15   the plaintiffs' arguments -- but what <u>Howey</u> talks about and

16   what the <u>Howey</u> investment contract test is trying to establish

17   is whether some other transaction is an equity-like interest in

18   a common enterprise.  It is a test that is trying to see

19   whether or not what transaction is at issue looks and smells

03:01 20   like an equity investment.  And that's evident from the facts

21   of <u>Howey</u> itself.  There was an orange grove.  There were strips

22   of land, each of which had 48 trees on it, but the strips of

23   land was just a measure of the investor's interest in the

24   enterprise.  The land was not what was being sold, it was just

25   a convenient method of measuring an equity-like interest in an

1    enterprise.  And we submit, your Honor, there's nothing of that

2    sort alleged here.

3          In a similar vein, the plaintiffs point out repeatedly

4    in their brief that what matters here and what the cases say is

5    that substance governs over form.  With that, the defendants

6    agree.  But the implications of that rule here is not the

7    implications that are advocated for by the plaintiffs.  It's

8    the plaintiffs that are seeking to elevate form over function

9    by making comparisons to cryptocurrency cases and declaring

03:03 10   that courts have found digital assets and cryptocurrencies to

11   be securities.  That's form.

12         The substance here is a collectible attached to an NFT

13   and a Reinmaker game piece.  That's the substance.  The fact

14   that there's an NFT involved in this at all has nothing to do

15   with the substance.  That's the form, not the substance.  It is

16   the plaintiffs that aren't embracing and addressing the

17   substance.

18         Now, on the <u>Howey</u> test, the <u>Howey</u> test, as your Honor

19   knows, has three elements.

03:03 20   Nobody's disputing the first element with the

21   investment of money.

22         The second element concerns whether there's a common

23   enterprise, which I'll come to in a second.

24         And the third element has two sort of subelements,

25   it's whether the NFT purchasers were objectively induced by the

1    promoted to expect profits and whether those promised profits

2    were to be derived from the managerial efforts of defendants.

3            As the 1st Circuit said in SG Ltd., horizontal

4    commonality requires the pooling of assets from multiple

5    investors in such a manner that all share in the profits and

6    risks of the enterprise.  We submit the facts here allege the

7    opposite.

8            There is no pooling of investments here.  What the

9    plaintiffs say is not that the proceeds of the NFT sales were

03:04 10    pooled in the enterprise, which they say is the Marketplace,

11    they say they were pooled in DraftKings.  They don't say that

12    the NFT proceeds were used for the benefit of the Marketplace,

13    they say they were used by DraftKings however it saw fit.

14            The 1st Circuit in SG Ltd. found pooling to be present

15    where there was a, quote, an unambiguous representation to its

16    clientele that the participants' funds were pooled into a

17    single account and used to settle the participants' online

18    transactions.

19            The funds here were pooled into a different entity,

03:05 20    DraftKings, not the enterprise, to be used as DraftKings

21    wishes, not for the benefit of NFT purchases.  That doesn't

22    meet the pooling test, and that alone is sufficient reason to

23    grant the motion.

24            THE COURT:  The pooling test for the purpose of the

25    common enterprise or the pooling test for the purposes of the

1    expectation of profits?

2         MR. FRAWLEY:  This, your Honor, is for the pooling

3    test for the common enterprise.

4         And before I will hear the word "Dapper Labs" come out

5    of my colleague's mouth many times when I turn over the podium

6    here, the Dapper Labs case found pooling in that case because

7    the court effectively found that Dapper's entire business was

8    the enterprise.  So by pooling the funds into Dapper Labs'

9    business, they were pooled into the enterprise.

03:06 10         Plaintiffs argue vociferously here that the enterprise

11   is not DraftKings, it's the Marketplace alone.  By doing so,

12   they destroy their pooling theory entirely.

13        A second element of the common enterprise test is that

14   investors must face --

15        THE COURT:  And why couldn't it be DraftKings?  Are

16   you saying because that's not how it's pled?

17        MR. FRAWLEY:  The plaintiffs in their opposition, and

18   perhaps in their complaint, although I think that's ambiguous,

19   but their opposition makes clear that the enterprise is

03:06 20   Marketplace and not DraftKings, and they chastise us for having

21   said otherwise in the motion.

22        So it is the plaintiffs' theory that the enterprise is

23   the Marketplace, and it's their allegation that the money went

24   to DraftKings, not to the Marketplace.  And it's their

25   allegation that DraftKings used the money as it wished, not for

 1    the benefit of NFT purchasers.

 2         A second element of commonality -- of the common

 3    enterprise is some version of horizontal or vertical

 4    commonality.  Before we get to that, the plaintiffs in their

 5    brief argue that they've established broad vertical

 6    commonality, except in their complaint they plead that they

 7    must allege either strict vertical commonality or horizontal

 8    commonality.  That's at paragraph 102 of the complaint.  So

 9    their opposition is arguing for a theory that their complaint

03:07 10   affirmatively disavows.

11         As to horizontal commonality, the 1st Circuit has said

12    that commonality requires that the risks and the rewards of the

13    investment be shared among the investors.

14         In the Revak v. SEC Realty case, the 2nd Circuit said

15    that that commonality may not exist where an individual

16    purchaser may make profits or sustain losses independent of the

17    fortunes of other purchasers.

18         It is clear from the allegations of the complaint that

19    these dissimilar NFTs can profit or lose on a daily basis

03:08 20   independent of others.

21         I want to talk briefly about the two forms of NFTs

22    here, because, again, the collectible NFTs, or what I'm

23    referring to as collectible NFTs, are not addressed at all in

24    the complaint on this topic.  There isn't an allegation of

25    profit potential, profit earnings, or that the investors in

1   these collectible NFTs had some common interest and common risk

2   profile together.

3           As I alluded to earlier, all of the allegations that

4   are specific to the NFTs concerned the Reinmaker NFTs.

