**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ———————————————————— )<br>**JUSTIN DUFOE, on behalf of himself and all** )<br>**others similarly situated,** )<br> )<br>**Plaintiff,** )<br> )<br>**v.** )<br> )<br>**DRAFTKINGS INC., JASON D. ROBINS,** )<br>**JASON K. PARK, and MATTHEW KALISH,** )<br> )<br>**Defendants.** )<br>———————————————————— ) | **Case No. 23-cv-10524-DJC** |

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, J.**                                                                                   **July 2, 2024**

## I.      Introduction

Plaintiff Justin Dufoe ("Dufoe") has filed this putative class action lawsuit against the Defendants DraftKings Inc. ("DraftKings") and its officers, Jason D. Robins ("Robins"), Jason K. Park ("Park"), and Matthew Kalish ("Kalish") (collectively, "Defendants"), for violations of federal securities law arising from the sale of unregistered securities.   D. 38.   Defendants have moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6).   D. 46.   For the reasons stated below, the Court DENIES the motion to dismiss.

## II.      Standard of Review

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief."   <u>Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012).   Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.   <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013).

First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal allegations are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  García-Catalán, 734 F.3d at 103 (quoting Iqbal, 556 U.S. at 678).  On a Rule 12(b)(6) motion, the Court may also consider documents incorporated into the complaint, as well as "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to plaintiffs' claim" and "documents sufficiently referred to in the complaint."  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

## III.   Factual Background

The following facts are drawn from Dufoe's amended complaint, D. 38, and are accepted as true for the purposes of resolving Defendants' motion to dismiss.

### A.   NFTs and Blockchain Technology

A public blockchain is a technology that collects and stores sets of information, called "blocks," and links those blocks to previously filled blocks.  D. 38 ¶ 18.  The blockchain can record transactions much as a database or a ledger would.  Id.  Typically, this database is distributed among a network of computers to maintain a secure and decentralized record of all transactions, that can be viewed by any individual with internet access.  Id.

A non-fungible token ("NFT") is a digital asset whose ownership, including history of purchases and sales, is reflected in a blockchain.  Id. ¶¶ 18–19.  When an NFT is transacted, details such as the NFT itself, the quantity transacted and the creator are logged on a blockchain.  Id. ¶

19.  The initial creation of an NFT is referred to as "minting" the NFT.  Id.  The initial sale of minted NFTs is called a "drop."  Id.

### B.  DraftKings and Its NFT Marketplace

DraftKings is a "digital sports entertainment and gaming company."  Id. ¶ 10.  The individual Defendants are officers of DraftKings.  Id. ¶¶ 11–13.  Kalish is the President of DraftKings North America. Id. ¶ 13.  Robins is the Chief Executive Officer, Chairman of the Board of Directors and a co-founder of DraftKings.  Id. ¶ 11.  Park is the Chief Financial Officer of DraftKings.  Id. ¶ 12.  DraftKings owns and operates DraftKings Marketplace (the "Marketplace"), an online platform where individuals can buy and sell DraftKings NFTs.  Id. ¶ 10.  DraftKings NFTs feature a static or dynamic image of a professional athlete and were categorized in various rarities.  Id. ¶ 26.  These NFTs were minted on the Polygon blockchain.  Id.  The Polygon blockchain is built on top of the better-known Ethereum blockchain and allows developers to mint NFTs.[1]  Id. ¶¶ 26, 42.  The launch of the Marketplace was announced on July 21, 2021.  Id. ¶ 25. DraftKings's first NFTs, released in August 2021, featured Tom Brady and sold for $12 to $1,500 each.  Id. ¶ 41.

A document titled "Important Legal Notice Regarding DraftKings Marketplace Terms of Use" ("Terms of Use") governed the relationship between DraftKings and participants in the Marketplace.  Id. ¶ 27.  The Terms of Use made clear that the owner of a DraftKings NFT does not own the content associated with the NFT (that is, the name or image of the player) or any intellectual property rights associated with the content.  Id. ¶ 29.  Instead, the NFT buyer receives only "a limited, non-exclusive, non-transferable (except pursuant to a Secondary Sale in

---

[1] Although not explicitly stated in the amended complaint, the parties appear to agree that the Polygon blockchain is a public blockchain developed by a company called Polygon Labs.  D. 47 at 12; D. 55 at 8, 14, 20.

accordance with these [Terms of Use]), revocable, non-sublicensable license to the Intellectual Property Rights practiced by, incorporated, or embedded in your purchased DraftKings NFT solely for the purposes of you using, accessing, and/or holding such purchased DraftKings NFT, including viewing the Content associated with such purchased DraftKings NFT." Id. ¶ 30. DraftKings retained considerable rights after selling the NFTs to Marketplace participants. For instance, DraftKings retained a reversionary interest in the NFTs if the NFT owner violated the Terms of Use. Id. ¶ 35. DraftKings NFTs were also kept in wallets owned by DraftKings after they were sold to purchasers. Id. ¶¶ 70–74.

Owners of DraftKings NFTs could resell those NFTs to other participants in the Marketplace. Id. ¶ 36. DraftKings charged fees for every sale of a DraftKings NFT between participants in its Marketplace. Id. ¶¶ 53, 56–57. The Terms of Use contemplate that an NFT owner may be able to sell their NFTs outside the DraftKings's platform. D. 38-3 at 7; D. 38-4 at 7. Transfer to an owner's personal wallet is typically the first step to selling the NFT on a platform outside the Marketplace, however, and DraftKings had "sole discretion to determine which Marketplace NFTs are eligible to be transferred to your Self-Custodial Wallet and to prohibit, for any reason, in DraftKings' sole discretion, any transfers of any Marketplace NFTs from the DraftKings Marketplace to any Self-Custodial Wallet." D. 38 ¶ 33; D. 38-3 at 7; D. 38-4 at 8. DraftKings also retained the right to collect a royalty from a sale that occurred outside the DraftKings Marketplace. D. 38 ¶ 76.

