FILED
IN CLERK'S OFFICE

2025 MAY 22  AM II: 09

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**Dufoe v. DraftKings, Inc., et al., Case No. 1:23-cv-10524-DJC**

DISTRICT OF MASS.

# OBJECTION TO PROPOSED SETTLEMENT, PLAN OF ALLOCATION, AND REQUEST FOR ATTORNEYS' FEES

Submitted by:
Cory Siemon
757-286-5905
corysiemon@gmail.com

---

To the Honorable Court:

I respectfully submit this objection as a member of the Settlement Class in *Dufoe v. DraftKings, Inc.* I acquired 543 DraftKings Reignmakers NFTs, including 533 player cards and 10 Field Pass collectibles, through the DraftKings Marketplace at a cumulative cost of approximately $63,000. Following DraftKings' abrupt discontinuation of the Reignmakers ecosystem on July 31, 2024, I suffered immediate and total loss of the core utility and value associated with these assets.

I object to the proposed Settlement, Plan of Allocation, and Fee and Expense Award on the following grounds:

---

## I. The Settlement and Allocation Structure Fail Rule 23 Standards of Fairness

Rule 23(e)(2) requires the Court to consider whether the proposed settlement is fair, reasonable, and adequate to all class members. This requirement extends to both procedure and substance, and includes fiduciary obligations owed by lead counsel and the named plaintiff to all class members, not just a subset.

However, the current Plan of Allocation compensates only users with a calculated "Individual Recognized Loss" (IR) based on formulaic transactional data, ignoring the broader destruction of value tied to DraftKings' platform discontinuation. This results in:

- Full compensation for users who purchased NFTs but did not earn enough in contests to offset those purchases, and thus show net transactional losses;
- Zero compensation for users whose contest winnings exceeded their purchase prices, even if their portfolio composition and contest performance were a direct function of the platform's marketed utility, which has now been entirely eliminated.

This distinction lacks fairness and coherence. All users lost the core utility, liquidity, and functionality of their NFTs. The platform's value proposition was not speculative, it was

2

systematically marketed as a multi-year product. Contest integration, secondary sales, utility tiers, and exclusive access were explicitly priced into the offering. Denying compensation to those who used the platform as intended, particularly those with high-tier or long-held assets, is inequitable.

## II. The Proposed Fund Size is Inadequate Relative to the Harm and DraftKings' Capacity

DraftKings is a publicly traded company valued at approximately $19 Billion, with significant cash reserves and revenue streams from Reignmakers primary NFT drops, contest rake, and secondary market fees. In its first year, Reignmakers generated $52 Million in direct revenue, accounting for around 2 percent of DraftKings' total revenue. In addition, secondary market activity drove approximately $170 Million in transactions, resulting in another $17 Million in fees for DraftKings. Altogether, Reignmakers generated $69 million in year 1 revenue alone. Yet the proposed settlement fund for impacted users is only $10 Million, with up to one third potentially consumed by legal fees.

This fund does not approach a meaningful recovery for most class members and appears designed to resolve liability efficiently for DraftKings rather than provide redress for destroyed value. No valuation expert opinion or audited loss modeling has been made available to justify this low amount.

I was offered a "conclusion payment" of $1,583.87—roughly 2.5% of my investment—despite owning significantly more valuable NFTs (top 10 valued over $10,000 shortly before the shutdown). Offers like this suggest a systematic effort to minimize claims, obscure liabilities, and limit recovery.

## III. The Plan of Allocation is Arbitrary and Discriminatory

The proposed IR formula:
$$IR = (PP + SP) - (SR + CR + PR)$$

This formula excludes future utility loss, uses contest success to disqualify claims, and assigns zero claim value to users who recovered enough contest winnings to break even, despite those contests being an advertised feature and core component of the NFTs' utility.

The result:

- Users who never profited from contests, regardless of portfolio quality or platform use, are prioritized for compensation under the IR formula.

- Users who purchased NFTs and successfully competed, earning enough to offset their purchase price, are assigned $0 in claim value, even though DraftKings' discontinuation erased the future contest access and resale potential that justified those purchases.

