**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JUSTIN DUFOE, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DRAFTKINGS INC., JASON D. ROBINS, JASON K. PARK, and MATTHEW KALISH,<br><br>Defendants. | Case No. 23-cv-10524-DJC<br><br>CLASS ACTION<br><br>Honorable Judge Denise J. Casper |

**LEAD PLAINTIFF'S COMBINED RESPONSE IN SUPPORT OF:**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION (ECF NO. 95)**
**-AND-**
**MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARD (ECF NO. 97)**

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. The Settlement Satisfies the Requirements of Rule 23(e)(2) and Should Be Approved ..... 2

1. The Settlement Was Reached After Significant Proceedings ..... 3

2. The Risk, Complexity, and Expense of Continued Litigation Weighs in Favor of Final Approval ..... 3

3. Comparing the Proposed Settlement to the Likely Result of Continued Litigation Weighs in Favor of Final Approval ..... 3

4. Lead Plaintiff Had Sufficient Information to Make Informed Decisions About Settling This Case ..... 4

5. The Favorable Reaction of the Class Supports Final Approval ..... 4

6. The Plan of Allocation Should Be Approved ..... 5

B. Notice to the Class Satisfied the Requirements of Rule 23 and Due Process ..... 9

C. Lead Plaintiff's Service Award Should Be Approved ..... 9

D. Class Counsel's Attorneys' Fees and Expenses Should Be Approved ..... 10

E. A.B. Data's Fees and Expenses Should Be Approved ..... 12

III. CONCLUSION ..... 12

# TABLE OF AUTHORITIES

## Cases

*In re Asacol Antitrust Litig.*,
No. 15 Civ. 12730, 2017 WL 11475275 (D. Mass. Dec. 7, 2017) ........ 10

*Bezdek v. Vibram USA Inc.*,
79 F. Supp. 3d 324 (D. Mass. 2015) ........ 3

*Blum v. Stenson*,
465 U.S. 886 (1984) ........ 11

*Boardakan Rest. LLC v. Atl. Pier Assocs., LLC*,
33 F. Supp. 3d 543 (E.D. Pa. 2014) ........ 7

*Bussie v. Allmerica Fin. Corp.*,
50 F. Supp. 2d 59 (D. Mass. 1999) ........ 4

*Chechile v. Baystate Health, Inc.*,
No. 22 Civ. 30155-KAR, 2023 WL 8851006 (D. Mass. Dec. 21, 2023) ........ 12

*Com. Union Assur. Co., PLC v. Milken*,
17 F.3d 608 (2d Cir. 1994) ........ 5

*Cunningham v. Brown*,
265 U.S. 1 (1924) ........ 7

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ........ 7

*In re Equity Funding Corp. of Am. Sec. Litig.*,
603 F.2d 1353 (9th Cir. 1979) ........ 5

*Esposito v. American Rental Associates Holdings, Inc., et al.*,
No. 16 Civ. 11797-ADB, ECF No. 106 (D. Mass. June 15, 2018) ........ 11

*Farley v. Henson*,
11 F.3d 827 (8th Cir. 1993) ........ 6

*G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp.*, Inc.,
No. 04 Civ. 01199, 2008 WL 5083700 (D. Nev. Nov. 25, 2008) ........ 6, 7

*In re Hi-Crush Partners L.P. Sec. Litig.*,
12 Civ. 8557, 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ........ 11

*Hill v. State St. Corp.*,
No. 09 Civ. 12146-GAO, 2015 WL 127728 (D. Mass. Jan. 8, 2015) ........ 4, 5

*Kazanjian v. MSM Enters., Inc.*,
No. 93 Civ. 227, 1995 WL 140153 (D. Me. Mar. 15, 1995) ........ 11

*Luna v. Carbonite, Inc.*,
No. 19 Civ. 11662-LTS, ECF No. 193 (D. Mass. May 15, 2024) ........ 11

*Mohanty v. AVID Technology, Inc., et al.*,
No. 16 Civ. 12336-IT, ECF No. 69 (D. Mass. May 2, 2018) ........ 11

*New England Biolabs, Inc. v. Miller*,
No. 20 Civ. 11234-RGS, 2022 WL 20583575 (D. Mass. Oct. 26, 2022) ........ 5