5           We submit, your Honor, it's just not possible to argue

6   that purchasers of Reinmaker NFTs have that sort of

7   commonality.  The whole point of the Reinmaker NFTs is for the

8   purchasers to engage in battle against one another for profit,

9   prizes.  The purchasers compete against one another to buy and

03:09 10  acquire the NFTs, they compete against one another to form

11  their preferred lineup for competitions, and then they compete

12  against each other to win the prize.  That's the opposite of

13  commonality; it's competition, not commonality.

14          The last element of the horizontal commonality is that

15  the common interests of the investors be tied to the

16  enterprise.  So the causal effect of the common winning and

17  losing by the investors --

18          THE COURT:  Counsel, I may be mixing up apples and

19  oranges, I sort of remember some discussion about packs and the

03:10 20  value of the NFTs, and I'm not sure if that was in regards to

21  the collectibles or the reignmaking.

22          MR. FRAWLEY:  The entire concept of packs, like

23  baseball cards, relates to the Reignmaker NFTs.  The

24  collectible NFTs are sold as you would sell any portrait or

25  other collectible.

1    THE COURT:  And isn't there some allegation about the

2    value of those rising and falling separate from the competition

3    between the reignmaking NFTs as game pieces, I guess?

4    MR. FRAWLEY:  Well, there is an allusion to that in

5    the complaint which is somewhat overwhelmed by the other

6    allegation in the complaint that DraftKings told purchasers of

7    the Reignmaker NFTs that they would lose value week after week

8    throughout the season and that the utility of the Reignmaker

9    NFTs was a function of the player, the length of the season

03:11 10    left, and other factors relating to the game.  But it was --

11    it's unambiguous in the complaint, and it's attachments -- it's

12    paragraphs 113, 114 and 117 of the complaint, they're

13    summarized at page 7 of our opening brief.  But the --

14    DraftKings told the investors this the Reignmaker NFTs would

15    decrease in value.  And then the documents that the plaintiff

16    attaches to his complaint has discussion among Reignmaker

17    purchasers and commentators explaining how that would happen

18    and why it would happen as the players become less valuable as

19    the season wanes on.

03:12 20    So -- and there's no dispute about this in the

21    opposition, that their complaint makes clear that the

22    Reignmaker NFTs would lose value as the season went on.  And

23    that was what DraftKings told people when they sold them.

24    The last element of the common enterprise or

25    horizontal commonality is that the common interests of the NFT

1     purchasers all be tied to the success or failure of the

2     enterprise itself, that there be some causal connection between

3     the risk and reward to the investors and the success and

4     failure of the enterprise.

5           Your Honor, we submit that there's no allegation

6     about -- anything about the success or failure of the

7     Marketplace or even how one would measure the success or

8     failure of the Marketplace.  It's just an electronic platform

9     by which one buys or sells NFTs.  It's an eBay for NFTs for

03:13 10   DraftKings.

11          But, beyond that, the plaintiffs say at 145 of their

12     complaint that the NFT values peaked in either 2020 or 2021 and

13     the values thereafter cratered.

14          Well, the Reignmaker game was introduced in the fall

15     of 2022, and then more sports were added in 2023, that's at

16     paragraphs 45 and 50 of the complaint.  So the years when the

17     Marketplace was succeeding, the plaintiffs say NFTs were

18     failing.  And again, that's the inverse of the commonality that

19     they need to plead.

03:14 20          I touched briefly on vertical commonality before, and

21     I won't spend a lot of time, the plaintiffs don't either.  I

22     will point out that the Dapper Labs case that the plaintiffs

23     like to refer actually found vertical commonality absent.  And

24     the reason it's absent is quite simple, and that is that the

25     vertical commonality or strict vertical commonality is absent

1   if an investor can profit when the promoter loses or vice

2   versa.

3          And I know this begins to get a little confusing, your

4   Honor, I was pretty confused about this, too, but the vertical

5   commonality test, unlike some of the other ones that we talked

6   about, is measuring the success of the promoter and investors,

7   not the enterprise, the promoter here, presumably being

8   DraftKings.  And there isn't possibly an allegation of the

9   complaint, nor could there be, that DraftKings', a company with

03:15 10  three or four billion dollars in revenue, success or failure

11  depends on whether or not NFT investors with $70 million of

12  annual revenue make or lose any money.  And in fact --

13          THE COURT:  And can I decide that on the record here

14  where I have to assume the allegations to be true?

15          MR. FRAWLEY:  You do have to assume the well-pled

16  allegations to be true, your Honor.  But as we pointed out in

17  our brief, much like the question with the Marketplace, the

18  plaintiffs plead in their complaint DraftKings' earnings and

19  derisively talk about the fact that DraftKings had lost a lot

03:15 20  of money every year.  But the year that DraftKings lost the

21  least amount of money in the period that's covered by

22  plaintiffs' allegation is the year that the plaintiffs say NFTs

23  performed at their worst.  So the year that DraftKings

24  performed at its best, the NFTs performed at their worst.

25  That's covered at pages 14 to 15 of our brief.

1          Turning now to the final element of the <u>Howey</u> test,

2     like many of these, it has two elements.  The first element is

3     that the instrument must have been sold as a profit-making

4     investment rather than an item to be used or consumed.

5          I point out that the complaint nowhere even contends

6     that the plaintiff himself had any belief about the investment

7     potential of the NFTs he purchased or that that belief was

8     induced by DraftKings or that that was the reason for his

9     purchases of NFTs.

03:17 10          Admittedly, this is an objective standard, but if the

11     plaintiff can't muster that allegation on his own, one should

12     be suspect of his contention.

13          But to qualify as an investment contract, investors

14     must be motivated by a reasonable expectation and one that is

15     fomented by the promoter, DraftKings, that the investment

16     enables them to profit on the success of the enterprise.

17          Our brief goes through this in detail.  The only

18     reference to profit-making opportunities that is attributed to

19     DraftKings in the complaint relates to the Reinmakers' prizes.

03:17 20     There is no allegation anywhere in the complaint that says

21     DraftKings promised investment profits from any of these NFTs,

22     not the collectible NFTs, not the Reignmaker NFTs.