### C.   **DraftKings Gamified NFTs and Reignmakers**

In February 2022, Robins stated that DraftKings intended to launch "gamified NFT collections" during the 2022 to 2023 NFL season. Id. ¶ 43. On May 17, 2022, DraftKings began generating the "gamified" NFTs. Id. ¶ 45. These NFTs depicted current NFL players in five rarity tiers. Id. Every player had a "common" NFT, but only star players were depicted on higher rarity

NFTs.  Id.  Interested purchasers could purchase these NFTs in "packs."  Id. ¶ 47; see D. 48-2 at

3–4 (analogizing DraftKings NFTs to physical sports "cards" and "packs").[2]  Each pack contained

a certain number of purportedly random NFTs, but provided no guarantee as to the players within.

D. 38 ¶ 47.  Packs were also priced by their rarity tier, with rarer packs having a higher percent

chance of containing cards of rarer cards.  Id. ¶ 48.  Participants could purchase the packs when

they initially dropped by queueing for the opportunity to purchase directly from DraftKings.  Id.

¶ 47.  Packs would sometimes run out before everyone in the queue could purchase one.  Id.

Purchasers could resell packs, in addition to individual NFTs, to other Marketplace participants.

Id. ¶ 52.  When viewing a pack on the Marketplace, a user sees the floor price, the number of

owners, the highest offer to buy, transaction history and other details related to the pack.  Id. ¶ 58;

D. 38-5 at 3–4.  DraftKings would also distribute high-rarity NFTs in auctions.  Id. ¶ 59.

DraftKings NFT owners could use the "gamified NFTs" in Reignmakers contests to earn

cash prizes reigning from $10,000 to $125,000.  Id. ¶ 54.  Owners would submit and assemble a

line-up of players from one of the teams selected in each week's Reignmakers contests.  Id.  The

line-up had to feature five players from different positions on the selected team and, depending on

the size of the prizes available, a certain number of cards of higher rarity.  Id.; D. 48-2 at 12.  Given

the limited number of available packs and the random nature of the NFTs contained in those packs,

participants would generally need to purchase NFTs and packs on the secondary market to meet

the requirements for a Reignmakers contest.  Id. ¶ 56.  Participants' scores in these contests

---

[2] The Court notes that Defendants have attached complete copies of certain articles, chat messages
and videos that were quoted and cited in the amended complaint.  D. 48 ¶¶ 2-5; D. 48-1–D. 48-4.
The Court "may properly consider the relevant entirety of a document integral to or explicitly
relied upon in the complaint, even though not attached to the complaint, without converting the
motion into one for summary judgment."  Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.,
228 F.3d 24, 32 (1st Cir. 2000) (citation omitted).

depended on the performance of the football players in each participant's line-up, much as in fantasy football.  See id. ¶ 54; D. 48-2 at 6.  As alleged by Dufoe, "[t]he overwhelming majority of contests were won by a curiously select and limited number of NFT holders."  D. 38 ¶ 64.

### D.    Promotion of the Marketplace

DraftKings promoted Reignmakers and its NFTs in various ways.  Id. ¶¶ 108–30.  Of relevance to the present motion, the DraftKings's official Youtube channel also included videos introducing viewers to Reignmakers and a podcast hosted by Kalish and entrepreneur Gary Vaynerchuk.  D. 38 ¶¶ 108, 120.  In a May 2022 podcast episode, Vaynerchuk and Kalish made statements comparing NFTs to stocks.  Id. ¶ 122.  The Twitter account associated with the podcast also posted "NFTs are the opportunity to invest in startups, artists, operators and entrepreneurs all at once. Do you agree? @garyvee and @kevinrose do!"  Id. ¶ 123.  In another podcast Vaynerchuk stated that "this will be the summer of people picking up some stuff on fire sale that twelve years from now was like 'oh my god, how much did you pay in August 2022?'" in the context of a conversation about the prize for a Reignmakers contest.  Id. ¶ 124.  Twitter accounts operated by DraftKings commented on "the biggest risers and fallers" in the Marketplace and notified followers whenever a DraftKings NFT sold for more than $500.  Id.  ¶¶ 126, 128.

DraftKings also hosted a chatroom called "Locker Room" which was the designated chatroom for "everything Reignmakers Football."  Id. ¶¶ 110, 129; D. 38-5 at 8.  In response to a user's question about whether purchasers would "own" the DraftKings NFTs, Kalish wrote that "[y]ou'll keep the open market profit of yours cards [don't worry]. Maybe at worst this prevents you from making more money right?" on August 29, 2022.  D. 38 ¶ 112; D. 38-5 at 8.  Earlier in August 2022, Kalish had assured a different user that "guaranteed scarcity" "will not be amended" because "it is a fundamental premise of the whole game."  D. 38 ¶ 110.  Users in the Locker Room

and other chats operated by DraftKings compared the Marketplace for NFTs to a stock market.  Id. ¶¶ 130–132, 134–36.

The amended complaint also cites to various third-party articles and social media posts between 2021 and 2022, which offered opinions on whether DraftKings NFTs and the Reignmakers contests were a good investment opportunity.  Id. ¶¶ 115–17, 119.