This approach rewards disengagement, punishes successful gameplay, and fails to recognize the Reignmakers platform as a multi-dimensional, utility-based product, not merely a passive investment. Even more concerning is the inverse relationship between asset value and claim eligibility: users who won contests likely held the most valuable and effective NFTs, yet those are the very users deemed ineligible for recovery under this formula.

## IV. Due Process and Informed Choice Were Undermined

DraftKings offered voluntary opt-in cash settlements immediately after the Court denied their motion to dismiss. These offers were:

- Ambiguous in legal effect, especially regarding class membership and future rights;
- Unaccompanied by valuation transparency, thus impairing informed choice;
- Incentivized under time constraints (e.g., October 31, 2024 deadline) to force a decision with limited legal guidance.

These tactics further undermine the fairness and transparency expected in class settlements. Many users may accept these offers without understanding their legal rights, especially since no clear disclosures were provided about the implications of accepting compensation.

## V. Proposed Alternative Framework

If the Court chooses to approve a settlement, I urge a revised Plan of Allocation and Settlement structure that includes:

1. Minimum Claim Guarantee for users who retained NFTs through the platform's shutdown and spent over a threshold amount (e.g., $5,000), regardless of IR status.
2. Tier-weighted valuation, where premium or high-rarity NFTs receive higher claim values, given their price and promised access to gated contests and multipliers.
3. Future utility offset, based on an implied 3-year utility horizon of each NFT and supported by marketing claims.
4. Expanded Settlement Fund: At minimum, the Court should require a $50 Million fund to reflect the true scale of affected capital.
5. Fee Award Cap: Legal fees should not exceed 20% of the fund unless the Court is satisfied that extraordinary complexity or effort justifies a larger cut.

These alternative structures restore fairness, encourage trust in future digital finance innovation, and ensure the Court's ruling strengthens, not undermines, compliance with securities law.

## VI. Platform Dismantling as a De Facto Admission

While Defendants officially deny wrongdoing, the immediate shutdown of the Reignmakers platform and DraftKings' NFT Marketplace following the Court's ruling sustaining securities law claims suggests otherwise. This unilateral action obliterated the value of all user-held NFTs and removed any remaining utility or future use. If DraftKings were truly confident that no securities violations occurred, this scorched-earth response would not have been necessary.

In this context, the Settlement should not serve merely as a procedural resolution to minimize risk and cost for DraftKings. Instead, it must appropriately reflect the magnitude of the harm, the potential legal violations at issue, and the precedent this Court sets regarding enforcement of securities law in emerging digital asset ecosystems.

If wrongdoing occurred, and the platform's abrupt dismantling implies this strongly, then the class should receive a remedy that does not disproportionately shield the company from consequences or undervalue the losses suffered by its most engaged participants.

## VII. Conclusion

DraftKings built and operated an unregistered securities platform that solicited hundreds of millions of dollars from retail participants under the guise of gamified utility. When litigation exposed these regulatory violations, DraftKings abruptly terminated the ecosystem and proposed a settlement that offered little more than transactional restitution to the least engaged users, while denying relief to those who were most financially committed and operationally engaged.

This case is not merely about offsetting spreadsheet losses. It is about enforcing securities law and sending a message that multi-billion-dollar companies cannot market, sell, and operate complex financial ecosystems without registration, oversight, or consequence.

The proposed $10 million fund, of which a third may be consumed by legal fees, is grossly inadequate relative to the scale of capital involved, the number of harmed participants, and the seriousness of the legal violations. Comparable regulatory settlements in securities matters (e.g., the $300 million+ penalty in SEC v. Ripple Labs, or other multi-million-dollar cases involving unregistered offerings) have imposed penalties in the hundreds of millions of dollars.

**Settlements of this nature should aim not only to make victims whole but also to deter future misconduct. A settlement that inadequately addresses the scale of the misconduct may risk signaling that violations of securities law are a manageable cost of doing business, carrying minimal consequence rather than meaningful accountability.**

I respectfully urge the Court to reject the current proposal, require a revised and more equitable allocation structure, and, if settlement is warranted, ensure that both the financial penalty and class recovery are commensurate with the scope of the misconduct.

I am prepared to appear, provide documentation, or assist further should the Court require it.

Thank you for considering this objection.

Respectfully submitted,

Cory Siemon
Class Member, Dufoe v. DraftKings
U.S. Military Veteran