*In re Puerto Rican Cabotage Antitrust Litig.*,
815 F. Supp. 2d 448 (D.P.R. 2011) ........ 4

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
630 F. Supp. 3d 241 (D. Mass. 2022) ........ 10

*Randall v. Loftsgaarden*,
478 U.S. 647 (1986) ........ 6, 7, 8

*In re Relafen Antitrust Litig.*,
231 F.R.D. 52 (D. Mass. 2005) ........ 3

*In re Solodyn Antitrust Litig.*,
No. 14 MDL 2503, 2018 WL 7075881 (D. Mass. July 18, 2018) ........ 10

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
535 F. Supp. 2d 249 (D.N.H. 2007) ........ 3, 5

**Statutes**

15 U.S.C. § 77l(a) ........ 6, 8

**Rules**

Fed. R. Civ. P. 23(c)(2) ........ 9
Fed. R. Civ. P. 23(e)(2) ........ 2

**Other Authorities**

Restatement (First) of Restitution § 157 (1937) ........ 6

## I. INTRODUCTION

The overwhelmingly positive reaction of the Class confirms that the $10,000,000 Settlement and the requested attorneys' fees and expense reimbursement and service award are fair, reasonable, and adequate.[1] Following implementation of the Court-approved Notice Program—which included emailing 1,554,528 potential Settlement Class Members—the Settlement has received a nearly unanimous positive reaction. The deadline for Settlement Class Members to object or opt out was July 9, 2025. Only three limited objections and eight opt outs were received. By contrast, 14,606 potential Settlement Class Members filed timely claims. No Settlement Class Member has objected to the Court-approved Notice Program.

As explained in the opening papers, and confirmed by the continued reaction of the Class, the Settlement is fair, reasonable and adequate. Class Counsel achieved a significant monetary recovery of $10 million for the Class in a first-of-its-kind case dealing primarily with gamified NFTs and whether they qualify as "investment contracts" under the Supreme Court's *Howey* test. This Action was highly risky given the new legal and regulatory environment concerning digital assets, and the particular features of the NFTs at issue. Post-settlement developments in the regulatory framework only serve to underscore that an excellent result was obtained for the Class.

The one-third attorneys' fee requested in this complex and risky case is based on established case law. Despite the percentage, Class Counsel will receive a negative multiplier on their lodestar, which reflects coordinated and efficient efforts to prosecute the Class's claims and ensure the finality of this Settlement. A single Settlement Class Member objects to the attorneys' fee request in cursory fashion, contending that the settlement amount should be larger and the fee

---

[1] With this brief, Lead Plaintiff submits the Supplemental Declarations of Kirby McInerney LLP ("Suppl. Kirby Decl."), Berman Tabacco ("Suppl. Berman Tabacco Decl."), Hannafan & Hannafan, Ltd. ("Suppl. Hannafan Decl."), and G. Dowd Law LLC ("Suppl. Dowd Decl."), and the Supplemental Declaration of Kathleen M. Brauns ("Suppl. Brauns Decl.").

should only be 20%. The objection contains no analysis concerning the significant risks that Class Counsel undertook, no dispute that Class Counsel was well-armed with information when reaching the Settlement, and no dispute that Class Counsel will receive a negative lodestar multiplier.

Three Settlement Class Members, including the fee objector, object to the proposed Plan of Allocation. They oppose their prize winnings being deducted for purposes of calculating their recognized loss, which will be used to determine their pro rata share of the Settlement proceeds. The federal and state securities law rescission remedy, however, mandates this deduction. Simply put, money paid for the investment minus money received from the investment is the measure of rescission. The cash prize contest winnings were indisputably received from the investment.

No Settlement Class Member objects to the Service Award for Lead Plaintiff, whose involvement in this case was extensive. And no Settlement Class Member objects to expenses reasonably incurred in this litigation.

For all the reasons set forth herein, and in the opening papers filed with the Court on June 25, 2025, Plaintiff and Class Counsel respectfully request that the Court approve the Settlement. Overall, the Class's reaction is powerful evidence that confirms the fairness, adequacy, and reasonableness of the Settlement, the Plan of Allocation, and Notice Program, the fee and expense request, and the Service Award.