23          THE COURT:  And the reignmaking prizes were as a

24     result of competition?

25          MR. FRAWLEY:  Yes, your Honor.

1          THE COURT:  As alleged?  As alleged here?

2          MR. FRAWLEY:  Well, I don't think the complaint

3  alleges what caused the reignmaking prices to move, other than,

4  as I alluded to, it agrees that the reignmaking prizes declined

5  as the season progressed.  In terms of what promises or

6  representations were made by DraftKings, the only

7  representations attributed to DraftKings about the

8  profitability or profit potential of buying NFTs talks about

9  Reignmaker contests and prizes.

03:18 10          But in their opposition, the plaintiffs say prize

11  opportunities is not the profit that matters for their theory.

12  They abandon any reliance on any profit-making theory that is

13  tied to contest prizes, and by doing that, they abandon the

14  only theory of investment motive that's attributed to

15  DraftKings.

16          And there's -- there's two sort of counterbalancing

17  issues associated with that.  The plaintiffs need to establish

18  that the profit-making potential was the inducement for the

19  investment, but they disavow reliance on the only profit-making

03:19 20  potential that is in the complaint.  And the complaint argues

21  repeatedly that it was the contests and the prizes that was the

22  motivation for people to invest in the NFTs and allege that

23  that was the mechanism that DraftKings used to market and

24  promote the NFTs.  But, if that's the case, they're contending

25  that the incentive that they need to show, the profit motive,

1    is not the profit motive they're relying on.  So they're

2    effectively disavowing the only theory that they offered in

3    their complaint.

4         The last element of -- the last <u>Howey</u> prong is --

5         THE COURT:  So, I guess, counsel, just on that last

6    point, and maybe I misunderstood your argument in this regard.

7    I thought part of the argument was that the contests and

8    prizes, in the defendants' view, couldn't be the expectation of

9    profits since it wasn't derived solely from the efforts of the

03:20 10   promoter.  Did I misunderstand that?

11        MR. FRAWLEY:  No, your Honor, you fully understood our

12   argument.  And then, in the opposition to our motion, the

13   plaintiffs said that you're all wrong, defendants, the

14   prize-making potential is not the profits and we don't care

15   about the prize-making potential, and that that was -- that was

16   just some marketing gimmick that you were using to get

17   additional investors.

18        THE COURT:  Okay.  Thank you.

19        MR. FRAWLEY:  Just two more points on this last prong

03:21 20   of <u>Howey</u>.  The Supreme Court in the <u>Forman</u> case also held that

21   where a purchaser is motivated by desire to use or consume the

22   item purchased, the securities laws do not apply.

23        As we argued in our papers, and again here this

24   morning, clearly with regard to the Reignmaker NFTs, and I

25   frankly don't believe the plaintiffs even dispute this, that

1    they are used in contest of skill for prizes.  And that's what

2    people bought them for.  And for that reason, it's not capable

3    of being the basis of a claim that it's a security under the

4    Forman test.

5         And their reference to the Dapper Labs case on this

6    point doesn't apply because what the Court in Dapper Labs said

7    is that functionality or gamification, as the words were used

8    there, didn't exist for the NFTs at issue in Dapper Labs.

9         Now, admittedly the Dapper Labs court found that what

03:22 10   I referred to as the collectible NFTs, there was a fact issue

11   as to whether or not their primary motivation was one for

12   utility or for investment.  But, we submit, your Honor, that

13   was the factual issues in Dapper Labs about an allegation where

14   the defendants in that case very overtly marketed the NFTs as a

15   means to raise money to support their blockchain and

16   cryptocurrency.  It's a different circumstance.  We submit

17   there is not allegations here about investors or purchasers

18   buying collectible NFTs for investment value, at least not any

19   attributed to DraftKings.

03:23 20        The last issue that -- raised by the Howey test, and I

21   know there's a lot of issues I just raised here, but every one

22   of them is a required element of the test, is that the profits

23   have to be predicated on managerial efforts of the defendants.

24        As the plaintiffs describe it at page 23 of their

25   brief, says that the purchasers have to have reasonably

1    expected their investment profits to come from the efforts of

2    the promoter based on what purchasers were led to expect by the

3    promoter.

4         The complaint here doesn't allege anywhere that

5    DraftKings promised to undertake any managerial efforts for the

6    benefit of NFT purchasers.  In fact, they chide DraftKings and

7    quote at length from the Terms of Use of the DraftKings NFT to

8    say that the DraftKings had promised to do nothing, that they

9    sold NFTs and didn't agree to do anything to benefit the NFT

03:24 10   purchasers.

11         THE COURT:  Well, don't they -- isn't it alleged that

12   they operate the Marketplace?

13         MR. FRAWLEY:  They operate the Marketplace, but they

14   have -- they never made any promises that they would continue

15   to do so or what services would be provided or how the

16   Marketplace would benefit them or increase the value of their

17   investment or increase the value of NFTs.

18         In the Rodriguez case, the 1st Circuit said that in

19   the absence of any promise as to what managerial efforts would

03:24 20   be provided there was no pretense of a common enterprise

21   managed by the promoter.

22         The 1st Circuit made clear that the bundle of

23   rights -- again, this is an investment contract, the theory

24   here is that the purchasers acquired some bundle of rights and

25   those bundle of rights included a right that the promoter was

1    going to manage an enterprise for their benefit.  And if there

2    was no promise in that bundle of rights to provide the

3    managerial efforts that were going to benefit the value of this

4    supposed security, that there wasn't a security.  And we think

5    that applies here in spades.

6              So, in sum, on the _Howey_ test, we don't believe

7    there's any pooling because there was no unitary place where

8    the proceeds were put for the benefit of NFT purchasers.

9    Instead, the plaintiffs allege affirmatively, it was given to

03:25  10    DraftKings to do with it as it wished.  There's no common

11    enterprise, and there was no promise of profits based on the

12    managerial efforts of DraftKings.