### E.      Dufoe's Transactions

Dufoe bought and sold NFTs on the Marketplace between February 28, 2022 and February 13, 2023.  D. 38-1 at 5–142.  Dufoe seeks to represent a class of plaintiffs "who purchased or otherwise acquired" DraftKings NFTs between August 11, 2021 and the present.  D. 38 ¶ 8.

## IV.    Procedural History

Dufoe instituted this action on March 9, 2023, D. 1, and subsequently amended his complaint.  D. 38.  Defendants have now moved to dismiss the amended complaint.  D. 46.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 57, 58.

## V.     Discussion

### A.      Whether the DraftKings NFTs are Securities

The primary ground for Defendants' motion to dismiss is that DraftKings's NFTs are not securities, and thus are not subject to the registration requirements of the Securities Act of 1933, or the Securities and Exchange Act of 1934 (the "Exchange Act").  D. 47 at 16.  Dufoe asserts that the NFTs should be considered an "investment contract" and thus a security under federal law.  D. 38 ¶ 92; D. 55 at 11–13.

"[A]n investment contract for purposes of [federal securities law] means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  SEC v. W.J. Howey Co., 328 U.S. 293, 298–99 (1946); see SEC v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001) (identifying the

three elements of the <u>Howey</u> test as "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party"). The definition of investment contract is "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." <u>SG Ltd.</u>, 265 F.3d at 47 (quoting <u>Howey</u>, 328 U.S. at 299). "[I]t is immaterial whether the enterprise is speculative or non-speculative," "whether there is a sale of property with or without intrinsic value" and "whether the promoter depicts the enterprise as a serious commercial venture or dubs it a game." <u>Id.</u> at 48.

For the purposes of the motion to dismiss, Defendants do not debate whether the DraftKings NFTs at issue involved the "investment of money." D. 47 at 16 n.5. Accordingly, the Court focuses its attention on the remaining elements of the <u>Howey</u> test. Namely, whether Dufoe and other purchasers were investing in a common enterprise with the expectation of profits derived solely from the efforts of others. <u>See</u> <u>SG Ltd.</u>, 265 F.3d at 46.

In recent years, multiple courts have held that blockchain-based digital assets may be investment contracts. <u>See, e.g.</u>, <u>SEC v. Ripple Labs, Inc.</u>, No. 20 CIV. 10832 (AT), 2023 WL 4507900, at *8–11 (S.D.N.Y. July 13, 2023); <u>Audet v. Fraser</u>, 605 F. Supp. 3d 372, 394–99 (D. Conn. 2022); <u>SEC v. LBRY, Inc.</u>, 639 F. Supp. 3d 211, 216–22 (D.N.H. 2022). The majority of these cases have involved the initial offerings of cryptocurrencies, often referred to as "initial coin offerings" or "ICOs," and are distinguishable from the present case. <u>See</u> <u>Friel v. Dapper Labs, Inc.</u>, 657 F. Supp. 3d 422, 433 (S.D.N.Y. 2023) (collecting cases and distinguishing between cryptocurrency ICOs and NFTs). While the ICO cases are helpful; they "do not dictate an outcome." <u>Id.</u> at 433. Both parties' briefs cite <u>Dapper Labs</u> as the leading case on whether NFTs can be considered a security. <u>See</u> D. 47 at 29–32; D. 55 at 12. <u>Dapper Labs</u> concluded that sports-

related NFTs sold by the promoter as a collectible were plausibly alleged to be securities based on the surrounding facts of that case.  Dapper Labs, 657 F. Supp. 3d at 429–30, 444–46.  This Court need not decide whether any and all NFT transactions should be considered an investment contract. Instead, the Court evaluates only whether Dufoe has plausibly alleged that DraftKings NFTs in the context of the Marketplace are securities.  See Rodriguez v. Banco Cent. Corp., 990 F.2d 7, 11 (1st Cir. 1993) (explaining that although a "simple sale of land, whether for investment or use, is not a 'security,'" "the commitments and promises incident to a land transfer, and the network of relationships related to the project, can cross over the line and make the interest acquired one in an ongoing business enterprise").

### 1.    Common Enterprise

The common enterprise requirement may be satisfied by "horizontal commonality," in other words, "the pooling of assets from multiple investors in such a manner that all share in the profits and risks of the enterprise."  SG Ltd., 265 F.3d at 50, 52 (concluding that the alleged arrangement satisfies this standard as "it provides the requisite profit-and-risk sharing to support a finding of horizontal commonality").  "Pooling occurs when the funds received by the promoter through an offering are, essentially, reinvested by the promoter into the business. In turn, such reinvestment increases the value of the instrument offered."  Dapper Labs, 657 F. Supp. 3d at 436. Usually, but not always, horizontal commonality involves *pro rata* distribution of funds.  See Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994).  In cryptocurrency cases, courts generally conclude that the horizontal commonality is satisfied where promoters invest proceeds back into the ecosystem upon which the value of the cryptocurrency depends or into further investments from which investors would be paid.  See, e.g., Ripple Labs, 2023 WL 4507900, at *9 (concluding that horizontal commonality was satisfied where defendant pooled proceeds into a network of bank accounts under its control and used the those proceeds to develop uses for

cryptocurrency and protect the trading market, thereby generating additional investor profit); <u>SEC v. Terraform Labs Pte. Ltd.</u>, No. 23-CV-1346 (JSR), 2023 WL 4858299, at *13 (S.D.N.Y. July 31, 2023) (concluding that SEC demonstrated horizontal commonality where digital tokens were deposited in pool for further investment and proceeds of token purchases were used to develop proprietary blockchain and increase value of tokens); <u>SEC v. Kik Interactive Inc.</u>, 492 F. Supp. 3d 169, 178–79 (S.D.N.Y. 2020) (concluding that horizontal commonality was established where proceeds were deposited in a single bank account and used to construct digital ecosystem that drove demand for cryptocurrency and thus dictated investor profits).