## II. ARGUMENT

### A. The Settlement Satisfies the Requirements of Rule 23(e)(2) and Should Be Approved

As detailed in the opening papers, and as the overwhelmingly favorable reaction of the Class demonstrates, the Settlement readily satisfies all Fed. R. Civ. P. 23(e)(2) requirements.

#### 1. The Settlement Was Reached After Significant Proceedings

The Settlement is presumptively reasonable because Class Counsel was armed with all information needed to prosecute this case and then bargained at arm's length while in excellent position to evaluate the strengths and weaknesses of their respective claims and defenses. *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007) ("[T]here is a presumption in favor of the settlement if the parties negotiated it at arms-length, after conducting meaningful discovery."). Indeed, no objector or other Settlement Class Member objects to the Settlement on the basis that the Settlement was reached prematurely.

#### 2. The Risk, Complexity, and Expense of Continued Litigation Weighs in Favor of Final Approval

Continued litigation would be complex, risky, and costly. *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 74 (D. Mass. 2005) ("[T]he settlement represents a necessary compromise between inherent risks of [fully litigating the claims] and a guaranteed cash recovery."). No Settlement Class Member disputes the risk faced by the Class and Class Counsel at any stage of these proceedings. This risk has only increased with the shifting regulatory environment concerning digital assets and whether they are securities.

#### 3. Comparing the Proposed Settlement to the Likely Result of Continued Litigation Weighs in Favor of Final Approval

Given the relative strengths and weaknesses of the Class's claims, the $10 million Settlement is reasonable. *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 343 (D. Mass. 2015), aff'd, 809 F.3d 78 (1st Cir. 2015) ("There is a presumption that a settlement is within the range of reasonableness '[w]hen sufficient discovery has been provided and the parties have bargained at arms-length.'"). Although Cory Simeon contends in his objection that $10 million is an inadequate settlement amount, he does so without addressing the serious risks faced by Lead Plaintiff and Class Counsel in this litigation, including those arising from the difficulty of proving the NFTs are

"securities" in the face of shifting guidance from securities regulators and other risks associated with class certification, summary judgment, trials, and appeals. *See* Objection to Proposed Settlement, Plan of Allocation, and Request for Attorneys' Fees Submitted by Cory Simeon ("Simeon Objection") (ECF No. 93).

### 4. Lead Plaintiff Had Sufficient Information to Make Informed Decisions About Settling This Case

Class Counsel had "sufficient information to make a well informed decision" regarding the merits of Class's claims. *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 474 (D.P.R. 2011). Prior to mediation, the Parties had begun discovery and DraftKings had produced significant documents to Class Counsel. No objector or Settlement Class Member contends otherwise.

### 5. The Favorable Reaction of the Class Supports Final Approval

Since the opening papers were filed, the continued reaction of the Class has been overwhelmingly positive. An additional 649 claims were made, bringing the total to 14,606. Suppl. Brauns Decl. ¶ 8. By contrast, only one additional objection was filed, bringing the total to three, and only five additional opt outs were received, bringing the total to eight. *Id.* ¶¶ 9-10. The Class's favorable reaction to the Settlement demonstrates that it is fair, reasonable, and adequate. *See Hill v. State St. Corp.*, No. 09 Civ. 12146-GAO, 2015 WL 127728, at *8 (D. Mass. Jan. 8, 2015) (describing class's reaction as "very positive" where only two objections and ten opt outs were received out of a class of 765,900); *see also Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999) (finding that the "favorable reaction of class to settlement, . . . constitutes strong evidence of fairness of proposed settlement and supports judicial approval" where there were 144 opt outs and 13 objections, accounting for 0.05% and 0.003% of the class respectively).

### 6. The Plan of Allocation Should Be Approved

The proposed Plan of Allocation is fair, reasonable, and adequate, and should be approved. "A plan of allocation is fair and reasonable as long as it has a 'reasonable, rational basis'" and "[i]n determining whether a plan of allocation is fair and reasonable, courts give great weight to the opinion of experienced counsel." *New England Biolabs, Inc. v. Miller*, No. 20 Civ. 11234-RGS, 2022 WL 20583575, at *4 (D. Mass. Oct. 26, 2022) (quoting *Hill*, 2015 WL 127728, at *11).