13             The only other substantive issue raised in the motion

14    to dismiss, your Honor, is the question of whether there is a

15    viable implied cause of action for plaintiffs' third and fourth

16    course of action under the Exchange Act.

17             There's not much to say on this, your Honor.  The

18    Supreme Court has basically ruled out implying causes of action

19    since 15 years ago, and each time it addresses the issue, it

03:26  20    rules it out further.  The 1st Circuit has as well.  So unless

21    the statute unambiguously confers a right of action, there is

22    none, and it's not the role of courts to imply one.  And the

23    cases that the plaintiffs cite, one from the District of

24    Colorado and others from many decades ago, have no application

25    in the 1st Circuit and have no application in light of more

1    recent Supreme Court and 1st Circuit decisions.

2         If the Court has no other questions, I appreciate your

3    time.

4         THE COURT:  Thank you.  Thank you.

5         Counsel, I'll hear from you.

6         MR. FATA:  Thank you, your Honor.  Again, for the

7    record, my name is Anthony Fata, and I represent lead plaintiff

8    and the putative class.  We appreciate you having us in today,

9    your Honor.

03:27 10        I'd like to start with a few opening principles, the

11   first of which is that on a motion to dismiss, the well-pled

12   allegations of the complaint, which is to be viewed as a whole

13   and not in isolated subparts, are to be taken as true.  And

14   here we have several examples where plaintiff has alleged

15   something that the defendants are not acknowledging or

16   recognizing.

17        And I will start with the point that plaintiffs

18   alleged that the profit motive was the gamified version of some

19   of the NFTs.  And I believe I heard counsel say that our profit

03:27 20   motive alleged in the complaint were these games and that we

21   did a switcheroo, if you will, in our response brief.  And that

22   simply, your Honor, is not the case.

23        If you look at paragraph 4 of our complaint, it states

24   about -- starting with the second sentence, it states, In this

25   case, lead plaintiff in the class bought DraftKings NFTs in

1   DraftKings' initial public offerings, called "drops," with the

2   expectation that the DraftKings NFT platform would allow them

3   to realize profits on their NFTs.  The profits would come from

4   the efforts of DraftKings to promote and operate the NFT

5   platform.  The profits would be realized when lead plaintiff

6   and the class would sell their NFTs on the secondary market

7   platform that DraftKings solely owned and managed.

8           THE COURT:  And when you say "platform" there, are you

9   referring to the Marketplace?

03:28 10        MR. FATA:  Yes, your Honor, I'm --

11          THE COURT:  When you said "secondary," is that

12  different than the Marketplace or are they all the same

13  Marketplace?

14          MR. FATA:  In this instance, because DraftKings

15  controlled every facet of the DraftKings Marketplace, which is

16  what we allege is the enterprise, and because the NFTs could

17  only be sold on the DraftKings Marketplace, that is the

18  secondary market to which we're referring.  And it's synonymous

19  in this case, unlike other cases, where you have decentralized

03:29 20  digital assets.  In this case, secondary market is the

21  DraftKings Marketplace which is the enterprise at issue.

22          THE COURT:  And as alleged, does that apply both to

23  the collectibles and to the reignmaking?

24          MR. FATA:  One hundred percent, your Honor.  The

25  collectibles and the Reinmakers are treated the same, as long

1    as they're DraftKings-issued NFTs.  The -- and I will get into

2    it in a moment, but this gamification process, as alleged in

3    the complaint, was very limited and did not touch all

4    investors.

5         The other fact -- there are other allegations, like

6    paragraph 4, throughout the complaint regarding capital

7    appreciation, your Honor, and secondary market sales.

8    Paragraph 58 and Exhibit 5 at pages 4 to 5 discuss and allege

9    the stock market-like feel of the secondary market for

03:30 10   DraftKings Marketplace.

11        Paragraph 107 once again refers to capital

12   appreciation.

13        I think, most importantly, your Honor, was the

14   statement that defendants did not make any representations

15   about open market profits and did not make any representations

16   that there would be capital appreciation.  And that is simply

17   not true.

18        If you look at paragraph 112 of the complaint, there's

19   a statement by the creator of the DraftKings Marketplace,

03:31 20   Mr. Kalish, who is one of the defendants, and an investor asked

21   on a message board whether DraftKings NFT purchasers really

22   owned the NFTs, or they referred to them as cards.  And this is

23   on August 29, 2022.  Mr. Kalish responds:  "You'll keep the

24   open market profit" -- pause there -- "the open market profit

25   of your cards.  Don't worry.  Maybe at worst this prevents you

1    from making more money, right?"

2        And so a fair inference from that statement is buy the

3    rights to the NFT, sell it on the open market, the only open

4    market, the secondary market is the DraftKings Marketplace, and

5    pocket the profits.  That is capital appreciation 101.  It's

6    what investors in the stock market do every day.

7        THE COURT:  Meaning -- and again, when you say "open

8    market," you mean the Marketplace?

9        MR. FATA:  Correct.

03:32 10        THE COURT:  Meaning, the allegation here is they only

11    have value in the Marketplace.

12        MR. FATA:  That is correct, because they can't be

13    taken outside of the Marketplace, DraftKings prevents that.

14        If you look at other allegations in the complaint --

15    oh, I want to add that August 29, 2022 statement, that comes

16    after the gamification, which the defendants want to turn this

17    entire case into.

18        The NFTs were initially launched in August 2021.  In

19    February 2022, DraftKings says, We're going to start a gamified

03:32 20    version.  In May 2022, they start selling the gamified NFTs.

21    Then there's the summer and the preseason, et cetera, before

22    the season starts.  But on August 29, 2022, right before the

23    season starts and right before the period of time in which

24    defendants claim that they advertised to the world that these

25    would reduce in value, Mr. Kalish, the president, tells an

1    investor, You will keep the open market profits.

2            The other issue, your Honor, is we've heard

3    discussions about these -- the elements of the Howey test, an

4    investment of money in a common enterprise with an expectation

5    of profits to come from the managerial or entrepreneurial

6    efforts of the promoter.