Here, Dufoe has sufficiently alleged the pooling of assets requirement, because the revenue generated by the sale of NFTs was reinvested into DraftKings's business, including through the promotion of the Marketplace. D. 38 ¶¶ 23, 40, 44, 104 (alleging that DraftKings uses the proceeds from NFT sales to develop the "NFT platform," stoke interest in the NFTs through advertising and Reignmakers contests, and potentially for other uses unrelated to the NFTs). The fact that some NFT sales took place after the Marketplace had been established does not necessarily negate pooling of those assets. <u>See</u> <u>Dapper Labs</u>, 657 F. Supp. 3d at 436–37 (rejecting argument that promoter must pool capital from offering of digital assets prior to constructing ecosystem that supports the assets); <u>SEC v. Telegram Grp. Inc.</u>, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020) (explaining that after the launch of blockchain and cryptocurrency, investors' fortunes remain tied together). Although Defendants assert otherwise, the fact that NFT owners do not gain a "participatory interest in a common pool of DraftKings assets" or "draw any profits" from "a single pool" of proceeds is not fatal to Dufoe's claim. <u>See</u> D. 47 at 18. While the schemes described by Defendants are examples of how pooling may occur, pooling can also be based on reinvestments into the ecosystem upon which the investment's value depends. <u>See</u> <u>Dapper Labs</u>, 657 F. Supp.

3d at 438 (concluding that pooling could be plausibly inferred where plaintiff alleged that defendant pooled NFT revenue to raise additional capital and to prevent the collapse of the blockchain platform); Kik, 492 F. Supp. 3d at 178–79.

In reply, Defendants emphasize that DraftKings "co-mingled NFT funds with its vast trove of other revenues" and that the NFT marketplace is not DraftKings's entire business. D. 56 at 11; see D. 47 at 20.  Defendants have not provided the Court a basis on which it can consider their assertion that DraftKings's revenue exceeded $2.24 billion in 2022.  See D. 47 at 10.  This figure is not alleged in the complaint, nor does it appear to be derived from any document of which the Court may properly take judicial notice at this juncture.  Nor do Defendants identify any case law requiring that all proceeds from the NFT sales be kept in a single account and reinvested entirely into the Marketplace to avoid dismissal.  In at least some of the cryptocurrency cases, defendants used the capital from their coin offerings to support other businesses, see Telegram, 448 F. Supp. 3d at 360 (noting that defendant used digital token proceeds to cover 90% of its expenses, including the cost of its messaging app), or held the capital in different accounts associated with different subsidiaries, Ripple Labs, 2023 WL 4507900, at *9.  At least at this stage of litigation, the Court concludes that pooling has been adequately alleged.[3]

As to whether the pooling in this case results in all investors sharing in the risks and profits of an enterprise, the Court notes the following.  Typically, in cases involving fungible

---

[3] Defendants also emphasize that Dufoe "alleges only an *inverse* relationship between Marketplace NFT values and DraftKings' business success."  D. 47 at 18.  To the extent this argument focuses on the link between DraftKings as a promoter and the individual NFT buyers, this argument appears to relate to "strict vertical commonality" (i.e., that "requires that the fortunes of investors be tied to the fortunes of the promoter," Telegram, 448 F. Supp. 3d at 369 (internal citation and quotation marks omitted)) rather than horizontal commonality that the Court concludes has been adequately alleged.  SG Ltd., 265 F.3d at 50 (describing horizontal commonality as "the pooling of assets from multiple investors in such a manner that all share in the profits and risks of the enterprise").

cryptocurrency, the value of every investor's holding in the cryptocurrency rises and falls uniformly with the price of the cryptocurrency, such that the fortunes of all investors are linked together by the success of the underlying blockchain technology and digital ecosystem.  See, e.g., Audet, 605 F. Supp. 3d at 394 (concluding that evidence at trial supported horizontal commonality where defendant's "own promotional materials described its plan to use funds raised via the various ICO stages to create a 'Coin Adoption Fund' that it would use to guarantee a $20 price floor and facilitate widespread adoption, thereby increasing Paycoin's market value"); Telegram, 448 F. Supp. 3d at 369 (explaining that buyers "will possess an identical instrument, the value of which is entirely dependent on the success or failure of the TON blockchain as well as Telegram's enforcement of the lockup provisions on [earlier purchasers]").  In such cases, courts have concluded that horizontal commonality exists even though individual investors may independently buy or sell their holdings.  See Kik, 492 F. Supp. 3d at 179; Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019).