Here, the proposed Plan of Allocation is supported by the opinions of experienced Class Counsel. Declaration of Anthony F. Fata ("Fata Decl."), filed as Exhibit A to the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation (ECF No. 96-1), ¶¶ 45-50. It was developed in consultation with the assistance of Peregrine Economics, a firm whose principal has over 26 years of experience as a consultant and has served as an expert on hundreds of matters. *Id*. ¶ 48; *see also In re Tyco,* 535 F. Supp. 2d at 262 ("The fact that these independent experts evaluated the plan of allocation and agreed that it was fair weighs strongly in its favor."). The proposed Plan of Allocation does not benefit DraftKings or Class Counsel, but is solely "for the purpose of allocating the available settlement funds among the various claimants." *See In re Equity Funding Corp. of Am. Sec. Litig.*, 603 F.2d 1353, 1364, 1366 (9th Cir. 1979) (affirming settlement plan with offset to ensure class members would "share and share alike" in the settlement based on their "net adjusted losses"). The plan follows the letter and spirit of rescission damages: investment dollars paid minus dollars received. *See Com. Union Assur. Co., PLC v. Milken*, 17 F.3d 608, 615 (2d Cir. 1994) (discussing "rescissory measure of damages" under Section 12(2)).

Mr. Siemon, Keith Downing, and Brad Wyatt argue that the Plan of Allocation should not deduct prize receipts when calculating actual recognized loss. These objectors do not dispute that investing in the NFTs was a prerequisite to participating in the NFT contests; instead they argue

that the contests required additional skill. Formal Objection to Proposed Plan of Allocation Submitted by Keith Downing ("Downing Objection") (ECF No. 94), at 2; Formal Objection to Proposed Plan of Allocation Submitted by Brad Wyatt ("Wyatt Objection") (ECF No. 100), at 3.

The prize receipt offset is fair and reasonable given the remedies available for the Class's claims. Under Section 12(a)(2) of the Securities Act, the purchaser of an unregistered security is entitled "to recover the consideration paid for such security with interest . . . less the amount of any income received thereon." 15 U.S.C. § 77l(a). "This language sets forth a rescissory calculation designed to restore the plaintiff to the position he held before he entered into the wrongful transaction." *Farley v. Henson*, 11 F.3d 827, 837 (8th Cir. 1993). To achieve this end, the Plan of Allocation considers all cash payments made by Settlement Class Members to DraftKings for NFTs that they purchased, and all cash payments received by Settlement Class Members from DraftKings associated with the NFT investment. Fata Decl. ¶ 49. Put simply, the prize receipts in this case were "income received" from the investment's use.

Prize receipts came from NFT investments. In *Randall v. Loftsgaarden*, the Supreme Court relied on the common law Direct Products Rule to interpret what constitutes "income received" under Section 12(2). 478 U.S. 647, 658 (1986). "Under the Direct Product Rule the party seeking rescission is required to only credit the other party with benefits that are the direct product of the property acquired by the party seeking rescission, and are not required to credit tangential or merely collateral benefits." *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp.*, Inc., No. 04 Civ. 01199, 2008 WL 5083700, at *4 (D. Nev. Nov. 25, 2008). A payment is a "direct product" of a security if it is "derived from the ownership or possession of the [security] without the intervention of an independent transaction by the possessor." *Randall*, 478 U.S. at 658 (quoting Restatement (First) of Restitution § 157, cmt. b (1937)) (holding that "tax benefits" were not a "direct product"

of the security "because they accrue only if the tax deductions or credits the investment throws off are combined with income generated by the investor or taxes owed on such income").

Prizes were paid by the issuer and promoter of the NFTs—DraftKings. As the objectors discuss, DraftKings marketed these prizes to Settlement Class Members to entice NFT purchases. *See* Simeon Objection at 1-2. Contest prize receipt money is "income received" from the NFTs, unlike the tax benefits examined in *Randall*. *See* 478 U.S. at 656. Furthermore, because the prizes were paid to Settlement Class Members by DraftKings, the issuer of the NFTs, the prize receipts are distinguishable from federal courts' application of the Direct Product Rule in other contexts finding that income paid to possessors by third parties does not offset damages. *See, e.g., Boardakan Rest. LLC v. Atl. Pier Assocs., LLC*, 33 F. Supp. 3d 543, 554 (E.D. Pa. 2014) (tenant's restaurant profits were not a "direct product" of lease agreement); *G.K. Las Vegas*, 2008 WL 5083700, at *4 (profits derived from subsequent use of sale proceeds with third parties were not a direct product of the sale agreement).