7            Throughout --

8            THE COURT:  So, counsel, we're going to have to go

9    back to this open market profit concept just so I'm clear on

03:33 10   what you're alleging.

11            Are you saying that the allegation about Mr. Kalish's

12   statement is, what, that -- how would an investor keep the open

13   market profit?  Just give me a hypothetical so I understand.

14            MR. FATA:  Sure.  So on August 1, 2022, they would buy

15   an NFT.

16            THE COURT:  And would it matter if it was collectible

17   or --

18            MR. FATA:  No.

19            THE COURT:  -- reignmaking?

03:34 20            MR. FATA:  No.

21            THE COURT:  Okay.

22            MR. FATA:  And if they saw the value of the NFT

23   increasing, then they could sell it and pocket the difference

24   in profits -- I'm sorry, profit the difference in purchase

25   price and sale price, that equals profits, which equals capital

1   appreciation --

2       THE COURT:  Selling it to someone else on the

3   marketplace.

4       MR. FATA:  Correct.

5       Your Honor, if it would help, if you look at Exhibit 5

6   to the complaint -- and I don't know if you have them handy,

7   but --

8       THE COURT:  I don't, but I'll go back, counsel.

9       MR. FATA:  Exhibit 5 shows screenshots of NFTs for

03:35  10   sale.  And in those screenshots, what is shown is the -- for

11   those NFTs the increasing value from one sale to the next when

12   they were sold.  And they even present something like a bid-ask

13   spread that you see in the stock market where they say the best

14   offer price is X and the best bid price is Y.

15       In the DraftKings Marketplace or exchange vernacular,

16   I think they refer to both as offers.  In the stock market, it

17   would be a bid and an offer.

18       So we have these core three elements under Howey, and

19   I'm going to get into the common enterprise and the expectation

03:35  20   of profits components, but before I do, I think it's important

21   to remember that both Howey, the Supreme Court's decision in

22   1946, and SG Ltd., the 1st Circuit's decision applying Howey --

23   by the way, applying it to an online game -- make clear that

24   the three-prong test or the tripartite test, as the 1st Circuit

25   refers to it, is flexible and adaptive to new innovations

conjured by securities promoters who are looking to obtain
other people's money.  And substance controls form and the
focus is on the economic realities of the transaction.

And here we have DraftKings riding a wave of investor
interest in cryptocurrencies and NFTs and capitalizing on that.

We allege throughout the complaint that the enterprise
is the DraftKings Marketplace, which consists of both the
initial drops, or initial public offerings, and the secondary
market sales.  Defendants want to spin this into we're alleging
DraftKings as the enterprise or DraftKings itself has to be the
enterprise.  They don't cite any case that stands for that
proposition.  And under the Howey test, particularly its -- and
under its application by the 1st Circuit, that would
effectively allow, you know, a large, publicly traded,
established company to sell unregistered securities and avoid
the registration requirements because they would always have
businesses or business lines, if you will, that are separate
from the securities they're offering or the enterprise tethered
to those securities.  And that's simply not the law, your
Honor.

Finally, both SG Ltd. and Howey make clear that you
shouldn't impose additional requirements beyond the three basic
requirements in the tripartite test.  And several of
defendants' arguments in their response brief are taking the
facts of cases over time in the 70-plus years since Howey where

1    certain items were present and treating those as if they are --

2    treating those as if they are elements.

3         So defendants challenge the common enterprise and the

4    expectation of profits elements, and in doing so they swim

5    against the currents established by the Supreme Court's

6    decision in SEC v. Howey, the 1st Circuit's opinion in SEC v.

7    SG Ltd., as well as Dapper Labs -- I finally said it after

8    several minutes of argument -- as well as Dapper Labs and the

9    initial coin offering cases.  All of these cases recognize the

03:38 10    flexible approach of the investment contract test.

11        Turning first to the common enterprise, we agree with

12   defendants that the 1st Circuit has recognized that common

13   enterprise may be established with horizontal commonality, and

14   it's expressly reserved judgment on whether one or both forms

15   of vertical commonality suffice.

16        This Court need not reach the issue of whether

17   vertical commonality applies because we satisfy the test for

18   horizontal commonality.  It requires two components:  Number

19   one, the pooling of assets from multiple investors; and number

03:39 20   two, that all investors share in the profits and risks of the

21   enterprise.

22        What does pooling of assets mean?  It means that

23   investors' monies accumulated into a single enterprise.  The

24   money is invested into the enterprise and used to improve the

25   ecosystem.

1          I believe I heard counsel say that the complaint does

2    not allege that the money that DraftKings Marketplace raised

3    from selling NFTs in the initial drops or initial public

4    offerings and the money that it raised from its commissions

5    were used to develop or improve the DraftKings Marketplace, the

6    enterprise.  But, again, our complaint alleges the opposite.

7    In paragraph 40, we allege that DraftKings made an initial

8    modest investment to get the DraftKings Marketplace going, to

9    tout it; and then in paragraphs 23 and 24, we allege that

03:40 10   DraftKings used the money from the NFT sales to develop the

11   DraftKings Marketplace.

12          Defendants may argue that DraftKings could have used

13   the money for other purposes as well.  This is no different

14   than any promoter of securities taking money into the

15   enterprise and using it for their own purposes, whether it's to

16   buy a second home or an island.

17          That DraftKings may have used some of the proceeds --

18   which is not alleged in the complaint -- while it may have used

19   some of the proceeds for other business operations does not

03:40 20   control the outcome in this case.

21          So in August 2021, DraftKings launches the Marketplace

22   and says that it will be selling NFTs in initial drops, and

23   further, that it will be setting up the secondary Marketplace,

24   the DrafKings Marketplace for the resale of NFTs.

25          The enterprise, an ecosystem, were given a name, the

1    DrafKings Marketplace.  And from August 2021 onward, investors

2    paid DraftKings for the NFTs sold in the initial public

3    offerings, and all secondary market sales went through

4    DraftKings and it kept it's 5 to 15 percent commission.  All

5    this money from the initial drops and the commissions was paid

6    to DraftKings, one entity.