The Court has considered that when NFTs are involved, it is less obvious that risks and profits are shared across all investors because each NFT is definitionally unique or non-fungible.  See D. 47 at 18–19.  Nevertheless, the Court is persuaded that the reasoning of Dapper Labs applies here.  Much like the NFTs in Dapper Labs, the DraftKings NFTs are sold or traded in the Marketplace controlled by DraftKings.  Dapper Labs, 657 F. Supp. 3d at 438.  Thus if DraftKings shut down the Marketplace or interest in the Marketplace evaporated, the value of the NFTs would plausibly drop to zero.  D. 38 ¶¶ 87, 104; Dapper Labs, 657 F. Supp. 3d at 439.  Defendants assert that NFT prices "do not move in tandem" and that they may depend on other factors, D. 47 at 18, including the real-world performance and health of the associated athlete, id. at 18 n.6.  Defendants do not, however, cite to the amended complaint or its attachments in support of their factual

assertion that each NFT's price moves independently.  See id. at 18.  At a later stage of litigation, DraftKings will have the opportunity to present evidence that investors "could make profits or sustain losses independent of the fortunes of other purchasers" and thus negate horizontal commonality.  Audet, 605 F. Supp. 3d at 390 (concluding that evidence supported jury's finding that no horizontal commonality existed where investors who purchased shares in cryptocurrency mining operation could receive very different payouts depending on which the mining pool selected on a given day and whether the investor "boosted" their share).  At present, Dufoe's allegations that DraftKings controls the primary and secondary market for its NFTs and that the NFTs values are dependent on the success of the Marketplace are sufficient to survive a motion to dismiss.[4]  Dapper Labs, 657 F. Supp. 3d at 438–39.

Defendants argue that insofar as DraftKings's NFT transactions are recorded on a public blockchain, rather than its own proprietary blockchain, D. 38 ¶¶ 26, 42, this case is not like Dapper Labs.  D. 47 at 31.  Because the Polygon blockchain exists independently of DraftKings, Defendants state that their NFTs "can persist outside of the Marketplace" even if DraftKings were to dissolve.  D. 47 at 30.  Even if the Court were to accept this assertion, in applying the Howey test, the Court is bound by the "economic realities" of the transaction.  SG Ltd., 265 F.3d at 46. Plaintiffs plausibly alleged that the DraftKings NFTs remained in wallets controlled by DraftKings and that trading took place on the NFT Marketplace.  D. 38 ¶¶ 69–76.  Even though it may have been possible for NFT purchasers to transfer DraftKings NFTs to their personal wallets and presumably thus trade DraftKings NFTs on platforms independent of DraftKings, id. ¶ 33, it is not

---

[4] For the purposes of horizontal commonality, the Court focuses on the link between the popularity and development of the DraftKings's NFT ecosystem and individual purchasers' NFTs.  The existence of Reignmakers contests pitting NFT purchasers against each other for the cash prizes appears to bear upon the third element of Howey.

clear from the amended complaint and documents incorporated therein that transfers to personal wallets ever took place.  See Hays v. Adam, 512 F. Supp. 2d 1330, 1338 (N.D. Ga. 2007) (concluding that although contract between promoter and investors permitted investors to independently acquire advertisers for digital billboards, "the economic reality is that the purchasers exercised little or no control over the billboard" and all investors leased billboards back to promoter); D. 48-1 at 3 (reporting that NFT owners "can't currently withdraw [their] NFTs from DraftKings to store on a crypto wallet and trade [them] elsewhere").  Indeed, DraftKings retained sole discretion to prohibit transfers of NFTs to personal wallets.  D. 38 ¶ 33.  Dapper Labs examined the economic reality created by the minting of the relevant NFTs on a proprietary blockchain, which, as alleged, caused all NFT purchasers to become dependent on the success of the promoter's platform.  Dapper Labs, 657 F. Supp. 3d at 450.  For the purposes of a motion to dismiss, Dufoe has adequately pled that the fortunes of the purchasers of the DraftKings's NFTs are linked to a common enterprise, based on the rules of the Marketplace, which tied the purchasers to DraftKings's platform.

For the reasons stated, the Court concludes that Dufoe has plausibly alleged horizontal commonality.[5]

### 2.    *Reasonable Expectation of Profit from the Efforts of Others*

The final element of the Howey test is divisible into two components and this Court will address each separately.

---

[5] Having concluded that horizontal commonality is satisfied, this Court need not address whether any form of vertical commonality has been adequately pled or whether vertical commonality would satisfy the common enterprise requirement.

a)        Reasonable Expectation of Profits

There are two relevant forms of expected profits:  "(1) capital appreciation from the original investment, and (2) participation in earnings resulting from the use of investors' funds."  SG Ltd., 265 F.3d at 53.  "These situations are to be contrasted with transactions in which an individual purchases a commodity for personal use or consumption."  Id.  The fact that a product has some potential usefulness or intrinsic value will not defeat a reasonable expectation of profit where the primary motivation is profit.  See id. at 54 (comparing United Hous. Found., Inc. v. Forman, 421 U.S. 837, 853, (1975), where "principal attraction" was living in apartment, with SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 351 (1943), where "prospect of exploratory drilling gave the investments 'most of their value and all of their lure'"); see Dapper Labs, 657 F. Supp. 3d at 445 (concluding that allegations that NFTs "were primarily purchased for an investment purpose" were sufficient to survive motion to dismiss given strict limitations placed on how purchasers could consume the NFTs).  Whether there is a reasonable expectation of profit, is an "objective" inquiry, "focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant."  Ripple Labs, 2023 WL 4507900, at *9 (internal citation and quotation marks omitted); see SG Ltd., 265 F.3d at 54 (concluding that defendant's "persistent representations of substantial pecuniary gains" and "profit-related guarantees" satisfied expectation of profit requirement; LBRY, 639 F. Supp. 3d at 216–19 (emphasizing objective nature of inquiry and analyzing defendant's representations to purchasers).  The subjective intent of purchasers is probative, but not determinative.  Dapper Labs, 657 F. Supp. 3d at 442.