The reasonableness of the proposed Plan of Allocation is further supported by comparison to approaches used in equitably unwinding Ponzi schemes, where "circumstances . . . call strongly for the principle that equality is equity." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924). Courts often require Ponzi scheme winners to share the burdens of the scheme with losers. *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Under a netting approach, amounts transferred by the perpetrator to each investor are offset against the investor's own investment into the scheme. *Id*. Investors with net gains may be forced to disgorge for redistribution to investors with net losses. *Id*. DraftKings' cash prize payments to NFT investors were a significant portion of its proceeds from initial offerings and commissions on secondary market transactions, i.e., money paid by other investors. Fata Decl. ¶ 14. The proposed Plan of Allocation strikes a balance: no disgorgement but a reduction

based on recognized gains. Under the allocation plan proposed by Mr. Downing and Mr. Wyatt, which would not consider prize winnings in calculating recognized loss, a Settlement Class Member who purchased $10,000 in NFTs from DraftKings and won $20,000 in contest prizes (a $10,000 net profit) would receive a larger share of the Net Settlement Fund than a Settlement Class Member who purchased $5,000 in NFTs and won no prizes (a $5,000 net loss). Such a distribution would result in a windfall for net gainers at the expense of other investors who suffered greater economic harm.

The other arguments raised by the objectors do not defeat approval. Mr. Downing and Mr. Wyatt both express concern that prize receipts will be based on DraftKings' own assessments of the fair market value of non-cash prizes. Wyatt Objection at 3; Downing Objection at 4. To the contrary, the prize receipt offset includes only prizes awarded by DraftKings *in cash*. Fata Decl. ¶ 49. Mr. Downing also contends that the prize receipt offset is unfair because Class Members paid taxes on their prize receipts. Downing Objection at 4-5. Tax consequences are neither consideration nor income received for the purposes of calculating recessionary damages under Section 12(2). *See* 15 U.S.C. § 77l(a); *Randall*, 478 U.S. at 658.

Mr. Siemon proposes compensating only skillful investors using a complicated formula accounting for both a "tier-weighted valuation" based on the quality of NFTs held and each NFT's "3-year utility horizon." Siemon Objection at 4. This plan ignores dollars invested and dollars returned—the heart of the rescission model. It would also create a complicated "valuation" process and substantially increase the cost of administering the Settlement (leading to less recovery to the Class) and delay the distribution of Settlement payments to Settlement Class Members. Suppl. Brauns Decl. ¶ 11.

Mr. Siemon also expresses concern with the "conclusion payment" offered to him by

DraftKings after the shuttering of its Marketplace. Siemon Objection at 3-4. This payment is separate from the pending Settlement and is not before the Court. DraftKings, without this Court's or Class Counsel's knowledge or participation, unilaterally decided to shutter its Marketplace and offer conclusion payments to Mr. Simeon and other Settlement Class Members. Although DraftKings attributed its decision to offer these payments to this litigation, DraftKings did not consult with Class Counsel regarding these payments. Fata Decl. at ¶ 32. Disagreement over the amount of the payments is not fairly leveled against this Settlement. The Settlement does not exclude Settlement Class Members who received conclusion payments. The proposed Plan of Allocation deducts such payments when calculating claims: if less was paid to a Settlement Class Member by DraftKings during the closure payments, less will be deducted, and their claim will be higher. *See* Notice of Pendency and Proposed Settlement of Class Action Settlement Hearing, and Right to Appear, attached as Exhibit C to the Declaration of Kathleen M. Brauns Regarding Implementation of the Settlement Notice Program (ECF No. 96-2), attached to the Memorandum in Support of Final Approval as Exhibit B at 11-12.

**B. Notice to the Class Satisfied the Requirements of Rule 23 and Due Process**

As set forth in the opening papers, the Notice Program provided "the best notice . . . practicable under the circumstances including individual notice to all members" identified in the records provided by DraftKings. Fed. R. Civ. P. 23(c)(2)(B). There were no objections to the Notice Program. The large number of claims demonstrates that the program was effective.