7          DraftKings controlled every aspect of the ecosystem.

8    It picked which NFTs would be the subject of initial offerings,

9    and it picked which NFTs could be sold on the DrafKings

03:42 10    Marketplace.

11          DraftKings mandated that its NFTs be resold only on

12    the DrafKings Marketplace, could not be sold on third-party

13    platforms.

14          DraftKings retained exchange-like commissions, 5

15    percent or more of the sale price occurring in the secondary

16    market exchange that it created.

17          It used the proceeds of the initial offerings in

18    secondary market exchanges to further develop the DrafKings

19    Marketplace ecosystem.

03:42 20          Importantly, DraftKings retained all of the NFTs that

21    it sold or that were traded between investors.  It kept those

22    for itself in its own crypto wallet on the Polygon Blockchain.

23          This is not a situation like Bitcoin where investors

24    keep the asset in their own wallets or in a variety of, you

25    know, brokers' wallets.  DraftKings is, as far as the public is

1   concerned and as far as the investors are concerned, the only

2   owner of record for the DraftKings NFTs.  So what the investors

3   are really trading are the limited rights that are alleged in

4   the complaint: the right to view the DraftKings NFT on their

5   DrafKings Marketplace account page, the right to sell those

6   DraftKings NFTs to another DraftKings user who's registered an

7   account on the DrafKings Marketplace, and I'll get into it in a

8   little bit.  They could also use them, some, perhaps, should

9   they have a sufficient number for the promotions that

03:43 10   DraftKings started to gin up further interest in the

11   Marketplace, and that's the gamification.

12          All of the money went to one place, and the fruits of

13   that money are reflected in one crypto wallet.  And that, your

14   Honor, satisfies the pooling of assets from multiple investors,

15   the first component of horizontal commonality.

16          The next component of horizontal commonality is the

17   sharing of --

18          THE COURT:  So, I guess -- so maybe you're getting to

19   this now, but is it sufficient that -- and I'm assuming it's --

03:44 20   that you're relying on Dapper Labs for this -- but is it

21   sufficient that the money is going to this ecosystem as opposed

22   to some suggestion that there's going to be pro rata

23   distribution of money across the enterprise?  Do you understand

24   my point?

25          MR. FATA:  I understand your point, your Honor.

1          That is correct.  There's no requirement in the Howey

2     test that there be pro rata distribution across all investors

3     in the enterprise.  They can have varying profits, some can

4     have losses, some can have gains, and pro rata distribution is

5     not required.

6          Dapper Labs is one case which expressly held that, and

7     in doing so it reviewed the 1st Circuit's opinion in SG Ltd.,

8     and it said -- the 1st Circuit -- Judge Marrero held the 1st

9     Circuit didn't require pro rata profit distribution, instead,

03:45  10    pro rata distribution just happened to be a component of the

11    investment scheme there, but it wasn't a rule, it's not a

12    requirement.  And if -- if the Court considers the other ISO

13    cases, initial coin offering cases, those do not require pro

14    rata distribution either.

15         And there have been -- even before the cryptocurrency

16    wave, there have been a number of investment contract cases

17    where investment contracts were found even though the investors

18    did not receive the same level or degree of profits or did not

19    receive common stock or anything resembling common stock.

03:46  20         If you look at the Supreme Court decision in SEC v.

21    Edwards, that involved contracts related to pay phone leases

22    and leasebacks and management rights.  And those pay phones

23    would have been -- the payouts would have been dependent on how

24    the pay phone location was operating.  And it may have been

25    framed in terms of an interest rate, but they were not buying a

1  common unit of stock or anything resembling a stock other than

2  it was an investment contract.

3       There have been other cases dealing with whiskey casks

4  and, you know, animal breeding, et cetera, that are cited in

5  our complaint where the measure of profits varies from one

6  investor to the next.

7       In terms of the sharing of profits and risks, the

8  second component of horizontal commonality, all that needs to

9  be shown is that all investors shared in the profits and risks

03:47 10  of the DrafKings Marketplace.  And this is established when the

11  fortunes of each investor is tied to the success of the overall

12  venture.  It can occur when the enterprise depends on new money

13  coming in, when a portion of the revenue is used to support the

14  enterprise, and in the digital asset context when the success

15  of the digital asset is tied to the success of its underlying

16  infrastructure.

17       And on this point, I need to take a detour.  Dapper

18  Labs did involve NBA moments, not dissimilar to some of the

19  sports NFTs at issue here.  And defendants argue, well, that

03:48 20  case was really predicated on the fact that there was also this

21  blockchain that Dapper Labs had created and that the promoter

22  wanted the blockchain to succeed and one way it could get the

23  blockchain to succeed was by only authorizing the sale of NBA

24  moments on that blockchain.

25       It's the same situation here.  The only difference is

1       DraftKings is not using a blockchain, it's using the

2       Marketplace.  A blockchain is a ledger, if you will.  There can

3       be a public blockchain where computers -- no one picks who's

4       verifying transactions -- verifies and records the transactions

5       in the ledger, and then there can be a private blockchain where

6       one entity controls the ledger using block chain technology.

7              Here, there was a centralized ledger, not unlike a

8       private blockchain.  It may not have operated on blockchain

9       technology, but the DrafKings Marketplace alone and its

03:49 10       personnel were the ones who verified the transactions between

11       DrafKings Marketplace participants.  And so the success of the

12       DrafKings Marketplace and the individuals involved in promoting

13       the DrafKings Marketplace depended entirely on the success of

14       the ecosystem, just like the success of the investors depended

15       entirely on the success of the DrafKings Marketplace ecosystem.

16              So we would respectfully submit that that is a

17       substance over form issue, where defendants are trying to

18       distinguish themselves from Dapper Labs by saying that involved

19       a private blockchain, but it's really the same thing.

03:49 20              THE COURT:  So, I guess, counsel -- and I suspect

21       you're moving on to the last prong of Howey.  I guess I would

22       like the best articulation from you of what the expectation of

23       profits was.