Here, Plaintiff's theory of expected profits is capital appreciation.  D. 55 at 9-10, 13.  That is, that the value of existing NFTs is driven upwards if DraftKings maintains investor interest and demand in the Marketplace.  D. 38 ¶¶ 96, 146.  Defendants counter that "even if Plaintiff had some economic interest in purchasing NFTs beyond amassing collectibles or competing in a

Reignmakers contest, it is the 'type of economic interest [that] characterizes every form of commercial dealing.'" D. 47 at 26 (alteration in original) (quoting <u>Forman</u>, 421 U.S. at 858). As an initial matter, the Court notes that as alleged in the amended complaint, Reignmakers was not announced until months after DraftKings first began dropping NFTs. D. 38 ¶¶ 41, 43. Thus early purchasers would not have necessarily been motivated by a desire to compete in Reignmakers. Nevertheless, the Court acknowledges that the fact that a functioning game was created and NFT owners were able to use their NFTs to play distinguishes this case from <u>Dapper Labs</u> and most cryptocurrency cases. <u>Cf.</u> <u>Dapper Labs</u>, 657 F. Supp. 3d at 445 (concluding that defendant's "big plans" to create a mobile basketball game using NFTs "appear to be only speculative uses and are fact questions for which discovery is needed"); <u>Kik</u>, 492 F. Supp. 3d at 180 (noting that consumptive use of cryptocurrency for everyday digital services did not exist at time of distribution and thus concluding that investors were attracted by the financial return). At least one other court within this Circuit, however, has concluded that when a digital asset has both consumptive and speculative uses, a defendant's marketing of the asset as an investment opportunity cannot be defeated by the fact that some purchases were made with consumptive intent. <u>LBRY</u>, 639 F. Supp. 3d at 220–21.

Defendants argue that none of the allegations in the complaint plausibly allege that DraftKings represented to consumers that their NFTs would appreciate in value or their payments would be further invested to generate additional earnings. D. 47 at 24–25. In particular, Defendants urge that all communications regarding the profitability of DraftKings NFTs either originated with third-parties or related to prizes available in Reignmakers competitions rather than investor profit. <u>Id.</u> The Court disagrees.

First, Dufoe asserts that DraftKings provided users a "high-level financial look at each NFT," which encouraged users to view the NFTs as investments.  D. 55 at 29; D. 38 ¶ 58; D. 38-5 at 4–5.  Defendants used a Twitter account to share news on "the biggest risers and fallers" within the NFT Marketplace.  Id. ¶¶ 125–26.  Such marketing had the potential to encourage its audience to view DraftKings NFTs as an investment opportunity and which could be expected to appreciate.  See Dapper Labs, 657 F. Supp. 3d at 444.

Second, the Court notes that Dufoe has identified at least some statements by Kalish, regarding the profit-making potential of the NFTs in the Locker Room chat.  For instance, Dufoe alleges that in Kalish wrote that "[y]ou'll keep the open market profit of yours cards [don't worry].  Maybe at worst this prevents you from making more money right?" and promised "guaranteed scarcity" to a different user.  D. 38 ¶¶ 110, 112.  The Court acknowledges that it is unclear that Dufoe or a significant number of his fellow NFT purchasers, would have viewed statements Kalish made in a chatroom, compared to statements made as on social media posts or mass marketing campaign.  Kalish's statement that users can "keep open market profit" does not guarantee profits for all NFT holders or otherwise trumpet the NFTs value in a manner that would seem to generate undue excitement.  Cf. SG Ltd., 265 F.3d at 54 (concluding that defendant created expectation of profit where it "flatly guaranteed that investments in the shares of the privileged company would be profitable, yielding monthly returns of 10% and annual returns of 215%); Dapper Labs, 657 F. Supp. 3d at 443 (citing to social media posts promoting record sales with "rocket ship," "stock chart" and "money bags" emojis which "objectively mean one thing:  a financial return on investment").  Viewed in the light most favorable to Dufoe, however, Kalish's statement can be read as promising "open market profit" to assuage potential purchasers' concerns with the structure of DraftKings's NFT Marketplace.  Similarly, although Kalish's statement regarding "scarcity"

can be read solely in reference to the importance of different rarity tiers in the Reignmakers contests, his statement can also be plausibly interpreted as creating an expectation of profit for early purchasers of DraftKings NFTs by controlling the available supply. Scarcity guarantees have been found to contribute to a reasonable expectation of profits in analogous cases. See Telegram, 448 F. Supp. 3d at 372 (concluding that promoter created expectation of profit in part by indicating that promoter would reduce the supply of available cryptocurrency if market price fell below half of floor price).

Third, statements made on the podcast hosted by Kalish and Vaynerchuk, encouraged investors to view the NFTs as profitable. Id. ¶¶ 120–22, 124 (alleging that DraftKings published a podcasts containing statements from entrepreneurs regarding NFTs as an investment, including "this will be the summer of people picking up some stuff on fire sale that twenty years from now was like 'oh my god, how much did you pay in August 2022'"). Although these statements were made by Vaynerchuk, who was not a DraftKings employees, the Court notes that the podcast was published by DraftKings, co-hosted by Kalish and posted to the DraftKings YouTube channel. Id. ¶¶ 108, 120.

Moreover, Plaintiffs allege that the public viewed DraftKings NFTs as an investment and purchased NFTs with such intent.[6] The record before the Court shows participants in DraftKings's chatrooms comparing the Marketplace to a stock market and various participants discussing how to make money while buying and selling DraftKings NFTs. Id. ¶¶ 130–32, 134–36. The amended complaint references articles published in late 2022 which advise potential investors on how to make money buying and selling DraftKings NFTs. D. 38 ¶ 116; id. ¶ 119. Individuals interested

---

[6] The Court's focus remains on statements attributable to DraftKings regarding the reasonable expectations of profit, but the subjective perception of investors and market participants has some probative value here. Dapper Labs, 657 F. Supp. 3d at 442; Telegram, 448 F. Supp. 3d at 374.

in cryptocurrency investments also described DraftKings's NFTs as a way to make money.  Id. ¶ 115; id. ¶¶ 121–24.  At least some of these statements clearly referred to the potential to make profit by buying and selling NFTs, rather than using those NFTs to compete in Reignmakers.  See id.  The subjective perspective of buyers and potential buyers as to the profit potential of the DraftKings NFTs has some probative value here and bolsters statements made by Defendants.