**C. Lead Plaintiff's Service Award Should Be Approved**

For the reasons set forth in the Memorandum in Support of the Motion for Fees, Expenses, and Service Award (ECF No. 98), the Service Award is reasonable. There have been *no objections* to Lead Plaintiff's Service Award. In addition to his efforts discussed in the opening papers, Lead Plaintiff also gathered and was ready to produce numerous documents in the discovery phase of

the Action, including pursuant to Rule 26(a)(1). Suppl. Kirby Decl. ¶ 24. Over the course of the Action, Lead Plaintiff sent more than 430 email messages to Lead Counsel focused on various aspects of this case. *Id*. at ¶ 25. For these extensive efforts on behalf of the Class, Lead Plaintiff is entitled to the $50,000 service award. *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 630 F. Supp. 3d 241, 248 (D. Mass. 2022) (approving $50,000 service awards); *In re Solodyn Antitrust Litig.*, No. 14 MDL 2503, 2018 WL 7075881, at *2 (D. Mass. July 18, 2018) (approving $90,000 service awards); *In re Asacol Antitrust Litig.*, No. 15 Civ. 12730, 2017 WL 11475275, at *4 (D. Mass. Dec. 7, 2017) (approving $100,000 service awards).

**D. Class Counsel's Attorneys' Fees and Expenses Should Be Approved**

Since filing the opening papers, Class Counsel dedicated additional time and resources to meet their obligations to the Settlement Class. Suppl. Kirby Decl. ¶ 4. The additional time was necessary to ensure final approval, address Settlement Class Members' inquiries, assist with claim filing, and oversee the claims administration process. *Id*. ¶ 5. The fees and expenses are updated in the supplemental firm declarations. *Id*. ¶ 6. As set forth in those declarations, Class Counsel have incurred a total of $52,792.07 in unreimbursed litigation expenses in order to prosecute this action from inception through July 22, 2025. *Id*. ¶ 20. These expenses were recorded contemporaneously by the respective firms and represent an accurate record of costs and expenses incurred in connection with the prosecution of this Action. *Id*. ¶ 21. These expenses have been advanced by Class Counsel on a fully contingent basis and have not been reimbursed. *Id*. ¶ 22.

Class Counsel have spent 4,421.9 hours litigating this Action from inception through July 22, 2025. *Id*. ¶ 16. Accordingly, the lodestar report in the Motion for Fees, Expenses, and Service Award has grown to $3,584,499.50, when calculated using historical hourly rates (*i.e.*, the rates in effect when the time was billed), resulting in a negative multiplier of 0.93. *Id*. ¶¶ 17-19. If lodestar were calculated using today's billing rates—which is commonly done when years pass between

the time services are rendered and the time a fee for those services awarded—the multiplier would be even lower. *Id*. *See Kazanjian v. MSM Enters., Inc.*, No. 93 Civ. 227, 1995 WL 140153, at *3 (D. Me. Mar. 15, 1995) (noting the absence of any First Circuit "authority requiring the use of strictly historical rates"); *see also In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014) ("[T]he use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation."). This further supports Class Counsel's request for an award of attorneys' fees of $3.33 million, or one-third of the settlement fund, as reasonable. *See Luna v. Carbonite, Inc.*, No. 19 Civ. 11662-LTS, ECF No. 193 (D. Mass. May 15, 2024) (awarding lead plaintiff's counsel attorneys' fees equal to a third of the settlement fund); *Esposito v. American Rental Associates Holdings, Inc., et al*., No. 16 Civ. 11797-ADB, ECF No. 106 (D. Mass. June 15, 2018) (same); *Mohanty v. AVID Technology, Inc., et al.*, No. 16 Civ. 12336-IT, ECF No. 69 (D. Mass. May 2, 2018) (same).