24              MR. FATA:  Yes, your Honor.

25              The expectation of profits, as alleged in the

complaint and that I discussed earlier when I began the

argument, was that of capital appreciation, by being able to

sell NFTs in the DrafKings Marketplace mandated secondary

market, the DrafKings Marketplace.

And that expectation of profits is alleged in at least

four ways in the complaint.  First we have a structure where

DraftKings set up its own securities system where it would be

the, you know --

THE COURT:  So a closed market, basically.

MR. FATA:  Correct.

THE COURT:  Okay.

MR. FATA:  It set up its own system where it would be

the initial public offerer of the securities, and then it would

set up a secondary market exchange for those securities, the

DrafKings Marketplace.

So that structure, that twofold structure in and of

itself gives investors a reasonable expectation of profits from

capital appreciation.  They can buy them in the initial public

offering and then those that don't do -- those that gain money,

they can, as Mr. Kalish said, keep their open market profits,

and that's paragraph 112.

And that leads to the second type of allegation.

Beyond the structure, we do allege statements like Mr. Kalish's

in which he states that you can keep the open market profits.

I won't rehash that anymore.

 1          THE COURT:  Okay.

 2          MR. FATA:  The third point, your Honor, expectation of

 3   profits, and the courts vary on what they -- they don't vary on

 4   what they consider, but they have considered a range of facts

 5   and factual allegations in looking at this.

 6          So there's media commentary on the DrafKings

 7   Marketplace, and as alleged in paragraph 119 in the complaint,

 8   one outlet said that the DrafKings Marketplace is a safe option

 9   for anyone looking to invest in NFTs.

03:52 10          Then we have --

11          THE COURT:  And can I rely on that for the purposes of

12   the third prong, where I should be focused on the efforts of

13   the promoter?

14          MR. FATA:  So the third prong -- the third element has

15   two prongs, and the first prong is the expectation of

16   profits --

17          THE COURT:  Yeah.

18          MR. FATA:  -- and the second prong --

19          THE COURT:  Yeah, and as to either, can I rely on

03:52 20   alleged statements made by people not associated with the

21   defendants?

22          MR. FATA:  Yes, your Honor.  The standard is what a

23   reasonable investor would surmise from a situation.  Certainly

24   media commentary on the industry would be a factor that the

25   Court could consider, as could investor sentiment.

1          And here we have investors saying things like, "It's

2     just like stocks, the secondary market is flooded."  That's at

3     paragraph 131.

4          Another at paragraph 131 is, "This is literally the

5     stock market in a nutshell."

6          And then at paragraph 134, we have, "The Marketplace

7     is like the stock market."  And again, that's paragraph 134.

8          In terms of defendants' statements, we have -- oh,

9     yeah, we have a podcast that Mr. Kalish participated in on May

03:53 10   17, 2022, again, after the announcement of the gamified version

11    that defendants focus on.  And Mr. -- the host says, "Some

12    people are saying NFTs were a fad, is anybody writing that the

13    stock market is a fad, because it's getting annihilated."

14         This is -- and to this statement Mr. Kalish responded

15    to it without saying these are nothing like stocks.  He

16    didn't -- he didn't disclaim the connection.  Because at the

17    time, and even to a certain extent now, investors were treating

18    NFTs, digital assets, not unlike stocks.

19         So expectation of profits were clearly there, and, you

03:54 20   know, I go back to the point in paragraph 4, at the outset of

21    our complaint, we allege capital appreciation in the DrafKings

22    Marketplace secondary market to be the profit motive.

23         And then where did those -- where did the -- it has to

24    be expectation of profits second component from the promotional

25    managerial entrepreneurial efforts of the promoter, in this

1   case DraftKings or the DrafKings Marketplace.  And for a

2   variety of reasons, that's where the expectation of profits

3   would come from.  And as Judge Marrero stated in the Drapper

4   Labs decision, if Dapper Labs shut down or shut down the

5   marketplace, what would happen to all of these NFTs?  They

6   would go to zero.

7        Your Honor, in this case, it is -- it is at least as

8   strong, if not stronger than what was presented in the Dapper

9   Labs case.  And the reason being, DraftKings controlled

03:55 10  everything.  You could only access your viewing rights and

11  transaction rights via the Marketplace.  And something that did

12  not seem present in Dapper Labs is DraftKings appears to be the

13  only holder of record publicly on the Polygon Blockchain of the

14  NFTs.

15       THE COURT:  And this is separate and apart from any

16  monies that investors could expect to get from the reignmaking

17  competition?  I guess I'm not clear where that fits into your

18  argument.

19       MR. FATA:  So the reignmaking competitions, Reignmaker

03:56 20  competitions, we allege were promotional efforts to gin up

21  interest in the DrafKings Marketplace.

22       Theoretically, a user could hold the requisite number

23  of cards -- if they just held one, that wasn't enough; if they

24  just held two, it wasn't enough; but they could hold the

25  requisite number of NFTs and position them for games, assuming

1    DraftKings, in its discretion, and it retained discretion,

2    decided to host games.  They could theoretically win prizes

3    from that -- from that gaming system, if you will.  And then at

4    some point they could sell the NFTs and still realize profits

5    in the secondary market or avoid losses in the secondary

6    market.

7              And the point about the declining prices that

8    DraftKings said would occur throughout the season, as we

9    explain in our response brief, there are many securities that

03:57 10    have prices that decline over time, the most obvious of which

11    are options, which have theta or time decay, and the closer an

12    option gets to maturity, the less value it has, less theta

13    value it has, because there's less time to decide whether to

14    exercise the option or not.  And it's not dissimilar in this

15    case.  That doesn't take it out of the realm of securities,

16    options are securities.  It's just simply a reflection of the

17    market may perceive less value for these particular NFTs that

18    qualify for the games, if DraftKings opts to allow games, and

19    as the season gets shorter and shorter, there's less and less

03:57 20    opportunity for that -- for winning the prize or participating

21    in the prize.