Defendants' arguments that Dufoe's and other buyers' expectations of profit were unreasonable or that buyers were motivated by consumptive intent is not necessarily futile. Defendants point to the fact that DraftKings lowered the price of new packs as the season progressed as evidence that it informed purchasers that its NFTs were expected to decrease in value rather than increase, D. 47 at 14, an understanding that several participants in the Marketplace shared, D. 48-3 at 6, D. 48-4 at 6.  In addition, some of the sources cited in the amended complaint suggest at least a mixed consumptive and speculative motive by NFT buyers or warn NFT buyers not to expect easy profit.  See, e.g., D. 48-1 at 3–4; D. 48-3 at 4–6, D. 48-4 at 6.  These contentions do not negate, however, the plausible allegations regarding DraftKings's promises and purchasers' expectation of the same.  Ultimately, these questions are not suited for resolution on a motion to dismiss, where all plausible inferences are drawn in favor of Dufoe.

Accordingly, the Court concludes that Dufoe has plausibly alleged that he was led to reasonably expect profits from his NFT purchase.

b)      Solely from the Efforts of Others

Courts have "declin[ed] to give literal meaning to the word 'solely' in this context, instead holding the requirement satisfied, as long as "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  SG Ltd., 265 F.3d at 55.

19

Here, although the NFTs were not minted on a DraftKings's proprietary blockchain, it is plausibly alleged that the NFTs values were dependent on the success of the DraftKings Marketplace.  D. 38 ¶¶ 96, 104.  As noted above, it is plausible that users did not, and possibly could not, withdraw their NFTs from DraftKings's system and place them in their own wallets. Id. ¶¶ 70, 75; D. 48-1 at 3.  It is also plausibly alleged that DraftKings went to substantial effort to promote its NFT Marketplace and the NFTs themselves, including by offering Reignmakers cash prizes to induce greater participation in the Marketplace.   Id. ¶¶ 104, 108–14, 120–28, 148. Although the NFTs are non-fungible assets whose prices do not uniformly rise and fall, it is still plausible for this Court to infer, and for Plaintiffs to expect, that if DraftKings drummed up additional demand for its NFTs while limiting the supply, that the value of most NFTs in the ecosystem would rise. Id. ¶¶ 104, 110, 141–42.  Inversely, if DraftKings failed to maintain scarcity or generate sufficient interest in the Marketplace, the price of the NFTs would fall.  See D. 48-3 at 4–5 (addressing increase in supply of DraftKings NFTs and explaining why author was not "invested at the moment").  The fact that the NFTs depreciated in value over the course of a single season does not foreclose the plausibility that the arrangement was an investment contract.  See LBRY, 639 F. Supp. 3d at 217–19 (concluding that digital token was investment contract where defendants attempted to assure purchasers of long-term value of investment although prices fell within five months of launch); Dapper Labs, 657 F. Supp. 3d at 447 (concluding that plaintiffs "plausibly allege that the value of [NFTs] in the secondary market depends upon [defendant's] ability to maintain hype and keep purchasers interested in buying and trading [NFTs]").

Defendants argue that the NFTs' value was impacted by other "market forces," including the star power of the represented athletes or the usefulness of the NFT in an upcoming Reignmakers match.  The Court is not entirely convinced that the suitability of an NFT for play in

future Reignmakers contests can be characterized as a "market force" where the structure of the Reignmakers contests allegedly were controlled entirely by DraftKings.  D. 38 ¶ 54.  In any event, the Court considers the primary forces behind the market price of the NFTs a factual question that is not suited for resolution on a motion to dismiss.

In sum, the Court concludes that Dufoe has plausibly pled that DraftKings NFTs were investment contracts, and thus securities within the meaning of the Securities Act and Exchange Act.  Accordingly, the Court denies Defendants' motion to dismiss the amended complaint on the basis that no sale or offer of securities was alleged.

### B.    Private Right of Action Under the Exchange Act

Private rights of action to enforce federal law must be "unambiguously conferred." Allco Renewable Energy Ltd. v. Massachusetts Elec. Co., 875 F.3d 64, 69 (1st Cir. 2017) (quoting Armstrong v. Exceptional Child Center, Inc., 575 U.S. 320, 332 (2015)).  "When a statute does not contain an express private cause of action, courts 'must interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.'"  Id.  at 69 (emphasis omitted) (quoting Alexander v. Sandoval, 532 U.S. 275, 286–87 (2001)).  Here, Defendants argue that Dufoe's "two claims under the Exchange Act," Counts III and IV, should be dismissed because he lacks a private right of action to pursue them.  D. 47 at 32. The two relevant counts of the amended complaint are in fact based on three provisions of the Exchange Act.  First, Dufoe asserts under § 5 of the Exchange Act, 15 U.S.C. § 78e, that DraftKings operated an unregistered exchange.  D. 38 ¶¶ 176–85.  Second, under § 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o, Dufoe asserts that DraftKings acted as an unregistered broker dealer.  Id. ¶¶ 186–96.  With regard to both counts, Dufoe also invokes § 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), to seek recission of his NFT transactions with DraftKings.  Id. ¶¶ 183,

195; <u>see</u> 15 U.S.C. § 78cc(b) (providing that "[e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void").