Only Mr. Siemon objects to the attorneys' fee award. He contends that "[l]egal fees should not exceed 20% of the fund," without any analysis of the significant risk counsel undertook. Siemon Objection at 4. Mr. Simeon, however, proposes a $50 million settlement, 20% of which would result in a $10 million fee, triple the amount requested by Class Counsel here. *Id*. More to the point, Class Counsel *did* undertake an extraordinarily complex case in a highly uncertain and constantly changing climate to achieve an excellent recovery for the Class. Far from a "typical" securities class action, this case involved many novel issues, including establishing that "gamified" NFTs were securities. Fata Decl. ¶ 17. *See Blum v. Stenson*, 465 U.S. 886, 899 (1984) (holding that the novelty and complexity of litigation are generally reflected in counsel's lodestar). The fact that

Class Counsel will receive a negative multiplier on their lodestar, notwithstanding their efficiency, only underscores the propriety of the requested fee.

**E. A.B. Data's Fees and Expenses Should Be Approved**

Since the filing of the Motion for Final Approval, A.B. Data has continued to administer the Settlement, and incur out-of-pocket costs and fees for its services. The $108,612.71 reflected in the declaration supporting that Motion (*see* ECF No. 96-2) included all costs and fees incurred through June 23, 2025. The total costs incurred since the Motion for Final Approval will be provided at the Final Approval Hearing scheduled for July 30, 2025. In any event, A.B. Data's fees and costs will not exceed $180,000. Suppl. Brauns Decl. ¶ 13. No Settlement Class Member has objected to this provision. Even if A.B. Data were to incur this entire amount in costs and fees, it would be less than 2% of the $10 million Settlement, which is an allotment consistent with previous administrative expenses awarded in this District. *See Chechile v. Baystate Health, Inc.*, No. 22 Civ. 30155-KAR, 2023 WL 8851006, at *2 (D. Mass. Dec. 21, 2023) (granting up to $50,000 in administrative and fiduciary expenses out of a $500,000 settlement fund).

## III. CONCLUSION

For the reasons set forth above, as well as in Lead Plaintiff's Motion for Final Approval and Lead Counsel's Motion for Fees, Expenses, and Service Award, Lead Plaintiff and Class Counsel respectfully request that the Court: (i) grant final certification of the Settlement Class; (ii) grant final approval of the proposed Settlement and Plan of Allocation; (iii) find that the proposed Plan of Allocation is fair, reasonable, and adequate; (iv) find that notice has been conducted in accordance with the Court-approved Notice Plan; (v) grant Lead Counsel's Motion for Attorneys' Fees, Expenses, and Service Award; and (vi) dismiss with prejudice Lead Plaintiff's and the Settlement Class Members' claims against DraftKings.

Dated: July 23, 2025

Respectfully submitted,

**KIRBY McINERNEY LLP**

*/s/ Anthony F. Fata*
Anthony F. Fata (*pro hac vice*)
Cormac Broeg (*pro hac vice*)
211 West Wacker Drive, Suite 550
Chicago, Illinois 60606
312.767.5180
afata@kmllp.com
cbroeg@kmllp.com

Sarah E. Flohr (*pro hac vice*)
250 Park Avenue, Suite 820
New York, New York 10177
212.371.6600
sflohr@kmllp.com

*Lead Counsel for Lead Plaintiff Dufoe*

**BERMAN TABACCO**
Patrick T. Egan (BBO #637477)
Justin N. Saif (BBO #660679)
1 Liberty Square
Boston, Massachusetts 02109
617.542.8300
pegan@bermantabacco.com
jsaif@bermantabacco.com

*Local Counsel for Lead Plaintiff Dufoe*

**HANNAFAN & HANNAFAN, LTD.**
Blake T. Hannafan (*pro hac vice*)
181 West Madison Street, Suite 4700
Chicago, Illinois 60602
312.527.0055
bth@hannafanlaw.com

*Additional Counsel for Lead Plaintiff Dufoe*

**G. DOWD LAW LLC**
George Dowd (*pro hac vice*)
181 West Madison Street, 47th Floor
Chicago, IL 60602
312.854.8300
george.dowd@gdowd.law

*Additional Counsel for Lead Plaintiff Dufoe*

**CERTIFICATE OF SERVICE**

I, Anthony F. Fata, hereby certify that on July 23, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel via transmission of Notices of Electronic Filing generated by CM/ECF, served upon objectors representing themselves pro se by mail, and will be uploaded to the Settlement website.

Dated: July 23, 2025

*/s/ Anthony F. Fata*
Anthony F. Fata