22              But nothing in the complaint alleges that all the NFTs

23    or all investors were motivated by the gamification, and

24    nothing in the complaint even alleges that all investors or all

25    NFTs qualified for the gamification, and in fact, they didn't.

1    And the allegations are perhaps too detailed on that issue, but
2    they go to the point of explaining the stringent requirements
3    for the games and how -- and from that the Court can reasonably
4    infer not all investors or not all NFTs would be eligible to
5    participate in the games.
6                THE COURT:  Thank you.
7                MR. FATA:  Just the last point, on the private right
8    of action under the Exchange Act, we allege that defendants
9    violated Sections 515 and 29 of the Exchange Act, and we would
03:58 10   assert that the -- for the reasons explained in our response
11   brief, your Honor, where, as here, Congress has provided a
12   cause of action, unregistered exchange, and a remedy,
13   rescission, rescission set forth in Section 29.  It's not the
14   type of implied right of action that defendants are referring
15   to.  And for the remainder of that, we will rely on our brief.
16                And unless your Honor has any more questions.
17                THE COURT:  Okay, thank you.
18                MR. FATA:  Thank you.
19                THE COURT:  Counsel, I'll give you brief rebuttal,
03:59 20   maybe a minute or so.
21                MR. FRAWLEY:  I realize we have been here longer than
22   expected, your Honor.  I will be very brief.
23                At the very end of this colloquy, my colleague
24   described the Reignmaker NFT, I submit, exactly as Mr. Kalish
25   did in the reference that was made in paragraph 112 of the

complaint.  He said that a Reignmaker NFT owner could use the

NFT in a contest to win prizes and still sell the NFT on the

market and cut their losses or get gains.  That's exactly what

Mr. Kalish said.  He didn't say you were going to make a

profit, he just said you -- the question was put to him:  Do

you own the NFT?  He said, Yes, you do.  You can still use it

to get prizes and you can still transfer it if you wish.

          Your Honor asked several times of my colleague, like,

what the promises were, and I submit the only answer that came

out of that colloquy was paragraph 112, one statement in three

years that doesn't even say what the plaintiff says it says,

but let's assume it does.  The test is whether or not the item

was promoted primarily as an investment.  That's the 2nd

Circuit case in Aqua Water, I believe it's called, but it's in

our brief.  Certainly one oral comment on a blog in three years

doesn't qualify.

          My colleague also read to the Court paragraph 122 of

their complaint where someone else said to Mr. Kalish, Are

NFTs -- didn't say DraftKings NFTs -- a fad, is the stock

market a fad?  This is what the complaint says Mr. Kalish

responded:  "I think the general idea is that if you hear a

marketing message that is related to returns that obviously

doesn't make sense, then it's a Ponzi scheme.  Just don't put

yourself in that position.  Just don't do it.  Do it from the

mindset, you know, it's going to be bad in the end."

          My colleague also referred on the same subject,

frankly, to SG Ltd. as a 1st Circuit case about an online game.

What the 1st Circuit said it was was a Ponzi scheme and that

horizontal commonality was established because the entity was

washing money off of new investors to pay old investors, the

online game was fake, but the purchasers acquired stock in the

fake company.  So that was the proportionate interest in the

gains and losses of the fake company that gave them the pro

rata interest that's entirely absent here.

04:02       There was also a lot of, frankly, confusing discussion

about what the complaint says and mixing and matching concepts

here this afternoon.  But one of the other themes that I think

is important here is the 1st Circuit also said in SG Ltd. that

it's important for capital markets that there be clear and

understandable rules as to what constitutes a security.  I

submit to you what the plaintiffs propose here are neither

clear nor understandable.

          The last, the plaintiffs suggested that we made up the

argument about whether or not or what DraftKings was going to

04:02 do with --

          (Phone ringing.)

          MR. FRAWLEY:  Very sorry, your Honor.

          THE COURT:  No worries.

          MR. FRAWLEY:  -- that DraftKings made up what was

going to happen with the revenues.  And the opposition at page

1, the complaint at page 44 says that DraftKings does what it

2   wishes with the NFT proceeds, including keeping profits for

3   itself or using it elsewhere in DraftKings' business.

4        And the last point -- actually, two very quick points,

5   your Honor.  The plaintiffs protested that any large company

6   could avoid the registration requirements because they're

7   large.  But that's not the issue here.  The issue is all of the

8   cases that the plaintiff relies upon there was a company with a

9   singular business that used some alternative form of raising

04:03 10  capital for the benefit of the business just like an equity

11   offering, they just didn't call it that, whether it be orange

12   groves or chinchillas or whiskey casks, all the same thing, pay

13   telephones, somebody used an asset to raise capital for

14   investment.  That's not what happened here.

15        The last point is your Honor asked about the declining

16   value of the Reignmaker NFTs, and my colleague said that

17   doesn't matter, some securities decline in value.  Well, it

18   does matter.  This isn't some security, it's an investment

19   contract, the premise of which is there has to be a promise

04:04 20  that it's going to increase in value.  The only promise that

21   was made here is that they were going to decrease in value.

22        And for that reason as well, your Honor the motion

23   should be granted.

24        I very much appreciate your time.

25        THE COURT:  Thank you.

1          Counsel, I appreciate the arguments on either side.

2     As hopefully my questions to both sides suggested, I've been

3     thinking about this; I need to give it some more thought.

4          Counsel, you're not making my job easy but that's for

5     me to deal with.  I appreciate the arguments on either side and

6     I'll take the matter under advisement and we'll go from there.

7     Thank you.

8          THE CLERK:  All rise.

9          (Court adjourned at 4:05 p.m.)

10              - - - - - - - - - - - -

11                    CERTIFICATION

12          I certify that the foregoing is a correct transcript

13     of the record of proceedings in the above-entitled matter to

14     the best of my skill and ability.

15

16

17

18     /s/Debra M. Joyce                    January 9, 2024
       Debra M. Joyce, RMR, CRR, FCRR       Date
19     Official Court Reporter

20

21

22

23

24

25