Defendants offer little in the way of statutory analysis and simply assert that an "overwhelming majority of courts" have decided that no private right of action exists as to § 5 or § 15 of the Exchange Act.  D. 47 at 32-33.  The case law cited by Defendants, is non-binding and largely out of Circuit.  <u>Id.</u>  In the First Circuit, whether § 15 provides a private right of action still may be an open question.  <u>Cooperativa Ahorro y Credito Aguada v. Kidder, Peabody & Co.</u>, 777 F. Supp. 153, 156–57 (D.P.R. 1991); <u>see</u> <u>Landry v. Hemphill, Noyes & Co.</u>, 473 F.2d 365, 368 n.1 (1st Cir. 1973) (noting that "[c]hurning may give rise to a civil cause of action under either § 10(b) or § 15(c) of the Securities Exchange Act"); <u>Sheldon v. Vermonty</u>, 204 F.R.D. 679, 684 (D. Kan. 2001) (citing <u>Landry</u>, 473 F.2d at 368 n.1, as "in the clear minority" of courts that "have recognized a private cause of action under section 15); <u>but see</u> <u>Roberts v. Smith Barney, Harris Upham & Co.</u>, 653 F. Supp. 406, 415 (D. Mass. 1986) (concluding no private right of action exists under § 15(c)(1)).  Moreover, the case law Defendants cite—including cases collected therein—refers to only § 15 of the Exchange Act.  <u>See, e.g.</u>, <u>Asch v. Philips, Appel & Walden, Inc.</u>, 867 F.2d 776, 777 (2d Cir. 1989) (addressing § 15(c)(1)); <u>Fox Int'l Rels. v. Fiserv Sec., Inc.</u>, 490 F. Supp. 2d 590, 611–12 (E.D. Pa. 2007) (addressing § 15(a)(1)).  Few, if any cases, appear to have analyzed whether a private cause of action arises under § 5.  <u>See</u> <u>Risley v. Universal Navigation Inc.</u>, No. 22 CIV. 2780 (KPF), 2023 WL 5609200, at *11 n.9 (S.D.N.Y. Aug. 29, 2023) (noting parties' agreement that no private right of action exists under § 5 or § 15(a)(1) of Exchange Act).

Even if the Court were to accept that no private right of action arises under § 5 or § 15(a)(1), the Court notes that a different result may be reached where a plaintiff invokes § 29(b) to rescind a contract in violation of the Exchange Act, as Dufoe does here.  <u>See</u> <u>Regional Props., Inc. v. Fin.</u>

& Real Estate Consulting Co., 678 F.2d 552, 557–61 (5th Cir. 1982) (concluding that § 29(b) provides private right of action for rescission and that § 29(b) action may be predicated on violation of § 15(a)(1)); Landegger v. Cohen, 5 F. Supp. 3d 1278, 1290–92 (D. Colo. 2013) (concluding that §§ 15, 29(b) together provide both a private right and private remedy).  The Supreme Court has recognized that § 29(b) "confers a 'right to rescind'" and "impl[ies] and equitable cause of action for rescission or similar relief." Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 18–19 (1979) (quoting Mills v. Electric Auto-Lite Co., 396 U.S. 375, 388 (1970)).  Even jurisdictions which reject private actions under § 15(a)(1) alone have recognized that actions for rescission under § 29(b) may be valid.  See, e.g., Knutson v. Harris, No. 3:17-CV-2618-BK, 2018 WL 4281557, at *7 (N.D. Tex. Sept. 6, 2018); see also Weiss v. Altholtz, No. 10 C 02609, 2011 WL 4538459, at *4 (N.D. Ill. Sept. 29, 2011).

Defendants object that Dufoe cannot rely on "decades-old" and "superseded" cases.  D. 56 at 18.  The Court notes that although more recent Supreme Court decisions have "re-calibrat[ed] the approach relevant to implied causes of action," Landegger, 5 F. Supp. 3d at 1288 (citing Sandoval, 532 U.S. 275), the Supreme Court has not overruled Transamerica Mortgage Advisors and Mills.  Moreover, to Defendants' point that the right of action must be "unambiguously conferred," the Court notes that at least one Circuit court has referred to the right of action in § 29(b) as one of "the express rights of action that the [Exchange Act] did create." In re Exxon Mobil Corp. Sec. Litig., 500 F.3d 189, 194 (3d Cir. 2007) (emphasis in original).

For the aforementioned reasons, the Court denies the motion to dismiss the Exchange Act claims (Counts III and IV).

### C.     Control Person Liability

The parties agree that Dufoe's control person claims rise and fall with the underlying claims under the Securities Act and Exchange Act.  D. 47 at 33; D. 55 at 33.  The Court has

concluded that Dufoe's underlying claims are adequately pled and the Defendants do not advance any other reason for dismissal of the control person claims.  Accordingly, the Court denies the motion to dismiss the control person claims (Counts II and V).

Having denied the motion to dismiss, the Court further denies as moot any request by Dufoe to amend the complaint.  D. 55 at 34; see, e.g., In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 55 (D. Mass. 2016) (denying "plaintiffs' informal request for leave to amend" in a securities fraud class action where, instead of "formally request[ing] leave to amend the amended complaint," plaintiffs requested same "on the final page of their thirty-page opposition to defendants' motion to dismiss").

## VI.    Conclusion

For the foregoing reasons, the Court DENIES the motion to dismiss, D. 46.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge